UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| In re: | |
| LEHMAN BROTHERS SECURITIES ANDERISA LITIGATION | Civil Action 09 MD 2017 (LAK)<br>ECF CASE |
| This Document Applies Only to: | |
| American National Insurance Company et al. v. Richard S. Fuld, Jr., et al., No. 1:09-cv-02363-LAK | <u>JURY TRIAL DEMANDED</u> |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.    NATURE OF THE CASE ......................................................................................... 1

II.   PARTIES ................................................................................................................. 3

III.  JURISDICTION AND VENUE ............................................................................. 11

IV.  FACTS .................................................................................................................... 12

    A.  SECURITIES PURCHASED BY PLAINTIFFS ..................................................... 12

        1.  THE ANTEX PURCHASE (THE "ANTEX BOND") ................................ 12

        2.  THE CIS AND MOODY FOUNDATION PURCHASES ............................... 13

            a.  CIS' PURCHASE OF PREFERRED J STOCK ........................... 13

            b.  THE MOODY FOUNDATION PURCHASES .............................. 14

                i.  CUSIP 52519FFE6 ....................................................... 14

                ii.  CUSIP 52519FFD8 ...................................................... 14

                iii. CUSIP 52519FFB2 ...................................................... 14

                iv.  CUSIP 52517P6B2 ...................................................... 15

                v.  CUSIP 52517PS69 ....................................................... 15

                vi.  CUSIP 524908R44 ....................................................... 15

    B.  MATERIAL MISREPRESENTATIONS ................................................................ 16

        1.  REPO 105 TRANSACTIONS ................................................................. 16

            a.  MARKET PRESSURE REGARDING BALANCE SHEETS AND LEVERAGE ................ 17

            b.  LEHMAN'S REACTION TO RISING CONCERN OVER BALANCE SHEETS AND LEVERAGE ................................................................ 17

                i.  NET LEVERAGE AND MATERIALITY DEFINED ............................. 17

                ii.  DELEVERAGING METHODS ................................................... 18

             c.  STRUCTURE OF A REPO 105 TRANSACTION ........................................ 19

i

       i.   Ordinary Repurchase Agreements.................................................19

       ii.  Repo 105 Transactions and Their Effect on Net Leverage............20

       iii. No Legitimate Business Purpose ........................................20

           a).  Repo 105 Transactions Were More Expensive than Ordinary Repos ..............................................................21

           b).  Repo 105 Transactions Were Undertaken to Artificially and Temporarily Shrink Balance Sheet and Net Leverage Ratios ............................................................21

           c).  No Other Investment Banks Used Repo 105 Transactions........24

   d.  Accounting for a Repo 105 Transaction ...................................24

       i.   Improper Use of SFAS 140 ......................................24

       ii.  Accounting Not Compliant with GAAP...............................26

   e.  Timing and Volume of Repo 105 Transactions...........................27

   f.  Misrepresentations Regarding Repo 105 Transactions .......................31

2.  Lehman's Involvement in the Mortgage Market ...........................35

   a.  Requests for Loan Repurchases .................................37

   b.  Overstated Value of Lehman's Real Estate...........................38

3.  Lehman's Failure to Report Subprime and Alt-A Exposure .....................42

4.  Lehman's Lack of Risk Controls .........................................51

   a.  Lehman Routinely Exceeded Risk Limits...........................52

   b.  Stress Testing Misrepresentations...........................60

   c.  Hedging Misrepresentations .................................61

   d.  Lehman Routinely Exceeded VaR Limits ...........................63

   e.  A Culture of Flagrant Disregard for Risk Procedures .....................63

5.  Lehman's Improper Valuation of Assets...........................65

      a.  Increased level 3 assets ..................................................................66

      b.  Lehman's Over-Valuation of its Assets ....................................70

          i.  Lehman Overvalued Archstone ...........................................70

          ii.  Lehman's Overvaluation of Rent Growth ..........................71

          iii.  Lehman's Overvaluation of Going-in Capitalization Rate ..........72

    6.  Lehman's Failure to Take Appropriate Write-Downs ..................74

    7.  Lehman Failed to Disclose Concentrations of Credit ................75

C.  Ernst & Young: Lehman's Auditor .........................................................77

    1.  E&Y's Knowledge of Lehman's Business Practices ....................78

    2.  E&Y's Knowledge of Repo 105 .................................................78

    3.  E&Y's Misstatements ...............................................................82

    4.  E&Y's Accounting Requirements ..............................................83

      a.  Generally Accepted Auditing Standards ...............................84

      b.  Statements on Auditing Standards ("SAS") ...........................86

D.  Lehman's Various Underwriters .............................................................90

E.  Additional Specific Misrepresentations in SEC Filings ..........................91

    1.  Lehman's 2006 10-K /2007 First Quarter 10-Q .............................91

    2.  Lehman's 2007 Second Quarter 10-Q ........................................91

    3.  Lehman's 2007 Third Quarter 10-Q ..........................................94

    4.  Lehman's 2007 10-K .................................................................97

    5.  Lehman's 2008 First Quarter 10-Q ..........................................101

F.  Scienter ...............................................................................................103

    1.  Defendant Fuld .....................................................................107

2.  DEFENDANT O'MEARA ................................................................ 109

3.  DEFENDANT GREGORY ............................................................... 111

4.  DEFENDANT CALLAN ................................................................. 112

5.  DEFENDANT LOWITT .................................................................. 114

6.  DEFENDANT E&Y ...................................................................... 116

V.    LOSS CAUSATION .................................................................................... 116

VI.   CAUSES OF ACTION ............................................................................... 120

A. EXCHANGE ACT VIOLATIONS ................................................................ 120

1.  VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT ........................ 120

2.  VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT ........................ 122

B. SECURITIES ACT VIOLATIONS ............................................................... 123

1.  VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT ........................... 123

a.  CIS'S CLAIMS ................................................................... 123

b.  ANTEX'S CLAIMS .............................................................. 125

c.  MOODY FOUNDATION'S CLAIMS ......................................... 127

2.  VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT .................. 129

a.  CIS'S CLAIMS ................................................................... 129

b.  ANTEX'S CLAIMS .............................................................. 130

c.  MOODY FOUNDATION'S CLAIMS ......................................... 132

3.  VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT ........................... 134

C. VIOLATIONS OF § 27.01 OF THE TEXAS BUSINESS AND COMMERCE CODE ................ 135

D. VIOLATIONS OF THE TEXAS SECURITIES ACT ............................................ 136

1.  PRIMARY VIOLATIONS OF THE TEXAS SECURITIES ACT ......................... 136

a.   CIS's Claims ........................................................................... 136

b.   ANTEX's Claims ..................................................................... 136

c.   Moody Foundation's Claims .................................................. 137

2.   Aiding & Abetting Violations of the Texas Securities Act ...................... 138

a.   CIS's Claims ........................................................................... 138

b.   ANTEX's Claims ..................................................................... 139

c.   Moody Foundation's Claims .................................................. 141

3.   Control Person Liability ..................................................... 142

E.   Common Law Fraud ............................................................................. 143

F.   Conspiracy ............................................................................................. 143

G.   Negligent Misrepresentation .............................................................. 144

1.   CIS's Claims ........................................................................... 144

2.   ANTEX's Claims ..................................................................... 145

3.   Moody Foundation's Claims .................................................. 147

VII.   PRAYER ...................................................................................................... 148

<u>SECOND AMENDED COMPLAINT[1]</u>

Plaintiffs American National Life Insurance Company of Texas, Comprehensive Investment Services, Inc. and The Moody Foundation file this Second Amended Complaint alleging as follows:

## I. NATURE OF THE CASE

1.      Lehman Brothers Holdings Inc. ("Lehman"),[2] one of the nation's largest and most well-respected banking institutions, crashed on September 15, 2008, when it filed for Chapter 11 bankruptcy, due, in large part, to its ever growing balance sheet and leverage problems coupled with a lack of liquidity and adequate capital.   Although Lehman (including its officers, directors, auditors and underwriters) was fully aware of the potentially insurmountable problems it faced, no one disclosed those problems to the investing public but instead sought to conceal the truth about Lehman's financial condition from the market.   As a result of the false and misleading statements made by Lehman, its officers, directors, auditors and underwriters, investors, such as the Plaintiffs, suffered losses on their Lehman securities.

2.      Lehman's offering materials, including its Forms 10-K and 10-Q contained untrue statements and omitted material facts concerning Lehman's financial condition.

3.      The offering materials specifically failed to include information concerning Lehman's extensive and improper use of "Repo 105" transactions which temporarily removed

---

[1] The filing of this Second Amended Complaint requires Plaintiffs to obtain leave of court or written consent of all of the parties. Fed. R. Civ. P. 15(a)(2).  On March 17, 2010, this Court issued Pretrial Order No. 14 permitting the Class Action Plaintiffs in *In re Lehman Brothers Equity/Debt Securities Litigation*, No. 08-cv-55523 (LAK) to amend their Second Amended Complaint after the Lehman Bankruptcy Examiner issued his Report in the Lehman Brother's bankruptcy case.  In light of Pretrial Order No. 14, and in conjunction with the letters on behalf all Defendants to this Court dated August 4, 2011, August 12, 2011 and August 16, 2011, Plaintiffs understand that all Defendants have consented in writing to this Second Amended Complaint and/or the Court has tacitly granted Plaintiffs leave to file this Second Amended Complaint.  If this Court deems that consent has not been granted or that this Court has not granted leave to file this Second Amended Complaint, the Plaintiffs will file a formal Motion for Leave to File its Second Amended Complaint.

[2] Lehman is expressly not named as a defendant in this action.

1

tens of billions of dollars from its balance sheet at the end of financial reporting periods.[3] These transactions, though booked as sales of assets, were really nothing more than regular repurchase agreements. There was no legitimate business purpose to the transactions and no United States law firm was willing to issue a "true sale" opinion regarding Repo 105 transactions. Nevertheless, as quarters came to a close, Lehman ramped up the use of these sham sales in an effort to artificially reduce its balance sheet and leverage positions.

4. In a Repo 105 transaction, Lehman sold $105 worth of assets for $100 in cash. Lehman then used the cash to pay down other liabilities so that there was a reduction in the amount of assets contained on its balance sheet. The reduction of assets had the temporary effect of lowering Lehman's net leverage ratio and distorting Lehman's true financial condition because Lehman essentially unwound the transaction days later.

5. With the sale came an obligation to repurchase the asset (usually a few days after the end of a reporting period) for $100 plus a stated amount of interest. Although Lehman recorded the sale on its balance sheet, it did not disclose the corresponding obligation to repurchase and instead booked a $5 derivative asset from its future right (not disclosing that it was, in fact, an obligation) to purchase $105 worth of assets for $100.

6. Repo 105 transactions misled the investing public about the true financial condition of Lehman and overstated Lehman's ability to absorb losses or write-downs.

7. Although Lehman hyped its leadership position in the mortgage backed securities market, Lehman never disclosed to investors the true obligations it had with respect to those

---

[3] Lehman used two substantially similar transactions: Repo 105s which involved fixed income securities and required a five percent overcollateralization and Repo 108s which involved equity securities and required an eight percent overcollateralization. In this complaint, unless otherwise noted, the term "Repo 105" will refer to both Repo 105 and 108 transactions.

securities nor did it disclose to investors that it was highly exposed to risk due to the subprime mortgages it securitized.

8.      Further, Lehman misled the investing public about its risk management.   Lehman and Defendants continuously touted, publically, the company's superior risk management system but internally, consistently and repeatedly disregarded, exceeded or simply redefined its own risk limitations.  Additionally, Lehman failed to disclose concentrations of credit.

9.      Lehman improperly valued its mortgage securities and misled the investing public concerning those assets.  Lehman intentionally overvalued its Archstone asset by incorporating outdated and inflated rent growth, as well as an inaccurate going-in capitalization rate, into the value of that portfolio.  Lehman's overvalued Archstone portfolio gave its investors a false impression of the value of Lehman's real estate portfolio and the value of its holdings. Additionally, Lehman failed to take appropriate write-downs on its assets.

10.     Based on misrepresentations made by Lehman and the Defendants concerning each of the above matters, which were contained in SEC filings, prospectuses, registration statements and statements to the investing public, Plaintiffs purchased Lehman securities.

## II. PARTIES

11.     American National Life Insurance Company of Texas ("ANTEX") is a Texas insurance company with its principal place of business in Galveston, Texas.

12.     Comprehensive Investment Services Inc. ("CIS") is a Nevada corporation with its principal place of business in League City, Texas.

13.     The Moody Foundation ("Moody Foundation") is a charitable trust operating as a private foundation with its principal place of business in Galveston, Texas.

14.     Defendant Richard S. Fuld, Jr. ("Fuld") joined Lehman in 1969, became Chief Executive Officer ("CEO") in November 1993 and was named Chairman of the Board of Directors in April 1994.  At all relevant times, Fuld was chair of Lehman's Executive Committee, which had the authority, in the intervals between meetings of the Board of Directors, to exercise all the authority of the Board of Directors, except for those matters solely reserved to the full Board of Directors by Delaware law or Lehman's Restated Articles of Incorporation.

15.     Defendant Christopher M. O'Meara ("O'Meara") served as Lehman's Chief Financial Officer ("CFO"), Controller, and Executive Vice President from 2004 until December 1, 2007. Defendant O'Meara joined Lehman in 1994 and prior to serving as CFO he operated as Lehman's Global Controller.  As Controller, Defendant O'Meara supervised Lehman's internal accounting programs and procedures.  Beginning on December 1, 2007, Defendant O'Meara served as the head of Worldwide Risk Management.  In his role as the head of Risk Management, Defendant O'Meara was also responsible for supervising Lehman's risk mitigation strategies and procedures.

16.     Defendant Joseph M. Gregory ("Gregory") was, at all relevant times, Lehman's President, Chief Operating Officer ("COO") and a member of Lehman's Executive Committee until forced to resign in June 2008. Defendant Gregory, in his role as COO, oversaw the day-to-day management of Lehman's operations.  He previously served as head of Lehman's Equities and Fixed Income Divisions, including Lehman's mortgage business, and head of Lehman's Global Equities Division, including the overall equities business.

17.     Defendant Erin Callan ("Callan") became Lehman's CFO and Executive Vice President on December 1, 2007, and served in that position until she resigned in June 2008. Defendant Callan joined Lehman in 1995 and served in various capacities, including head of the

4

Investment Banking Global Hedge Fund Coverage Group, the Global Finance Solutions Group, and Global Finance Analytics Group. Defendant Callan was a member of Lehman's Executive Committee from December 2007 until June 2008.

18.     Defendant Ian Lowitt ("Lowitt") joined Lehman in 1994. He replaced Defendant Callan as CFO in June 2008 and also served as the Co-Chief Administrative Officer. Defendant Lowitt oversaw Lehman's finance organization, including Financial Controls, Investor Relations, Planning and Analysis, Product Control, Tax and Treasury.     In his role as Co-Chief Administrative Officer, he was responsible for the global oversight of Risk Management. Defendant Lowitt was also a member of Lehman's Executive Committee and Lehman's Risk Committee from June 2008 until the date of Lehman's bankruptcy filing.

19.     Defendants Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Roland A. Hernandez, Henry Kaufman, and John D. Macomber (the "Director Defendants") were each, at all relevant times, a director of Lehman. Each of the Director Defendants signed the May 16, 2005 Registration Statement and Prospectus and the May 30, 2006 Registration Statement and Prospectus, pursuant to which Plaintiffs purchased Lehman securities, as more fully set forth below. Further each of the Director Defendants signed Lehman's 2005, 2006 and 2007 10-Ks, which were filed with the SEC.

20.     Defendant Banc of America Securities LLC ("BOA") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.    BOA underwrote and sold depositary shares of Lehman Preferred Series J Shares. BOA also underwrote and sold Lehman Notes, Series D.

21.     Defendant Citigroup Global Markets Inc. ("CGMI") is a subsidiary of Citigroup Inc., a financial services institution that, through it subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. CGMI underwrote and sold depositary shares of Lehman Preferred Series J Shares. CGMI also underwrote and sold Lehman Notes, Series D and Lehman's 6.875% Subordinated Notes due 2037.

22.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Merrill Lynch underwrote and sold depositary shares of Lehman Preferred Series J Shares.

23.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Morgan Stanley underwrote and sold depositary shares of Lehman Preferred Series J Shares. Morgan Stanley also underwrote and sold Lehman Notes, Series D.

24.     Defendant SunTrust Robinson Humphrey Inc. ("SunTrust") is a financial services institution that, through it subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. SunTrust underwrote and sold depositary shares of Lehman Preferred Series J Shares.

25.     Defendant UBS Securities LLC ("UBS") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. UBS underwrote and sold depositary shares of Preferred Lehman Series J Shares.

6

26.     Defendant Wells Fargo Securities LLC ("Wells Fargo") is a financial services institution that, though its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Wells Fargo underwrote and sold depositary shares of Lehman Series J Shares.

27.     Defendant RBC Capital Markets Corporation f/k/a/ RBC Dain Rauscher Inc. ("RBC Capital Markets") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. RBC Capital Markets underwrote and sold depositary shares of Lehman Preferred Series J Shares. RBC also underwrote and sold Lehman Notes, Series D and Lehman's 6.875% Subordinated Notes due 2037.

28.     Defendant Wachovia Capital Markets LLC ("Wachovia") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Wachovia underwrote and sold depositary shares of Lehman Preferred Series J Shares.

29.     Defendant BNY Mellon Capital Markets LLC f/k/a Mellon Financial Markets LLC, ("Mellon") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Mellon underwrote and sold Medium-Term Notes, Series G.  Mellon also underwrote and sold Medium-Term Notes, Series H.

30.     Defendant Williams Capital Group L.P. ("Williams Capital") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.     Williams Capital underwrote and sold Medium-Term Notes, Series H.

7

31.     Defendant Calyon Securities (USA) Inc. ("Calyon") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Calyon underwrote and sold Medium-Term Notes, Series H.

32.     Defendant Unicredit Capital Markets Inc. f/k/a HVB Capital Markets Inc. ("HVB") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  HVB underwrote and sold Medium-Term Notes, Series H.

33.     Defendant Daiwa Securities SMBC Europe, Ltd. ("Daiwa"), registered in London, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Daiwa underwrote and sold Medium-Term Notes, Series H.

34.     Defendant BBVA Securities Inc. ("BBVA") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  BBVA underwrote and sold Medium-Term Notes, Series I and Lehman's 6.875% Subordinated Notes due 2037.

35.     Defendant BNY Capital Markets Inc. ("BNY") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  BNY underwrote and sold Medium-Term Notes, Series I and Lehman's 6.875% Subordinated Notes due 2037.

36.     Defendant SunTrust Robinson Humphrey Inc. f/k/a SunTrust Capital Markets Inc. ("SunTrust Capital") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate

8

entities. SunTrust Capital underwrote and sold Medium-Term Notes, Series I and Lehman's 6.875% Subordinated Notes due 2037.

37.     Defendant RBS Securities, Inc. f/k/a Greenwich Capital Markets Inc. a/k/a RBS Greenwich Capital ("Greenwich") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. RBS Greenwich Capital is the marketing name for the securities business Greenwich Capital Markets Inc. Greenwich underwrote and sold Medium-Term Notes, Series I and Lehman's 6.875% Subordinated Notes due 2037.

38.     Defendant A.G. Edwards & Sons, Inc. (acquired by Wachovia Securities On October 1, 2007 which was acquired by Wells Fargo on December 31, 2008) ("A.G. Edwards") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. A.G. Edwards underwrote and sold Lehman Notes, Series D.

39.     Defendant Charles Schwab and Co., Inc. ("Charles Schwab") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Charles Schwab underwrote and sold Lehman Notes, Series D.

40.     Defendant Edward D. Jones & Co., L.P. ("E.D. Jones") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. E.D. Jones underwrote and sold Lehman Notes, Series D.

41.     Defendant Fidelity Capital Markets Services ("Fidelity Capital Markets") is a financial services institution that, through its subsidiaries and divisions, provides commercial and

9

investment banking services and commercial loans to corporate entities. Fidelity Capital Markets underwrote and sold Lehman Notes, Series D.

42.     Defendant Incapital LLC ("Incapital") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Incapital underwrote and sold Lehman Notes, Series D.

43.     Defendant Muriel Siebert & Co., Inc. ("Muriel Siebert") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Muriel Siebert underwrote and sold Lehman Notes, Series D.

44.     Defendant Raymond James & Associates, Inc., ("Raymond James") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Raymond James underwrote and sold Lehman Notes, Series D.

45.     Defendant UBS Investment Bank ("UBS Investment") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. UBS Investment underwrote and sold Lehman Notes, Series D.

46.     Defendant Wachovia Securities (acquired by Wells Fargo Securities on December 31, 2008) ("Wachovia Securities") is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Wachovia Securities underwrote and sold Lehman Notes, Series D.

47.     Defendant Ernst & Young LLP ("E&Y"), a limited liability partnership based in Delaware, is a public accounting firm. E&Y served as Lehman's auditor at all times relevant to

this complaint and the claims alleged. E&Y audited Lehman's financial statements, provided written reports regarding the internal controls of Lehman and reviewed Lehman's quarterly financial results.

48.     The Defendants described in ¶¶14-18 are referred to collectively as the "Officer Defendants." The Defendants described in ¶¶20-28 are referred to collectively as "Preferred J Underwriter Defendants." The Defendants described in ¶¶29-33 are referred to collectively as "ANTEX Underwriter Defendants." The Defendants described in ¶¶20, 21, 23, 27 and 34-46 are referred to as "Moody Foundation Underwriter Defendants."

### III.     JURISDICTION AND VENUE

49.     This action arises under the laws of the United States including Sections 10(b) and 20 of the Exchange Act, and Sections 11, 12(a) (2) and 15 of the Securities Act and involves federal questions. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332, Section 27 of the Exchange Act, 15 U.S.C. § 78aa and Section 22 of the Securities Act, 15 U.S.C. §77v. Moreover, this Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367.

50.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Section 22 of the Securities Act 15 U.S.C. § 77v (a); and 28 U.S.C. § 1391(b).

51.     The Court has personal jurisdiction over all Defendants in connection with the acts alleged in this complaint. Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. All Defendants are residents of the United States and have availed themselves of federal securities laws. The

Court has jurisdiction over the parties and subject matter of this cause, and has jurisdiction to grant all relief requested by Plaintiffs.

## IV.  FACTS

**A.    SECURITIES PURCHASED BY PLAINTIFFS**

52.    Each of the Plaintiffs in this matter purchased Lehman securities, all of which lost significant value, pursuant to or traceable to offering materials that contained material untrue statements and omissions.   When Plaintiffs purchased their respective Lehman securities, Lehman appeared to be a well-capitalized investment bank seeking to raise additional capital to pursue business opportunities.  In reality, at the time of each of the offerings, Lehman's reported balance sheets were misstated and its 10-Qs and 10-Ks contained numerous material misstatements and/or omissions.

53.    Plaintiffs purchased the following Lehman securities relying on the total mix of financial information about Lehman:

| CUSIP | Purchaser | Purchase/Settle/Trade Date | Face Value |
|---|---|---|---|
| 52517PG96 | ANTEX | 04/25/2006 | 1,500,000 |
| 52517PS69 | Moody Foundation | 01/29/2007 | 1,000,000 |
| 52517PS69 | Moody Foundation | 02/07/2007 | 1,000,000 |
| 52517P6B2 | Moody Foundation | 09/20/2007 | 2,500,000 |
| 52519FFB2 | Moody Foundation | 01/07/2008 | 1,000,000 |
| 52519FFD8 | Moody Foundation | 01/22/2008 | 1,000,000 |
| 52519FFE6 | Moody Foundation | 01/28/2008 | 1,000,000 |
| 52520W317 | CIS | 02/05/2008 | 9,000,000 |
| 52520W317 | CIS | 02/05/2008 | 1,000,000 |
| 524908R44 | Moody Foundation | 04/25/2008 | 1,000,000 |

**1.    THE ANTEX PURCHASE (THE "ANTEX BOND")**

54.    On May 16, 2005, Lehman filed a Registration Statement and Prospectus announcing the terms of its medium-term notes, Series H ("2005 Prospectus").  The 2005

12

Prospectus expressly incorporated by reference Lehman's 10-K, 10-Q and 8-K forms filed after May 16, 2005, but before the effective date of the particular offering. On April 25, 2006, Lehman issued a pricing supplement to the Series H notes. According to the pricing supplement, Lehman intended to raise $500 million through the sale of its notes priced at 99.863. ANTEX purchased securities pursuant to this Prospectus, pricing supplement and all publically available financial information at the time of the purchase, including but not limited to the publically available financial information incorporated by reference into the 2006 Prospectus and/or pricing supplement. The ANTEX Bond was underwritten by the ANTEX Underwriter Defendants.

## 2. THE CIS AND MOODY FOUNDATION PURCHASES

55. Each purchase by CIS and The Moody Foundation was made pursuant to an offering under Lehman's May 30, 2006 Shelf Registration Statement and Prospectus ("2006 Prospectus") and a supplemental prospectus or pricing supplement to that 2006 Prospectus. The 2006 Prospectus expressly incorporated by reference Lehman's 10-K, 10-Q and 8-K forms filed after May 30, 2006, but before the effective date of the particular offering.

### a. CIS' PURCHASE OF PREFERRED J STOCK

56. On February 5, 2008, Lehman filed its prospectus supplement announcing the terms of its Preferred J stock to be issued pursuant to the 2006 Prospectus. According to the prospectus supplement, Lehman intended to sell 66 million shares of Preferred J Securities at $25 per share, for a total value of $1.65 billion. Due to overallotment allowances granted to underwriters, 75,900,000 shares were issued for a total value of $1.8975 billion. The Preferred J Underwriter Defendants underwrote the offering and the underwriters received approximately $59 million in fees. CIS purchased Preferred J Securities pursuant to the 2006 Prospectus, prospectus supplement and all publically available financial information at the time of the

purchase, including but not limited to the publically available financial information incorporated by reference into the 2006 Prospectus and/or prospectus supplement.

### b.   THE MOODY FOUNDATION PURCHASES

#### i.   CUSIP 52519FFE6

57.     On January 31, 2008, Lehman filed a pricing supplement to its Series D Notes pursuant to the 2006 Prospectus. According to the pricing supplement, Lehman intended to raise $43,895,000. Moody Foundation purchased Series D Notes pursuant to the 2006 Prospectus, the January 31, 2008 pricing supplement and all publically available financial information at the time of the purchase, including but not limited to the publically available financial information incorporated by reference into the 2006 Prospectus and/or the January 31, 2008 pricing supplement.

#### ii.   CUSIP 52519FFD8

58.     On August 2, 2007, Lehman filed a Prospectus supplement regarding Series D Notes pursuant to its 2006 Prospectus.  Thereafter, on January 24, 2008, Lehman filed a pricing supplement for those Series D Notes.  According to the pricing supplement, Lehman intended to raise $35,909,000.   Moody Foundation purchased Series D Notes pursuant to the 2006 Prospectus, the August 2, 2007 prospectus supplement, the January 24, 2008 pricing supplement and all publically available financial information at the time of the purchase, including but not limited to the publically available financial information incorporated by reference into the 2006 Prospectus, August 2, 2007 Prospectus supplement and/or January 24, 2008 pricing supplement.

#### iii.   CUSIP 52519FFB2

59.     On January 10, 2008, Lehman filed a pricing supplement for its Series D Notes pursuant to the 2006 Prospectus.  According to the pricing supplement, Lehman intended to raise

$14,311,000.  Moody Foundation purchased Series D Notes pursuant to the 2006 Prospectus, the January 10, 2008 pricing supplement and all publically available financial information at the time of the purchase, including but not limited to the publically available financial information incorporated by reference into the 2006 Prospectus and/or January 10, 2008pricing supplement.

### iv.   CUSIP 52517P6B2

60.    On September 20, 2007, Lehman filed a pricing supplement for its medium-term notes, Series I pursuant to the 2006 Prospectus.  According to the pricing supplement, Lehman intended to raise $5,000,000.  Moody Foundation purchased Medium-Term Notes, Series I pursuant to the 2006 Prospectus, the September 20, 2007 pricing supplement and all publically available financial information at the time of the purchase, including but not limited to the publically available financial information incorporated by reference into the 2006 Prospectus and/or September 20, 2007 pricing supplement.

### v.    CUSIP 52517PS69

61.    On January 16, 2007, Lehman filed a pricing supplement for its medium-term notes, Series I, pursuant to the 2006 Prospectus.  According to the pricing supplement, Lehman intended to raise $10,000,000.  Moody Foundation purchased Medium-Term Notes, Series I pursuant to the 2006 Prospectus, the January 16, 2007, pricing supplement and all publically available financial information at the time of the purchase, including but not limited to the publically available financial information incorporated by reference into the 2006 Prospectus and/or January 16, 2007 pricing supplement.

### vi.   CUSIP 524908R44

62.    On July 13, 2007, Lehman filed a free writing prospectus for its 6.875% subordinated notes due 2037, pursuant to the 2006 Prospectus.  According to the free writing

prospectus, Lehman intended to raise $1,500,000,000. Moody Foundation purchased 6.875% subordinated notes pursuant to the 2006 Prospectus, the July 13, 2007 free writing prospectus and all publically available financial information at the time of the purchase, including but not limited to the publically available financial information incorporated by reference into the 2006 Prospectus and/or July 13, 2007 free writing prospectus.

63.    These notes were underwritten by the Moody Foundation Underwriter Defendants.

**B.    MATERIAL MISREPRESENTATIONS**

64.    Lehman made various misrepresentations in its financial reportings (2005 10-K, 2006 10-K, First, Second and Third Quarter 10-Qs, 2007 10-K and First Quarter 2008—all of which were incorporated by reference into the Registration Statements, Prospectus(es) (base and supplemental) and/or Pricing Supplements including the SEC filings incorporated by reference therein, pursuant to which Plaintiffs purchased the securities described above) including the following:

**1.    REPO 105 TRANSACTIONS**

65.    Repo 105 Transactions were artificial sales of assets used by Lehman to distort its true financial condition. On March 11, 2010, Anton R. Valukas, the appointed Examiner in Lehman's bankruptcy matter (the "Examiner"), issued a report detailing his findings as to the events surrounding Lehman's collapse (the "Examiner's Report").[4] The Examiner's Report states:

> The Examiner has investigated Lehman's use of Repo 105
> transactions and has concluded that the balance sheet manipulation
> was intentional, for deceptive appearances, had a material impact
> on Lehman's net leverage ratio, and because Lehman did not
> disclose the accounting treatment of these transactions, rendered

---

[4] References to the Examiner's Report are cited at "ER at ___."

> Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and misleading.

ER at 912-13, fn 3497.

### a.   MARKET PRESSURE REGARDING BALANCE SHEETS AND LEVERAGE

66.    In late 2006 to mid-2007, rating agencies began to place an emphasis on total balance sheet and leverage positions, as opposed to profit and loss statements, when making determinations and reporting on the health of an investment bank.   This focus intensified throughout 2007 and into 2008 with the breakdown of the securitization and structured finance markets. Rating agencies and analysts became even more concerned with the quality and quantity of an investment bank's inventory.   In response to this new focus, Lehman began to look for ways to shrink its own balance sheet and leverage positions in order to obtain favorable recommendations from analysts and ratings from rating agencies.

### b.   LEHMAN'S REACTION TO RISING CONCERN OVER BALANCE SHEETS AND LEVERAGE

### i.   NET LEVERAGE AND MATERIALITY DEFINED

67.    Traditionally, leverage is defined as the ratio between a company's assets and its equity.   Lehman, however, focused on what it called "net leverage," a tool it described as "a more meaningful, comparative ratio for companies in the securities industry."   *See, e.g.* Lehman's 2007 10-K at page 63, 2006 10-K at page 29, First Quarter 10-Q for 2007 at page 61. Lehman defined net leverage as "net assets divided by tangible equity capital."   Net assets were total assets minus 1) cash and securities segregated and on deposit for regulatory and other purposes, 2) collateralized lending agreements, and 3) identifiable intangible assets and good will.   Tangible equity capital included stockholders' equity and junior subordinated notes but excluded identifiable intangible assets and good will.   Net leverage was supposed to be a

17

comparison of Lehman's riskiest assets to the equity available to meet losses sustained by those assets.

68.     Net leverage was so important to Lehman that "any item individually, or in the aggregate, that move[d] net leverage by 0.1 or more" was deemed, by Lehman and its auditor, E&Y, to be material.[5]

### ii.   DELEVERAGING METHODS

69.     A company can reduce its leverage ratio by either raising equity or selling assets. Although Lehman wanted and needed to deleverage, neither of these options was appealing.

70.     Raising equity, according to Defendant Fuld, was not an option because it caused perception issues and would not address Lehman's underlying problems (*i.e.* its illiquid, "sticky" inventory positions created, in large part, due to Lehman's exposure to the subprime real estate mortgage market, discussed below). ER at 825-26.

71.     However, selling assets was problematic for Lehman as well since many of its inventory positions were "sticky"—they were weighted toward mortgages and loans which, in the face of the decline in the housing market coupled with the credit crises, could only be sold (if at all) at substantial losses.[6]   Not only would fire-selling sticky assets have a negative impact on Lehman's earnings, it would also have had a negative impact on the market's confidence in the valuations Lehman placed on its remaining assets by revealing that Lehman had "a lot of air in [its] marks." ER at 737.

72.     Thus, faced with two unappealing avenues to deleverage, Lehman instead turned to transactions it had traditionally used in the past: Repo 105s. Lehman realized that increased use of Repo 105 at quarter end would avoid the substantial losses and reputational risk it was

---

[5] Typically 0.1 amounted to $1.8 billion.
[6] Sticky assets were those assets that were illiquid and difficult to sell without incurring substantial losses.

sure to encounter by exiting large mortgage backed securities and sub-prime loan positions at significant discounts. "Repo 105 offer[ed] a low cost way to offset the balance sheet and leverage impact of current market conditions."[7]

### c.   STRUCTURE OF A REPO 105 TRANSACTION

73.    Although Repo 105 transactions were substantially similar to the ordinary repurchase agreements used routinely by most investment banks, Lehman's use of Repo 105 transactions caused its financial reportings, which were incorporated by reference into the registration statements, prospectuses, supplemental prospectuses and pricing supplements pursuant to which Plaintiffs purchased Lehman securities, to be materially false and misleading.

### i.   ORDINARY REPURCHASE AGREEMENTS

74.    In an ordinary repurchase agreement (a "repo"), an investment bank transfers securities inventory to a lender in return for cash.  At the end of the agreement period, the investment bank repays the cash amount, plus some interest, and the lender returns the securities. Repurchase agreements are, in substance, short-term borrowings or financing transactions and are properly accounted for in that way. ER at 768-69.  In fact, Lehman accounted for ordinary repos as secured lendings or financing transactions.  ER at 769.  In those transactions, the transferred securities remained on Lehman's balance sheet and the incoming cash increased Lehman's net assets thereby increasing its net leverage. Lehman specifically stated in all of its Forms 10-Q and 10-K from the fourth quarter of 2006 until the first quarter of 2008 that repurchase agreements were treated as collateralized agreements or financing transactions for financial reporting purposes. *See, e.g.* 2007 10-K at page 97, 2006 10-K at page 85.  However, despite this clear statement, Lehman did not treat all repurchase agreements as collateralized agreements or financings transactions.

---

[7] February 10, 2007 Lehman document entitled, "Proposed Repo 105/108 Target Increase for 2007."

ii.   REPO 105 TRANSACTIONS AND THEIR EFFECT ON NET
      LEVERAGE

75.     Repo 105 transactions were structurally identical to ordinary repurchase agreements, but Lehman treated Repo 105 transactions as sales of financial assets for accounting and financial reporting purposes.

76.     In a Repo 105 transaction, like an ordinary repurchase agreement, Lehman transferred securities to a repo lender in exchange for cash.  Again like an ordinary repurchase agreement, at the end of the term of the agreement, Lehman transferred cash, plus interest, back to the repo lender in exchange for the transferred securities.  However, unlike an ordinary repo, Lehman actually removed the transferred security from its balance sheet.  Although the incoming cash from the transfer was booked on Lehman's balance sheet, arguably having no net effect on the net leverage ratio, Lehman actually used that cash to pay down other liabilities.  Lehman's two step process of removing the "sold" asset and then using the cash from that "sale" to pay down other liabilities, had the effect of lowering Lehman's net leverage ratio.[8]

77.     This lower net leverage was artificial and misleading, however, because the effect was only temporary—within days after the close of the financial reporting period, Lehman was obligated to repurchase the Repo 105 assets.  The lower net leverage was also misleading because it did not disclose that Repo 105 transactions had no legitimate business purpose and were used solely to give the appearance of a smaller balance sheet and lower net leverage ratios.

iii.   NO LEGITIMATE BUSINESS PURPOSE

78.     Unlike ordinary repurchase agreements, which are legitimately used to obtain short term financing for a company, Lehman's Repo 105 transactions had no legitimate business purpose.

---

[8] In a Repo 105 transaction, Lehman's tangible equity capital remained unchanged.  Thus any reduction to Lehman's net assets lowered its net leverage ratio.

a).   REPO 105 TRANSACTIONS WERE MORE EXPENSIVE THAN
ORDINARY REPOS

79.     Lehman could have entered into ordinary repurchase agreements with respect to
the assets it transferred in Repo 105 transactions at a much lower cost.    The use of Repo 105s
was a more expensive proposition for Lehman for several reasons.

80.     First, as explained below, in order for Lehman to treat the transaction as a "sale"
it had to take a bigger "haircut" on the transaction.  Haircut refers to the difference between the
value of the transferred security and the cash received.  Typically, in Repo 105 transactions,
Lehman transferred $105 worth of securities for $100 in cash—meaning the haircut would be
approximately 5%.  Most ordinary repurchase agreement haircuts topped out around 2%.
Lehman, then, had to "fund the additional haircut by either dipping into its equity or through
long term borrowings." ER at 879.

81.     Second, counterparties to Repo 105 transactions were aware that Lehman wanted
to use the transaction for off balance sheet purposes and therefore charged a higher interest rate
on the transaction than it would on an ordinary repo.  ER at 879-82.

82.     There was no legitimate business purpose to expend extra funds for what was,
structurally, the same transaction as an ordinary repo except to artificially lower Lehman's net
leverage ratio and give an appearance of a smaller balance sheet.

b).   REPO 105 TRANSACTIONS WERE UNDERTAKEN TO
ARTIFICIALLY AND TEMPORARILY SHRINK BALANCE
SHEET AND NET LEVERAGE RATIOS

83.     Indeed, numerous Lehman executives admitted that Repo 105s were engaged in
solely to obtain balance sheet relief. On April 3, 2008, Bart McDade ("McDade"), Lehman's
Head of Equities from 2005 to 2008 and Chief Operating Officer from June to September of
2008, was questioned in an email about his familiarity with the fact the Repo 105 transactions

21

were used to reduce Lehman's net balance sheet. McDade responded, "I am very aware . . .it is another drug we r on." ER at 860.

84.    Other Lehman employees confirmed that the use of Repo 105s lacked a true business purpose:

- Kaushik Amin, former Head of Liquid Markets in Lehman's Fixed Income Division ("FID") stated that Lehman reduced its net balance sheet at quarter-end by engaging in tens of billions of dollars of Repo 105 transactions and that the assets in those transactions were returned to Lehman's balance sheet within a number of days after the opening of the new quarter. ER at 868.

- Clement Barnard, former Chief Financial Officer for FID said that Lehman relied upon Repo 105 for "balance sheet relief" near the end of financial quarters to reach internal balance sheet targets. ER at 868.

- Murtaza Bhallo, former Business/Risk Manager for Lehman's Principal Transactions Group Liquid Markets referred to Repo 105 as "an accounting gimmick." ER at 869.

- John Feraca, who ran Lehman's Secured Funding Desk in Lehman's Prime Services Group which was responsible for executing Repo 105 transactions, stated to the Examiner, "Senior people felt urgency only in the sense of trying to get to their targets because the Finance Division wanted to report as healthy a balance sheet and a leverage ratio as possible for investors, creditors, rating agencies and analysts." He further stated, "It was universally accepted throughout the entire institution that Repo 105 was used for balance sheet relief at quarter end." ER at 761, 868.

- Joseph Gentile, former FID Chief Financial Officer, stated to the Examiner "unequivocally that no business purpose for Lehman's Repo 105 transactions existed other than obtaining balance sheet relief." ER at 882. Despite this belief, Gentile attempted to have the Repo 105 "cap" raised in February of 2007. Among the reasons he advocated for raising the limits was the fact that, "Repo 105 offer[ed] a low-cost way to offset the balance sheet and leverage impact of current market conditions" (because Lehman would have significant difficulty exiting large positions in its Real Estate and Mortgage Groups without incurring substantial losses and encountering reputational risk). ER at 828, 882.

- Edward Grieb ("Grieb"), former Global Financial Controller, told Joseph Gentile that Repo 105 transactions were a "tool that could be used to reduce Lehman's net balance sheet." ER at 883. Grieb further concluded that one consequence of Lehman's use of Repo 105 transactions was a lower net leverage ratio. ER at 867.

- Martin Kelly ("Kelly"), another former Global Financial Controller, told the Examiner that "the only purpose or motive for [Repo 105] transactions was reduction in the balance sheet" and that "there was no substance to the transactions." Kelly further admitted that if an analyst or member of the investing public were to read Lehman's Forms 10-Q and 10-K from cover to cover, taking as much time as needed, he "would have no transparency into [Lehman's] Repo 105 program." ER at 868.

- Mitchell King, former head of Lehman's United States Agencies trading desk, who compiled lists on a weekly basis of collateral available for Repo 105 transactions stated that no business purpose existed for Repo 105 transactions other than to reduce Lehman's net balance sheet. ER at 869.

- Matthew Lee, a former Lehman Senior Vice President, Finance Division, in charge of Global Balance Sheet and Legal Entity Accounting stated that Lehman sold assets through Repo 105 transactions approximately four or five days before the close of a quarter and then repurchased them approximately four or five days after the beginning of the next quarter in order to "reverse engineer" its net leverage ratio for its publicly filed financial statements. ER at 868.

- Defendant Lowitt stated Lehman used Repo 105 as a way to "sell down assets" to meet internal balance sheet targets. ER at 867. Defendant Lowitt was aware of Lehman's use of Repo 105 transactions for "many years" and was aware that Lehman used Repo 105 to "meet balance sheet targets." ER at 914-15. Defendant Lowitt stated to the Examiner that "Repo 105 transactions used only liquid inventory" and that Defendant O'Meara was involved in setting limits on Lehman's Repo 105 usage. ER at 915.

- Michael McGarvey, former Senior Vice President, FID, sent an email in July of 2008 stating that "[Repo 105] is basically window-dressing. We are calling repos true sales based on legal technicalities. The exec committee wanted the number cut in half." ER at 860.

- Marie Stewart, former Head of Lehman's Accounting Policy Group, considered Repo 105 transactions "a lazy way of managing the balance sheet as opposed to legitimately meeting balance sheet targets at quarter end." ER at 869.

- Paolo Tonucci, former Treasurer, stated that Lehman used Repo 105 transactions to reduce its balance sheet. ER at 761.

85.     If the only purpose in using Repo 105 transactions was to manipulate Lehman's balance sheet and financial reportings, there was no legitimate business purpose involved in the practice.

23

### c). NO OTHER INVESTMENT BANKS USED REPO 105 TRANSACTIONS

86.     Tellingly, Lehman personnel believed that Lehman was the only investment bank using Repo 105 transactions to shrink balance sheet and improve net leverage. Lehman could not have believed that Repo 105 transactions had legitimate business purposes if it was the only investment bank on the street using the mechanism.

### d. ACCOUNTING FOR A REPO 105 TRANSACTION

#### i. IMPROPER USE OF SFAS 140

87.     In September 2000, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standard 140 ("SFAS 140"). Under SFAS 140, "a transfer of financial assets . . . in which the transferor surrenders control over those financial assets shall be accounted for as a sale to the extent that the consideration other than beneficial interests in the transferred assets is received in exchange." ER at 773. A transferor only surrendered control over financial assets if 1) the assets were isolated from the transferor, 2) the transferee had the right to pledge or exchange the assets without condition and 3) the transferor did not maintain effective control over the transferred asset through an agreement that entitled and obligated the transferor to repurchase the assets before their maturity. ER at 773. Thus, SFAS 140 permitted the transferor to account for the transaction as a sale of financial assets with a forward purchase agreement.

88.     A transferor is deemed to have lost control over an asset if it did not receive sufficient cash to purchase "substantially all" of the same or similar securities in the open market in the event of the transferee's default. SFAS at paragraph 49, 218. Thus, the bigger the haircut on a transaction, the less likely it is that the transferor retained control over the asset because it would not have received sufficient cash to purchase "substantially all" of the same or similar

securities in the open market. FASB determined that a transferor is able to repurchase "substantially all" of its assets when the assets' value does not exceed 102% of the cash received from the transferee. SFAS at paragraph 218. Lehman specifically required that Repo 105 assets be "sold" at 105% (hence the Repo 105 name) of their value in order to receive a "sale" treatment under FAS 140. Based on the approximately 5% haircut that Lehman took on the transactions, Lehman determined that it relinquished control of the transferred asset and therefore accounted for the transaction as a sale with a forward purchase agreement.

89. However, although Lehman recorded a forward purchase agreement along with the "sale" of the transferred asset, Lehman did not disclose that it was actually <u>required</u> (as opposed to merely having the right) to repurchase that asset (usually within a matter of weeks after the end of the financial reporting period). Instead of reporting this <u>obligation</u> to the investing public, Lehman instead reported a $5 derivative asset for its future right to purchase $105 worth of assets for $100. Lehman recorded its obligation to repurchase as an asset on its books, thereby causing false and misleading statement to be incorporated into its financial reportings.

90. Additionally, because Lehman treated Repo 105 transactions as a sale with a forward purchase agreement, Lehman's statement (contained in all of its Forms 10-Q and 10-K from the fourth quarter of 2006 until the first quarter of 2008) that repurchase agreements were treated as collateralized agreements or financing transactions for financial reporting purposes was false and misleading. *See, e.g.* 2007 10-K at page 97, 2006 10-K at page 85.

### ii.   ACCOUNTING NOT COMPLIANT WITH GAAP

91.     Lehman's use of SFAS 140 to classify Repo 105 transfers as sales with forward purchase agreements was not compliant with the generally accepted accounting principles ("GAAP").

92.     The overarching purpose of GAAP is to ensure the fair presentation of a company's financial condition. Technical compliance with an SFAS provision does not mean that a financial statement is GAAP compliant if the financial statement is not fairly presented. GAAP requires more than technical compliance with accounting provisions. ER at 964-66.

93.     Lehman's use of SFAS 140 and the consequential representations made in offering materials and public filings (Forms 10-Q and 10-K) did not present the public with a fair presentation of its financial condition. Lehman did not disclose its use of Repo 105 transactions. Lehman did not disclose that Repo 105 transactions were consummated shortly before the end of the reporting period solely to give the appearance of a smaller balance sheet and lower leverage positions for reporting purposes only. Lehman did not disclose that shortly after the end of the reporting period the "sold" assets would be placed back on Lehman's balance sheet. Lehman did not disclose that Repo 105 transactions had no legitimate business purpose. Lehman did not disclose the expense associated with undertaking Repo 105 transactions as opposed to ordinary repurchase agreements. Lehman did not disclose that Repo 105 transactions had the effect of temporarily (and artificially) lowering its net leverage ratio so that its appearance of being able to absorb losses from illiquid assets was a sham. Lehman did not disclose that it recorded Repo 105 transactions as sales rather than financings. In fact, Lehman affirmatively—and falsely—stated that it recorded securities sold under agreement to repurchase as financings—a materially false and misleading statement given its treatment of Repo 105 transactions as sales.

26

94.     Lehman's use of FAS 140 led to misleading financial statements and hid its true financial status.

      e.     **TIMING AND VOLUME OF REPO 105 TRANSACTIONS**

95.     Lehman began its use of Repo 105 transactions in 2001, shortly after SFAS 140 was issued in September of 2000.  After several months of meetings regarding the new financial accounting standard, Lehman and its independent auditor E&Y approved the use of Repo 105 transactions to help manage its balance sheet.  ER at 765.   Lehman published an internal Repo 105 Accounting Policy to govern the firm wide use of the transactions.  The policy noted that Repo 105 transactions, unlike other ordinary repo transactions, were treated as "sales of inventory and forward agreements to repurchase."  ER at 776.  The policy also admitted that Lehman could not obtain a "true sale" opinion under United States law so the transactions would be executed through LBIE, Lehman's European Broker-Dealer in London.[9]  ER 776.

96.     Additionally, as of July 2006, Lehman implemented internal limits on the amount of Repo 105 transactions that could be employed.  Defendant O'Meara was among those at Lehman who were responsible for setting those limits.  From July 2006 until, at least, the end of 2007, Lehman was not, based on its own rules, supposed to engage in more than $22 billion in Repo 105 transactions. However, from at least year-end 2006 until the time of its bankruptcy, Lehman consistently, and without fail, exceeded that $22 billion internal cap.  Even when Grieb and Defendant O'Meara "temporarily" agreed to a three billion dollar increase in limits (to $25 billion) in January or February of 2008, Lehman still exceeded—even doubled—its internal Repo 105 cap. ER at 889, 1002-1003.

---

[9] Lehman was able to obtain a "true sale" opinion from Linklaters, a London based law firm, under English law. However, that true sale opinion contained a number of conditions, including that parties and counterparties had to be subject to English law and that all assets used in Repo 105 transactions must be sited in the United Kingdom.

**TABLE 1** (UNDISCLOSED) REPO 105 USAGE (IN BILLIONS)

| | Nov. 30, 2006 (2006 10-K) | Feb. 28, 2007 (1Q07) | May 31, 2007 (2Q07) | Aug. 31, 2007 (3Q07) | Nov. 30, 2007 (2007 10-K) | Feb. 29, 2008 (1Q08) | May 31, 2008 (2Q08) |
|---|---|---|---|---|---|---|---|
| Repo 105 Usage | 24,519 | 27,284 | 31,943 | 36,407 | 38,634 | 49,102 | 50,383 |

97.    The sheer volume of Lehman's use of Repo 105 usage, which temporarily removed tens of billions of dollars from Lehman's balance sheet by showing "sales" of assets, caused Lehman's 2006 10-K, first, second and third quarter 2007 10-Qs, 2007 10-K and the first and second quarter 2008 10-Qs to materially misrepresent its net leverage position by 9% -- 15%.

**TABLE 2**    EFFECT OF REPO 105 USAGE ON NET LEVERAGE

| | Nov. 30, 2006 (2006 10-K) | Feb. 28, 2007 (1Q07) | May 31, 2007 (2Q07) | Aug. 31, 2007 (3Q07) | Nov. 30, 2007 (2007 10-K) | Feb. 29, 2008 (1Q08) | May 31, 2008 (2Q08) |
|---|---|---|---|---|---|---|---|
| Reported Net Leverage | 14.5 | 15.4 | 15.4 | 16.1 | 16.1 | 15.4 | 12.1 |
| Net Leverage if 105Transactions were treated as normal repos | 15.8 | 16.8 | 16.9 | 17.8 | 17.8 | 17.3 | 13.9 |
| Percent Change | 9% | 9% | 9% | 10% | 10% | 12% | 15% |

98.    Based on its use of Repo 105 transactions, Lehman reported net leverage ratios that were 1.3 to 1.9 points lower than what the net leverage ratio would have been had Lehman properly accounted for the transactions.  Although this difference is far greater than Lehman's .1x net leverage materiality threshold, Lehman failed to disclose the existence, nature and substance of Lehman's Repo 105 practice.

99.     Not only was the volume of Lehman's 105 transactions problematic, the timing of the transactions was structured to coordinate with financial reporting periods so that the benefit of the "sales" would be reflected in public filings.

100.    Despite internal rules that directed Lehman employees to maintain a consistent use of Repo 105 transactions throughout a reporting period, Lehman's Repo 105 usage spiked at quarter- and year-end.[10]

---

[10] Lehman had two guidelines in place regarding the timing and volume of Repo 105 transactions: (1) the 80/20 rule which stated that monthly Repo 105 usage should be maintained at 80% of the usage at that month's end and (2) the 120% rule which stated that the monthly or quarterly spikes in usage should not exceed 120% of daily average use for that month. Lehman did not follow these guidelines. ER at 872-876.

TABLE 3  TIMING OF REPO 105/108 TRANSACTIONS

| DATE | TOTAL REPO 105/108 USAGE |
|---|---|
| November 30, 2006 (Year End) | $24.519 billion |
| February 28, 2007 (Quarter End) | $27.284 billion |
| Early March 2007 | Approximately $22 billion |
| May 31, 2007 (Quarter End) | $31.943 billion |
| Early August 2007 | Approximately $22 billion |
| August 31, 2007 (Quarter End) | $36.407 billion |
| October 30, 2007 | $20.072 billion |
| November 30, 2007 (Year End) | $38.634 billion |
| February 15, 2008 | $24.217 billion |
| February 29, 2008 (Quarter End) | $49.102 billion |
| March 12, 2008 | $26.685 billion |
| March 14, 2008 | $12.750 billion |
| April 29, 2008 | $24.899 billion |
| May 31, 2008 (Quarter End) | $50.383 billion |
| July 15, 2008 | 16.828 billion |

101.   These spikes had the effect of lowering Lehman's net leverage ratio just in time for financial reportings.  By substantially increasing its volume of Repo 105 transactions just before quarter- and year-ends, Lehman and the Defendants omitted material information about, and misled investors concerning, Lehman's true financial condition.

### f.   MISREPRESENTATIONS REGARDING REPO 105 TRANSACTIONS

102.    As described above, Lehman never disclosed in its 2006 and 2007 Forms 10-K, in its first, second or third quarter 200710-Qs or its first quarter 2008 10Q the following material facts:

- The existence and accounting of Repo 105 transactions which rendered Lehman's balance sheet and net leverage positions misleading as discussed above.

- The amount of Repo 105 transactions Lehman engaged in which misled the investing public by misrepresenting Lehman's true balance sheet and net leverage positions as discussed above.

- The fact that Lehman was required to repurchase securities it "sold" mere days after the end of financial reporting periods.

- The timing of Lehman's Repo 105 transactions which misled the investing public regarding the accuracy of Lehman's balance sheet and net leverage positions, as discussed above.

- The fact that the "balance sheet relief" afforded by Repo 105 transactions was only temporary which misrepresented Lehman's stated purpose of deleveraging its inventory positions.

- The effect of Repo 105 transactions on Lehman's net leverage which misrepresented Lehman's ability to handle losses from retained assets.

- The true balance sheet and leverage positions of Lehman which would have given the investing public the true picture of Lehman's financial condition.

- The fact that Lehman treated securities sold under repurchase agreements in Repo 105 transactions as sales rather than financings in direct contradiction to affirmative statements contained in its Forms 10-K and 10-Q.

103.    Lehman made the following filings, which were incorporated by reference into the Registration Statements, Prospectus(es)(base and supplemental) and/or Pricing Supplements pursuant to which Plaintiffs purchased the securities outlined above:

**Table 4:  SEC Filings and Defendant Signatories**

| DATE | FILING | PERIOD ENDING | DEFENDANT SIGNATORIES |
|---|---|---|---|
| 02/13/2007 | 10-K 2006 ("2006 10-K") | November 30, 2006 | Fuld, O'Meara, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, Macomber |
| 04/09/2007 | 10-Q (for the First Quarter 2007) ("1Q07") | February 28, 2007 | O'Meara |
| 7/10/2007 | 10-Q (for the Second Quarter 2007) ("2Q07") | May 31, 2007 | O'Meara |
| 10/10/2007 | 10-Q (for the Third Quarter 2007) ("3Q07") | August 31, 2007 | O'Meara |
| 01/29/2008 | 10-K 2007 ("2007 10-K") | November 30, 2007 | Fuld, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, Macomber |
| 04/08/2008 | 10-Q (for the First Quarter 2008) ("1Q08") | February 29, 2008 | Callan |

104.    All of Lehman's Forms 10-Q and 10-K from the fourth quarter of 2006 until the first quarter of 2008 stated that Lehman treated repurchase agreements as "collateralized agreements" or "financing transactions" for financial reporting purposes. See, e.g. 2007 10-K at page 97, 2006 10-K at page 85. This statement was misleading because it failed to inform investors that Lehman improperly treated tens of billions of dollars in Repo 105 transactions as sales with forward purchase agreements. Lehman booked its "right" to repurchase securities sold in a Repo 105 transaction as an asset on its financial statements, instead of disclosing that it was actually *required* to repurchase the securities days after the end of a financial reporting period.

105.    All of Lehman's Forms 10-Q and 10-K from the fourth quarter of 2006 until the first quarter of 2008 also claimed to disclose all of Lehman's material off-balance sheet arrangements. However, these statements were misleading because Lehman did not disclose that

32

Lehman had engaged is tens of billions of dollars of off-balance sheet commitments through the use of Repo 105 transactions.

106. All of Lehman's Forms 10-Q and 10-K from the fourth quarter of 2006 until the first quarter of 2008 contained representations that Lehman's financial statements were prepared in conformity with GAAP along with certifications from Defendants Fuld, Callan and/or O'Meara that there were no untrue statements of material fact (or omitted fact) in the reports. Defendants Fuld, Callan and/or O'Meara further certified that reports fairly presented, in all material aspects, the financial condition of Lehman. These statements were misleading because Lehman's treatment of Repo 105 transactions did not conform to GAAP and the financial statements omitted the material fact that Lehman engaged in tens of billions of dollars in Repo 105 transactions that materially altered its net leverage positions and had no business purpose.

107. Additionally, each of Lehman's 10-Q's for the first, second and third quarter of 2007 and the first quarter of 2008 contained a "Report of Independent Registered Public Accounting Firm" signed by E&Y. Each of those reports stated E&Y reviewed Lehman's consolidated financials in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") and that E&Y was "not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles." These statements were materially misleading because E&Y was aware of Lehman's use of Repo 105 transactions and the fact that Lehman failed to disclose its use of Repo 105 transactions or the impact that those transactions had on its net leverage and balance sheet. The statements were additionally misleading because Lehman's failure to disclose its Repo 105 transactions violated GAAP.

108.     Lehman's 2006 10-K and its 2007 10-K contained a "Report of Independent Registered Public Accounting Firm" signed by E&Y.  Each of those reports certified that Lehman's financial results for each respective year were prepared in accordance with GAAP and that they fairly represented, in all material aspects, the financial condition and operation of Lehman.  E&Y also represented that it conducted its audit of Lehman's financials in accordance with GAAS.  However, these statements were misleading because E&Y's audit of Lehman did not comply with GAAS standards and   Lehman's financial results were not prepared in accordance with GAAP because they failed to disclose Lehman's use of Repo 105 transactions to artificially shrink its balances sheet and temporarily lower its net leverage ratios.

109.     Item 303 of SEC Regulation S-K required Lehman to disclose certain information in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of its SEC filings.  Specifically, Item 303 required Lehman to discuss and analyze material trends, events, demands, commitments and uncertainties that would likely result in a material increase or decrease in its liquidity and/or capital resources, including "changes between equity, debt and any off-balance sheet financing arrangements."  Item 303(a)(1), (2)(ii), (3) and (4)(i).   SEC Guidance states that disclosure is required where the reported financial information does not indicate future financial condition and where unusual events and transactions do not reveal apparent trends.  ER at 971.  For the reasons stated above, by failing to include any mention of its Repo 105 transactions in its MD&A discussion in any of its Forms 10-Q or 10-K from the fourth quarter of 2006 until the first quarter of 2008, Lehman materially misled the investing public about its true financial condition.

110.    Additionally, the following information was misrepresented in specific filings:

|  | 2006 10-K | 1Q07 10-Q | 2Q07 10-Q | 3Q07 10-Q | 2007 10-K | 1Q08 10-Q |
|---|---|---|---|---|---|---|
| Net Leverage | 14.5 | 15.4 | 15.4 | 16.1 | 16.1 | 15.4 |
| Securities Sold Under Agreements to Repurchase | $133.547 billion | $153.332 billion | $137.948 billion | $169.302 billion | $181.732 billion | $197.128 billion |

111.    The net leverage reported in each of the above filings was misleading because it failed to take into account the Repo 105 transactions for that period. See Table 1, *supra*. Had the Repo105 transactions been included in the net leverage calculations, the Lehman's true net leverage would have been materially higher for that period. See Table 2, *supra*.

112.    Additionally, the reported figures regarding securities sold under agreements to repurchase was misleading because they did not include the corresponding amount of Repo 105 transactions (see Table 1, *supra*) which Lehman "sold" but agreed to repurchase shortly after the end of the reporting period.

113.    Lehman's Repo 105 transactions were not disclosed to the investing public. "If an analyst or member of the investing public were to read Lehman's Forms 10-Q and 10-K from cover to cover, taking as much time as she or he needed, 'they would have no transparency into [Lehman's] Repo 105 program.'" ER at 854.  Nevertheless, Lehman's Repo 105 program had a material impact on Lehman's financial reporting.

### 2.    LEHMAN'S INVOLVEMENT IN THE MORTGAGE MARKET

114.    Lehman's primary involvement in the real estate market was in the securitization of mortgages.[11]   Importantly, when a securitizer, such as Lehman, sold a mortgage backed

---

[11] Mortgage borrowers are placed into three major categories: (1) prime, (2) subprime and (3) Alt-A. Subprime mortgage loans are issued to borrowers with low or deficient credit scores who do not qualify for conventional or

security ("MBS") it often agreed, unbeknownst to investors, to buy back any non-performing loans.

115.   Lehman was a leader in the collateral debt obligation market ("CDO"). It held more than $38.9 billion in commercial mortgages in 2007 and originated $60 billion in commercial mortgages that same year. As of March 2008, Lehman had more commercial mortgage holdings than any other firm.

116.   Lehman also originated approximately $60 billion in residential mortgages during 2006 and $47 billion during 2007. Aiding it in obtaining those mortgages were two Lehman-related companies: Aurora and BNC.

117.   To aid it in acquiring mortgages to securitize, Lehman acquired Aurora, a residential loan originator and servicer of predominately Alt-A mortgages, in 2003. Although Aurora characterized its mortgages as Alt-A loans, upon information and belief, such loans were more appropriately characterized as subprime. Lehman purchased BNC in 2004 as its "subprime origination platform." Upon information and belief, BNC sold roughly 75% of its production to Lehman.

118.   Lehman's involvement with Aurora, BNC and other mortgage originators left it highly exposed to the deteriorating real estate market, although that exposure was hidden from investors. The Officer and Director Defendants were fully aware of the risk practices being employed by Aurora but permitted them to continue in order to continue obtaining loans for the Company's lucrative securitization transactions. An article in *The Globe and Mail* dated December 22, 2008, entitled "Lehman's Rise and Fall," provided in pertinent part:

---

"prime" loans. Alt-A mortgage loans fall between prime and subprime. Alt-A borrowers generally have a clean credit history but may have some other qualities that increase risk to the lender. Although Alt-A loans were intended to be less risky than subprime loans, Alt-A products were actively marketed to subprime borrowers so that the practical difference between Alt-A and subprime loans was virtually eliminated.

Mark Golan was getting frustrated as he met with a group of auditors from Lehman Brothers.

It was spring, 2006, and Mr. Golan was a manager at Colorado-based Aurora Loan Service, LLC, which specialized in "Alt-A" loans, considered a step above subprime lending. Aurora had become one of the largest players in that market, originating $25 billion worth of loans in 2006. It was also the biggest supplier of loans to Lehman for securitization.

Lehman had acquired a stake in Aurora in 1998 and had taken control in 2003. By May 2006, some people inside Lehman were becoming worried about Aurora's lending practices. The mortgage industry was facing scrutiny about billions of dollars worth of Alt-A mortgages, also known as "liar loans" – because they were given to people with little or not documentation. In some cases, borrowers demonstrated nothing more than "pride of ownership" to get a mortgage.

**That spring, according to court filings, a group of internal Lehman auditors, analyzed some Aurora loans and discovered that up to half contained material misrepresentations. But the mortgage market was growing too fast and Lehman's appetite for loans was insatiable. Mr. Golan stormed out of the meeting, allegedly yelling at the lead auditor: "your people find too much fraud."**

a.    REQUESTS FOR LOAN REPURCHASES

119.    In late 2006, many of the loans acquired by Aurora went into default immediately upon acquisition and Lehman was faced with repurchase requirements as a result of those defaults.

120.    Aurora attempted to pass on those repurchase obligations by asking the original lender to make the repurchase. However, Aurora had difficulty getting various lenders to repurchase bad loans and Lehman actually began suing lenders for refusing to repurchase troubled loans as early as June 2006. Lehman's inability to enforce its own repurchase requests evidences the decrease in the value of non-prime loans and Lehman's knowledge that these loans were problematic.

121.    Despite the fact that Lehman, through Aurora, was purchasing huge amounts of troubled mortgage assets, Lehman did not disclose this liability to investors nor did Lehman disclose the risk these loans posed to Lehman's assets.

122.    Although Lehman clearly knew that the subprime and Alt-A loans it was securitizing were problematic and that its exposure was increasing, Lehman was not concerned with the risks associated with these loans.  Lehman's business model was designed to originate and distribute (not hold) loans in the form of MBSs.  Lehman was unconcerned with the performance of the underlying loans and its model did not account for, or intentionally ignored, the risk of holding the loans.

### b.    OVERSTATED VALUE OF LEHMAN'S REAL ESTATE

123.    The Examiner found that Lehman overstated certain real estate-related assets in its commercial group headed by Walsh:

> The Examiner determines that there is sufficient evidence to conclude that certain of the Principal Transactions Group ("PTG") real estate assets were not reasonably valued during [the second and third quarters of 2008]. Furthermore, the Examiner finds sufficient evidence to support a finding that Lehman's valuations of its Archstone bridge equity investment were unreasonable as of the first, second and third quarters of 2008.

ER at 214-15.

124.    Lehman's Principal Transactions Group ("PTG") assets were investments in real estate assets that Lehman held for its own account while a developer improved or developed the underlying assets, with the intention of selling the investment after the development or improvement was completed.

125.    The Examiner concluded that Lehman's "process for valuing its PTG portfolio was systemically **flawed** because Lehman primarily valued these assets based on whether the development was proceeding according to the project's business plan and not the price a buyer

would pay for the asset." ER at 286-88; *accord* 329-29) (emphasis added). The Examiner did not quantify the amount by which the portfolio was overstated. However, he noted that the portfolio balance totaled $9.6 billion at the end of fiscal 2007. The portfolio balance of Lehman was overstated by a material amount throughout 2007 and 2008 because of Lehman's difficulties finding a willing buyer to purchase its assets, and the prominent role those difficulties had in contributing to Lehman's bankruptcy.

126.    Archstone, a publicly traded Real Estate Investment Trust ("REIT"), was among Lehman's largest commercial real estate investments.

127.    To value its Archstone positions, Lehman primarily used a discounted cash flow model that determined fair value by discounting back to present value future expected cash flows using the current cost of capital. The future cash flow estimate was based on various assumptions including occupancy rates, rental growth rates, projected income and expenses, exit capitalization rates, and exit value. Lehman, however, failed to consider market information in these assumptions. For example, Lehman used a rental growth rate that was 1.9% to 3.5% higher than third-party projections for apartments within Archstone's primary markets; used net income growth rates that were 100% higher than the average net income growth rate for apartment REITs over a 15 year period; and failed to consider the lower capitalization rates that were being used for other comparable publicly traded REITs. ER at 424, 429, 464.

128.    The Examiner concluded that "evidence supports a finding that Lehman's valuation of $2.165 billion for its Archstone bridge and permanent equity investment was overvalued" by between 9% and 21% at the end of the first quarter of 2008. ER at 467. The overstatement was material because, among other things, had Lehman taken a write-down of at least $200 million (9% of the $2.165 billion valuation) in the first quarter of 2008 for its

Archstone assets: (i) Lehman's mark-to-market write down adjustments for commercial mortgages and related assets would have increased by 20%; and (ii) the Company's pre-tax income would have decreased by 40%.

129.   Moreover, Archstone was regarded as a "Level 3" asset for purposes of mark-to-market accounting under Statement of Financial Accounting Standards No. 157, Fair Value Measurement ("SFAS 157"), meaning its value could not be determined from readily observable market data. ER at 466. Lehman used significant judgment in valuing Archstone, as with all other Level 3 assets. The Examiner did not analyze all of Lehman's Level 3 assets. However, it is reasonable to infer that at least some of Lehman's other Level 3 assets (which totaled $42 billion and $43 billion at year-end 2007 and the first quarter of 2008, respectively) as well as Lehman's other real estate-related assets were similarly overstated throughout 2007 and 2008 given, among other things, Lehman's difficulties selling such assets to skeptical buyers and the prominent role those difficulties had in contributing to Lehman's bankruptcy.

130.   In 2006, Lehman began to pursue a strategy that caused Lehman to assume greater risk. This expansion strategy focused heavily on acquiring and holding commercial real estate and other real estate assets that entailed far greater risk and less liquidity than what was being told to investors.

131.   In its 10-K and 10-Q filings throughout 2006 and 2008, Lehman repeatedly assured investors that it had appropriate risk management policies in place and that the Company monitored and enforced strict adherence to those policies. For example, Lehman stated that "[w]e monitor and enforce adherence to our risk policies" (included in the 2007 10-K and first quarter 2008 Form 10-Q) and that "[m]anagement's Finance Committee oversees compliance with policies and limits" (included in the second and third quarter 2007 Form 10-Qs, 1007 form

40

10-K, and first quarter 2008 Form 10-Q). Lehman also stated that "[w]e . . . ensure that appropriate risk mitigants are in place" (included in the second and third quarter 2007 Form 10-Q), and that "[d]ecisions on approving transactions ... take into account ... importantly, the impact any particular transaction under consideration would have on our overall risk appetite" (included in the second and third quarter 2007 Form 10-Qs). These statements were materially misleading because Lehman's risk management framework and risk limits were not followed. The FCIC report stated that Lehman's "[s]enior management regularly disregarded the firm's risk policies and limits." (FCIC report p. 177.)

132.    The Examiner testified before Congress that "Lehman was in breach of its established risk appetite limits on a persistent basis during the second half of 2007." Lehman raised its risk appetite limit four times between December 2006 and December 2007, from $2.3 billion to $4.0 billion, but then regularly exceeded even those limits by material amounts. ER at 49-51.

133.    Lehman also established "concentration limits," which were designed to ensure that it did not put risk in a single, undiversified business or area. However, Lehman disregarded concentration limits with respect to its commercial real estate and leveraged loan business. Lehman failed to enforce its "single transaction limits," which were meant to ensure that its investments were properly limited and diversified by business line and counterparty. ER at 50. Lehman failed to consult with its Chief Risk Officer when deciding to acquire its $5.4 billion stake in Archstone. According to the FCIC report: "Although [Lehman] had proclaimed that 'Risk Management is at the very core of Lehman's business model,' the Executive Committee simply left its risk officer, Madelyn Antoncic, out of the loop when it made this [Archstone] investment." (FCIC report p. 176-77.)

134. Lehman made misleading statements concerning "stress tests," which were one of Lehman's purported risk controls. In its public filings in 2007 and 2008, Lehman represented that "[w]e use stress testing to evaluate risks associated with our real estate portfolios." Undisclosed to investors, Lehman excluded many of its most risky principal investments – including commercial real estate investments, private equity investments, and leveraged loan commitments – from its stress tests. The Examiner concluded that, because of the exclusion of those risky assets, "Lehman's management did not have a regular and systematic means of analyzing the amount of catastrophic loss that the firm could suffer from these increasingly large and illiquid investments." In fact, experimental stress tests conducted in 2008 indicated that a large proportion of Lehman's risk resided with real estate and private equity positions that had not been included in its stress tests. ER at 50, 66-70.

### 3. LEHMAN'S FAILURE TO REPORT SUBPRIME AND ALT-A EXPOSURE

135. Lehman's 2005 10-K filed on February 13, 2006 provided in the Management Discussion and Analysis ("MD&A") section as follows concerning the Company's mortgage-related activities:

**Capital Markets**

*       *       *

Net revenues totaled $9.8 billion, $7.7 billion and $6.0 billion in 2005, 2004 and 2003, respectively. Capital Markets net revenues in 2005 represent the seventh consecutive year of record performance in Fixed Income and the second highest revenue level in Equities. Fixed income revenues rose 28% in 2005 compared with 2004 on improved client-flow activities, an increased contribution from the non-US regions and record revenues across a number of products. . . . Fixed Income revenues improved in 2004 compared with 2003 as a favorable interest rate environment helped drive strength in mortgage originations and securitizations as well as interest rate products and the declining dollar drove higher foreign exchange activity. . . .

Fixed Income net revenues were a record $7.3 billion in 2005, increasing 28% compared with 2004 driven by double digit revenue increases from each geographic region and record revenues across a number of businesses including commercial mortgage and real estate, residential mortgage origination and securitization, and interest rate products. Revenues from our commercial mortgage and real estate businesses increased substantially in 2005 reaching record levels, as the strong demand for commercial real estate properties, the recovery in certain property markets and relatively low interest rates drove asset sales and robust levels of securitizations. *Revenues from our residential mortgage origination and securitization businesses increased in 2005 from the robust levels in 2004, reflecting record volumes and the continued benefits associated with the vertical integration of our mortgage origination platforms.* We originated approximately $85 billion and $65 billion of residential mortgage loans in 2005 and 2004, respectively. We securitized approximately $133 billion and $101 billion of residential mortgage loans in 2005 and 2004, respectively, including both originated loans and those we acquired in the secondary market. While the performance in our mortgage businesses reached record levels, these businesses were affected by somewhat lower levels of mortgage origination volumes and revenues in the U.S. in the latter half of 2005, partly offset by stronger volumes and revenues outside the U.S. We originated approximately $27 billion and $13 billion of commercial mortgage loans in 2005 and 2004, respectively, the majority of which has been sold through securitization or syndication activities during both 2005 and 2004. Interest rate product revenues increased in 2005 on higher activity levels, as clients repositioned portfolios in light of rising global interest rates and a flattening U.S. yield curve. Credit product revenues also increased in 2005 as compared to 2004 driven by strength in both high yield and high grade credit products. Fixed income net revenues increased 31% in 2004 compared with 2003, reflecting generally favorable market conditions. The mortgage securitization business was notably strong, with revenues in mortgage products benefiting from the low rate environment as well as the continued vertical integration of our mortgage origination platforms.

*     *     *

*Mortgages, mortgage-backed and real estate inventory positions.*
Mortgages and mortgage-backed positions include mortgage loans (both residential and commercial), non-agency mortgage-backed securities and real estate investments. We are a market leader in mortgage-backed securities and real estate investments. We are a market leader in mortgage-backed securities trading. We originate residential and commercial mortgage loans as part of our mortgage trading and securitization activities. We originated approximately $85 billion and $65 billion of residential mortgage loans in 2005 and 2004, respectively. We securitized approximately $133 billion and $101 billion of residential mortgage loans in 2005 and 2004, respectively, including both originated loans and those we acquired in the secondary market. In addition, we originated approximately $27 billion and $13 billion of commercial mortgage loans in 205 and 2004, respectively, the majority of

43

which has been sold through securitization or syndicate activities during both 2005 and 2004. See Note 3 to the consolidated Financial Statements for additional information about our securitization activities. We record mortgage loans at fair value, with related mark-to-market gains and losses recognized in Principal transactions in the Consolidated Statement of Income.

Management estimates are generally not required in determining the fair value of residential mortgage loans because these positions are securitized frequently. Certain commercial mortgage loans and investments, due to their less liquid nature, may require management estimates in determining fair value. Fair value for these positions is generally based on analyses of both cash flow projections and underlying property values. We use independent appraisals to support our assessment of the property in determining fair value for these positions. Fair value for approximately $3.6 billion and $3.8 billion at November 30, 2005 and 2004, respectively, of our total mortgage loan inventory is determined using the above valuation methodologies, which may involve the use of significant estimates. Because a portion of these assets have been financed on a non-recourse basis, our net investment position is limited to $3.5 billion and $2.9 billion at November 30, 2005 and 204, respectively.

We invest in real estate through direct investments in equity and debt. We record real estate held for sale at the lower of cost or fair value. The assessment of fair value generally requires the use of management estimates and generally is based on property appraisals provided by third parties and also incorporates an analysis of the related property cash flow projections. We had real estate investments of approximately $7.9 billion and $10.7 billion at November 30, 2005 and 2004, respectively. Because significant portions of these assets have been financed on a non-recourse basis, our net investment position was limited to $4.8 billion and $4.1 billion at November 30, 2005 and 2004, respectively.

136.    The 2005 10-K further provided in the MD&A section as follows concerning

Lehman's liquidity and risk management practices:

**Liquidity, Funding and Capital Resources**

Management's Finance committee is responsible for developing, implementing and enforcing our liquidity, funding and capital policies. These policies include recommendations for capital and balance sheet size as well as the allocation of capital and balance sheet to the business units. Management's Finance committee oversees compliance with policies and limits with the goal of ensuring we are not exposed to undue liquidity, funding or capital risk.

**Liquidity Risk Management**

We view liquidity and liquidity management as critically important to the Company. Our liquidity strategy seeks to ensure that we maintain sufficient liquidity to meet all of our funding obligations in all market environments. Our liquidity strategy is centered on five principles:

- We maintain a liquidity pool available to Holdings that is of sufficient size to cover expected cash outflows over the next twelve months in a stressed liquidity environment.

- We rely on secured funding only to the extent that we believe it would be available in all market environments.

- We aim to diversify our funding sources to minimize reliance on any given providers.

- Liquidity is assessed at the entity level. For example, because our legal entity structure can constrain liquidity available to Holdings, our liquidity pool excludes liquidity that is restricted from availability to Holdings.

- We maintain a comprehensive Funding Action Plan that represents a detailed action plan to manage a stress liquidity event, including a communication plan for regulators, creditors, investors and clients.

*     *     *

**Risk Management**

As a leading global investment bank, risk is an inherent part of our business. Global markets, by their nature, are prone to uncertainty and subject to participants to a variety of risks. The principal risks we face are credit, market, liquidity, legal, reputation and operational risks. Risk management is considered to be of paramount importance in our day-to-day operations. Consequently, we devote significant resources (including investments in employees and technology) to the measurement, analysis and management of risk.

While risk cannot be eliminated it can be mitigated to the greatest extent possible through a strong internal control environment. Essential in our approach to risk management is a strong internal control environment with multiple overlapping and reinforcing elements. We have developed policies and procedures to identify, measure, and monitor the risks involved in our global trading, brokerage and investment banking activities. Our approach applies and analytical rigor overlaid with sound practical judgment working proactively with the business areas before transactions occur to ensure appropriate risk mitigants are in place.

We also seek to reduce through the diversification of our businesses, counterparties and activities in geographic regions. We accomplish this objective by allocating the usage of capital to each of our businesses, establishing trading limits and setting credit limits for individual counterparties. Our focus is balancing risk versus return. We seek to achieve adequate returns from each of our businesses commensurate with the risks they assume. Nonetheless, the effectiveness of our approach to managing risks can never be completely assured. For example, unexpected large or rapid movements or disruptions in one or more markets or other unforeseen developments could have an adverse effect on our results of operations and financial condition. The consequences of these developments can include losses due to adverse changes in inventory values, decreases in the liquidity of trading positions, increases in our credit exposure to clients and counterparties and increases in general systemic risk.

Our overall risk limits and risk management policies are established by the Executive Committee. On a weekly basis, our Risk Committee, which consists of the Executive Committee, the Chief Risk Officer and the chief Financial Officer, reviews all risk exposures, position concentrations and risk-taking activities. The Global Risk Management Division (the "Division") is independent of the trading areas and reports directly to the Firm's Chief Administrative Officer. The Division includes credit risk management, market risk management, quantitative risk management, sovereign risk management and operational risk management. Combining these disciplines facilitates a fully integrated approach to risk management. The Division maintains staff in each of our regional trading centers as well as in key sales offices. Risk management personnel have multiple levels of daily contact with trading staff and senior management at all levels within the Company. These discussions include reviews of trading positions and risk exposures.

137.     The 2005 10-K did not specifically identify subsidiaries of the Company. The Form 10-K further failed to mention the term "Alt-A" and only made limited reference to the term "subprime" in connection with a discussion of the First Alliance class action referenced above.

138.     In addition, Defendants Fuld, as CEO, and O'Meara, as CFO, as required by the securities laws, signed and filed certifications on behalf of themselves and Lehman with the SEC relating to Lehman's 2005 10-K, which stated that the report was truthful, the financial statements in it were accurate and Lehman's internal disclosure and accounting controls were

designed to be effective to detect and prevent fraud and had been tested and found to be effective.

139.   Lehman's Form 10-Qs for the first through third quarters of 2006 contained substantially similar statements concerning the Company's mortgage operations, liquidity and risk management practices. The Form 10-Qs further failed to identify Aurora or BNC or to mention the terms Alt-A or subprime.

140.   In addition, Defendants Fuld and O'Meara signed similar certificates contained in the Form 10-Qs for the first through third quarters of 2006 attesting to the accuracy of the financial statements and the effectiveness of Lehman's internal disclosure and accounting controls.

141.   On March 14, 2007, Lehman announced record first quarter 2007 results in spite of the growing concerns in the subprime market. In the press release announcing the first quarter results, Defendant Fuld, touting the record results, state, "[b]y expanding our global footprint, building our capabilities and partnering with our clients, we have again posted record net revenues, net income and earnings per share. Our results clearly demonstrate that we are better positioned than ever to create value for our clients and our shareholders."

142.   Later that same day on a conference call with analysts and investors, Defendant O'Meara downplayed the effect the disruption in the subprime market had on Lehman's business. According to Defendant O'Meara:

> Before we move on to our outlook I want to take a minute to discuss recent market events and provide a bit more color on the topic of mortgages. Recent market adjustments have represented a repricing of risk with a widening of credit spreads, increased levels of volatility, and pricing adjustments in the equity markets. Given our diversified business model, parts of our business actually benefit from wider spreads and higher volatility. We expect clients to remain active in managing their portfolios through this part of the cycle and we stand ready to service this activity flow.

The current dislocations in the subprime mortgage market are consistent with late cycle trends where credit standards and pricing are lowered to maintain volumes when liquidity is ample. The situation has clearly been exacerbated by a wave of early payment defaults and more recently the bankruptcy of a number of monocline subprime mortgage lenders. *While we are not immune to these events, we believe we have done a very good job of managing the risks within our securitization business including the active hedging strategies we employed to mitigate our risks.* This is demonstrated by the fixed income results we have reported today.

*The subprime components of our mortgage business which include origination, securitization, and trading in the U.S. together account for a small portion of our revenues.* To put this into perspective, into context, over the past six quarters on average, these businesses, these three businesses all taken together, accounted for less than 3% of our firm-wide revenues. Additionally, our mortgage origination platform is very flexible because of its integration with our mortgage securitization platform in terms of intelligence on deal structure, collateral type, and pricing terms. In the U.S. subprime space, we have adhered to our origination standards. In terms of origination, we remain far more active in the prime and Alt A space which accounted for 75% of our origination volumes in the third quarter.

*From a balance sheet perspective, we believe we are well protected. We actively hedged the interest rate and credit components of our inventory positions including our non-investment grade retained interest in securitizations. The majority of which are prime mortgage related.* Recent market developments, such as the introduction of single name and index credit derivatives on asset backed products have helped us significantly mitigate our risk. It is important to note at this point, we see the subprime challenges as being a reasonably contained situation. The broader economy is still very strong. Unemployment is low, inflation is in check, and consumer confidence is still strong.

We expect that the U.S. subprime mortgage market will continue to face headwinds in the near term; however, we are now seeing a significant decrease in industry wide capacity in the subprime sector and the beginnings of the return of pricing power. *So we believe we are well positioned to benefit from this evolving situation given our experience in this sector as well as our ample liquidity and risk management practices.* In addition, we expect to see various opportunities as a result of the market dislocations.

Looking forward, although we are expecting continued challenges in part of the U.S. mortgage market, our outlook remains optimistic for the rest of our businesses.

143.    On June 12, 2007, Lehman again announced record results for the second quarter of 2007. Defendants Fuld and O'Meara continued to emphasize the "record" results and the

Company's strong liquidity and risk management practices and further continued to downplay Lehman's exposure to the growing troubles in the real estate market.

144.   On September 18, 2007, Lehman announced positive results for the third quarter of 2007 at a time when many of the Company's competitors began to announce massive write-down and substantial losses, and despite Lehman's announcement that it would be forced to close BNC, its subprime lender. Defendant Fuld remained upbeat concerning Lehman's results and outlook, stating: "Despite challenging conditions in the markets, our results once again demonstrate the diversity and financial strength of the Lehman Brothers franchise, as well as our ability to perform across cycles. . . .We remain focused on delivering significant long term value for our clients and shareholders." Defendant O'Meara in a conference call attributed these strong results to "[o]ur strong risk management culture with regard to the setting of risk limits, and the management of market and counter-party credit risks, and our strong liquidity framework." O'Meara further represented the following concerning Lehman's liquidity:

> ***Next I would like to discuss our liquidity position, which is now stronger than ever.*** As we have discussed with you in the past, we have structured our liquidity framework to cover our funding commitments and cash outflows for a 12-month period, without raising new cash in the unsecured markets, or selling assets to generate cash. . . .
>
> . . .Our conservative liquidity framework is based on the following principles: No reliance on short-term unsecured funding, including asset-backed commercial paper. Illiquid assets are funded with long term capital with a remaining life of 12 months or longer.

145.   On December 13, 2007, Lehman announced positive fourth quarter and year end 2007 results. Defendant Fuld continued emphasizing the positive results. Later in a conference call, Defendants O'Meara and Callan once again downplayed the effect of the mortgage crisis on Lehman's operations. Further, Defendants O'Meara and Callan continued to represent Lehman's

"strong" liquidity position and how Lehman's conservative liquidity framework was structured to cover the Company's funding commitments and cash outflows for a 12-month period.

146.    In January 2008, an internal presentation was made to the Lehman board concerning the real estate crisis and its impact on Lehman. During the presentation, the Officer and Director Defendants were warned that Lehman's liquidity could disappear fast. The internal analysis questioned "WHY DID WE ALLOW OURSELVES TO BE SO EXPOSED?" The analysis indicated that the "CONDITIONS [WERE] CLEARLY NOT SUSTAINABLE" and that Lehman "SAW WARNING SIGNS" but "DID NOT MOVE EARLY/FAST ENOUGH," and further that the Company lacked "DISCIPLINE ABOUT CAPITAL ALLOCATION."

147.    On a March 18, 2008, conference call, Defendant Callan admitted for the first time that Lehman's securitizations, were "primarily Alt-A" and that there was only "a pretty small component of prime."  She further revealed that within the Alt-A/Prime residential mortgages, "if there's $1 billion of the $14.6 billion Alt-a/Prime, that's probably the most that's in there."

148.    The very next day, Sanford C. Berstein & Co. LLC analyst Brad Hintz suggested that Lehman had $87 billion in "troubled" assets that would probably cause Lehman more losses. He stated:

> For the first time in its earnings release, Lehman provided a detailed breakdown of its balance sheet exposure to troubled asset classes...Regrettably, the picture was not pretty... Until these troubled assets are removed from Lehman's balance sheet, we would expect the firm will be exposed to further write downs in the upcoming quarters.

149.    As the market for subprime and Alt-A mortgages declined, Lehman failed to provide the extent of its Alt-A and subprime securitized assets to its investors. Instead Lehman reported that the situation was "reasonably contained."  This failure to disclose harmed Plaintiffs.

4.    LEHMAN'S LACK OF RISK CONTROLS

150.    The Registration Statements, Prospectuse(s)(base and supplemental) and pricing supplements, as well as the SEC filings incorporated therein, pursuant to which Plaintiffs purchased securities contained materially false and misleading statements regarding Lehman's risk management.    Statements made by the Officer Defendants regarding Lehman's risk management policies were also materially false and misleading. These statements indicated that Lehman had risk management policies in place and that Lehman monitored and followed those policies.  These statements were very important to Plaintiffs in considering any investment in Lehman because the very health of the company and the value of any investment is directly tied to Lehman's commitment to risk management.  If the risk controls were in place, and followed, investors would have confidence that Lehman was not taking on too much risk or jeopardizing its balance sheets.  However, the truth was that Lehman threw caution to the wind and its risk management procedures out the window as it embarked on an historic and sweeping course to acquire billions of dollars of illiquid and risky assets.

151.    Lehman's false and misleading representations regarding risk management relate to four areas of risk policies: risk limits, stress testing, hedging and Value-at-Risk ("VaR").

152.    Lehman's SEC filings stated that it "monitor[ed] and enforce[ed] adherence to [its] risk policies" and that "management's Finance Committee oversees compliance with policies and limits." Lehman stated that it "ensure[d] that appropriate risk mitigants are in place" and that "decisions on approving transactions…take into account…importantly, the impact particular transaction under consideration would have on our overall risk appetite."

### a.    LEHMAN ROUTINELY EXCEEDED RISK LIMITS

153.    The limit on Lehman's firm-wide risk appetite was supposed to be the "hardest" of all of Lehman's risk limits.  A determination of the Risk Committee (which consisted of Defendants Fuld, Gregory, Callan and Lowitt), the Chief Risk Officer and the Chief Financial Officer was required if the firm-wide risk appetite was exceeded.  Lehman's Second Quarter 10-Q for 2007 stated that it had internal control measures in place to monitor and limit risk:

> We utilize a number of risk measurement methods and tools as part of our risk management process.  One risk measure that we utilize is a comprehensive risk measurement framework that aggregates market event risk and counterparty risks.  Market event risk measures the potential losses beyond those measured in market risk such as losses associated with a downgrade for high quality bonds, defaults of high yield bonds and loans, dividend risk for equity derivatives, deal break risk for merger arbitrage positions, defaults for mortgage loans and property value losses on real estate investments.

154.    Lehman's 2007 10-K contained representations regarding Lehman's risk management:

> The bases of our risk control processes are:
>
> - We establish policies to document our risk principles, our risk capacity and tolerance levels.
> - We monitor and enforce adherence to our risk policies.
> - We measure quantifiable risks using methodologies and models based on tested assumptions.
> - We identify emerging risks through monitoring portfolios, new business development, unusual or complex transactions and external events and market influences.
> - We report risks to stakeholders.

155.    On a September 18, 2007 investor call, Defendant O'Meara highlighted Lehman's "strong risk management," and its "strong risk management culture with regard to the setting of risk limits."

156.   In a November 14, 2007 Merrill Lynch Banking & Financial Services Investor Conference (the "Merrill Conference") Defendant Lowitt represented that Lehman could weather the dismal market conditions because it had "extremely deep risk culture which is embedded through the firm," that Lehman was "very conservative around risk" and that it was "running a business where [it] could distribute all the risk." Defendant Lowitt went on to say that Lehman "stay[ed] true to the principle...of our strategy of being in the moving rather than the storage business. So essentially originating to distribute, not holding stuff on our balance sheet, not storing risk but moving it on."

157.   In a December 13, 2007 conference call with investors, Defendant O'Meara stated that Lehman's fourth quarter results "reflects that strength of our risk management culture in terms of managing our overall risk appetite seeking appropriate risk reward dynamics and exercising diligence around risk mitigation." Defendant Callan echoed this when she said that the fourth quarter results were the result of the company's "strong risk and liquidity management."

158.   After Bear Stearns Companies Inc. collapsed in March 2008, rumors began circulating that Lehman faced a similar cash crunch, and many Wall Street observers believed Lehman would be the next investment bank failure after Bear Stearns, and, as a result, Lehman stock took a hit. Nonetheless, defendants denied the rumors and maintained that Lehman remained a strong and viable Company.

159.   On March 18, 2008, Lehman again announced positive first quarter 2008 results. During the conference call held the same day, defendant Callan went to great lengths to assure investors that Lehman was not in fact going to be the next Bear Stearns and had maintained strong risk management practices which helped to insulate the Company from its Alt-A and

53

subprime exposure. Defendant Callan further maintained the Company had a strong liquidity and capital base:

> We saw a quarter where our risk management discipline allowed us to avoid any single outsize loss. And it's been our operating philosophy for a decade, which many people are very familiar with, that we remain closely focused on our liquidity, our long-term capital position, precisely for the purpose of weathering a difficult market environment that we've seen surfacing in recent weeks. So we're set up for that.
>
> *     *     *
>
> *We had disciplined liquidity and capital management, which we consider to be a core competency, and maintained robust liquidity to date,* and we've executed close to two-thirds of our full-year capital plan at the end of the first quarter.
>
> *     *     *
>
> Next, I'd like to review our liquidity position in a different way than we typically do and give you a lot more information. And I'm going to give you information that takes you through the quarter end and actually takes you through end of day yesterday. *And I think that, given the environment we're in, we've tried to add a lot more transparency here, as we've tried to relay the strengths and robustness of the liquidity position of the Firm.*
>
> As we've discussed in the past, we have structured our liquidity framework for a decade to cover expected cash outflows for the next 12 months. And we do so without being able to raise new cash in the unsecured markets, or without having to sell assets that are outside our liquidity pool, and the liquidity pool is comprised of basically cash and cash equivalents. *The framework I'm describing was specifically designed after 1998 and our experiences then, for this type of environment, so I want to be clear about that.*
>
> *     *     *
>
> Also, for those who saw it, Moody's reaffirmed our A1 credit rating yesterday, with some very good commentary about the strength of the capital base in the franchise and the liquidity.
>
> *So that's a fair amount of color I tried to give you about how we fund ourselves, why we feel comfortable with our liquidity, even absent the fed facility, would feel very comfortable.* The fed facility is a great addition to the equation, and why we think we're in a good position in today's market. So wanted to make sure everybody was fully engaged and had all the information that they needed on that front.

54

160.    On June 3, 2008, several executives from Lehman's money management subsidiary, Neuberger Berman, sent an email to Lehman's executive committee recommending that Lehman's top management forego bonuses for the year. According to the email, *"Many believe that a substantial portion of the problems at Lehman are structural rather than merely cyclical in nature."* The executive committee member who was in charge of the Neuberger division responded to the executive committee as follows:

> I am not sure what's in the water at 605 Third Avenue today, but Amato and I clearly have some work to do (given the [sic] today's similar emails from Marvin Schwartz, Michael Kaminsky and now Judy).
>
> The compensation issue she raises (Judy Vale and Benjamin Segal on one hand versus Marvin Schwartz and Jeff Bolton on the other) is a particular issue for a small handful of people at Neuberger and hardly worth the EC;s time now.
>
> I'm embarrassed and I apologize.

161.    The email was forwarded the same day to Defendant Fuld, who responded: "Don't worry-they are only people who think about their own pockets."

162.    On June 9, 2008, Lehman pre-announced its expected second quarter 2008 results, announcing its first quarterly loss since being spun off from American Express. However, the Defendants maintained Lehman had a strong liquidity and capital position. Defendant Fuld stated: "I am very disappointed in this quarter's results. Notwithstanding the solid underlying performance of our client franchise, we had our first-ever quarterly loss as a public company. However, with our strengthened balance sheet and the improvement in the financial markets since March, we are well-positioned to serve our clients and execute our strategy."

163.    On June 12, 2008, Lehman announced that Defendant Callan was being replaced as CFO by Defendant Lowitt.

164.    On June 16, 2008, Lehman announced its second quarter 2008 results. According to Defendant Fuld:

> "Since we announced our expected second quarter earnings last week, *we have begun to take the necessary steps to restore the credibility of our great franchise and ensure that this quarter's unacceptable performance is not repeated.* We have raised an additional $6 billion of capital. I have asked Bart McDade, our best operator, to serve as the Firm's president and chief operating officer. I have also asked Ian Lowitt, our co-chief administrative officer, to be our chief financial officer. With these actions and our continued commitment to our client-driven franchise, we are positioned to take advantage of opportunities that lie ahead, and we are focused on maximizing shareholder value."

165.    As his predecessors did, newly named CFO, Defendant Lowitt, stated in a conference call in which Defendant Fuld participated as follows: "Next, let me review our liquidity position which has never been stronger."

166.    Then, in September 2008, Lehman announced additional billions of dollars in losses and that it would need to raise billions of dollars of additional capital. Thereafter, the price of Lehman securities continued to react adversely as it was disclosed that Lehman was in fact almost insolvent. When it became apparent the federal government would not rescue Lehman, the Company was forced to file Chapter 11 bankruptcy on September 15, 2008, essentially wiping out its equity and debt holders.

167.    All of the above statements made by Lehman and/or its Officers were false and misleading. Contrary to Lehman's and the Officer Defendants statements, Lehman did not have a "strong risk management culture" and did not monitor or adhere to risk management policies. Lehman misrepresented its risk management controls and policies. The truth was that Lehman, over the course of 2005, 2006, 2007 and 2008, had ramped up its activities in procuring illiquid mortgage and real estate assets and utterly disregarded and exceeded all of the limits and controls that it represented were in place to manage the company's risk and failed to perform necessary

stress testing to evaluate the illiquid risk. In a prophetic email in July of 2007 to Defendant O'Meara, Defendant Lowitt criticized Lehman's failure to abide by risk limits and stated: "In case we ever forget; this is why one has concentration limits and overall portfolio limits. Markets do seize up."

168.   The markets did seize up and Lehman, because of its reckless and almost irrational foray into the extremely risky real estate market, was not in a good place to manage the company's risk or weather any downturn. Historically, Lehman had been in the business of moving its risks by securitizing its assets and then selling them to others. Lehman securitized mortgages originated by Aurora and BNC and sold them to investors. However, in 2006 and 2007 Lehman changed its plan from "moving" assets to "storing" them, specifically buying and holding commercial real estate, leveraged loans and private equity assets. As Lehman purchased and held these assets, it's "risk appetite limits" were greatly exceeded. A "risk appetite" is a measure of the total market risk, credit risk and event risk Lehman has undertaken. Lehman's risk management policies provided that Lehman had a "risk appetite" limit. However, Lehman routinely violated or disregarded its risk appetite limit, rendering the policy meaningless.

169.   The Examiner stated that "Lehman was in breach of its established risk appetite limits on a persistent basis during the second half of 2007." Lehman raised its risk appetite limit repeatedly between December 2006 and December 2007 and even exceeded the increased limits.

170.   In May of 2007, as part of its aggressive increase in the purchase of risky illiquid assets, Lehman embarked on an unprecedented purchase of Archstone – a commercial real estate business. This purchase was the largest in Lehman history and resulted in Lehman exceeding its risk appetite limits by $608 million in September of 2007 and the taking on of an enormous and illiquid risky asset. However, "despite the extraordinary size and risk of Lehman's commitment

to the transaction, Lehman's management did not conduct quantitative analysis of Lehman's exposure in advance of the risk Lehman was undertaking." ER at 113. This was in direct contradiction of Lehman's statement that in "approving transactions…[it] take[s] into account…importantly, the impact any particular transaction under consideration would have on our overall risk appetite." (*See*, for example, Second Quarter 2007 10-Q and Third Quarter 2007 10-Q).

171.    According to the Examiner "in pursuing its aggressive growth strategy, Lehman's management chose to disregard or overrule the firm's risk controls on a regular basis…" The Examiner further noted:

> Lehman's management decided to exceed risk limits with respect to Lehman's principal investments, namely, the "concentration limits" on Lehman's leveraged loan and commercial real estate businesses, including the "single transaction" limits on leveraged loans. These limits were designed to ensure that Lehman's investments were properly limited and diversified by business line and by counterparty. Lehman took highly concentrated risks in these two business lines, and, partly as a result of market conditions, ultimately exceeded its risk limits by margins of 70% as to leveraged loans.

> Lehman did not strictly apply its balance sheet limits, which were designed to contain the overall risk of the firm and maintain the firm's leverage ratio within the range required by the credit rating agencies, but instead decided to exceed those limits. To mitigate the apparent effects of these overages, Lehman used Repo 105 transactions to take assets temporarily off the balance sheet before the ends of reporting periods.

> Lehman's management decided to treat primary firm-wide risk limit – the risk appetite limit – as a "soft guideline, notwithstanding Lehman's representations to the Securities Exchange Commission and the Board that the risk appetite limit was a meaningful constraint on Lehman's risk taking. Lehman management's decision not to enforce the risk appetite limit was apparent in several ways:

> • Between December 2006 and December 2007, Lehman raised its firm-wide risk appetite limit three times, going from 2.3 to 4.0 billion.

- Between May and August 2007, Lehman omitted some of its largest risks from its risk usage calculation. The primary omitted risk was a $2.3 billion bridge equity position in the Archstone-Smith Real Estate Investment Trust ("Archstone" or "Archstone REIT") real estate transaction, an extraordinarily large and risky commitment. Had Lehman's management promptly included that risk in its usage calculation, it would have been immediately apparent that Lehman was over its risk limits.

- After Lehman did include the Archstone risk in the firm's risk appetite usage, Lehman continued to exceed the limit for several more months. Rather than aggressively reduce Lehman's balance sheet in response to these indicators of excess risk-taking, Lehman raised its firm wide risk limit again.

ER at 49-51.

172.    The Examiner stated to Congress on April 20, 2010 that:

> Lehman was significantly and persistently in excess of its own risk limits. Lehman management decided to disregard the guidance provided by Lehman's risk management systems. Rather than adjust business decisions to adapt to risk limit excess, management decided to adjust the risk limits to adapt to business goals.

173.    Thus, while telling Plaintiffs that it had a strong "risk culture" and was appropriately measuring and limiting risk, Lehman was actually, and routinely, exceeding its risk appetite limit – every month from July 2007 to February 2008. It committed to transactions that exceeded its single transaction limits and exceeded the limits of its leveraged loan bridge equity commitments. Any statement made by Lehman or the Officer Defendants that suggested that the company "enforce[ed] adherence to [its] risk policies" or that its management oversaw compliance with risk policies was at a minimum misleading and more accurately, utterly false.

b.   STRESS TESTING MISREPRESENTATIONS

174.   Lehman represented in Registration Statements, Prospectuse(s) and pricing supplements, as well as the SEC filings incorporated therein, pursuant to which Plaintiffs purchased securities, that it performed "stress testing to evaluate risks associated with its real estate portfolios." It stated, "the Company uses stress testing to evaluate risks associated with its real estate portfolios." It also said the "Company uses stress testing to evaluate risks associated with its real estate held for sale positions." According to Lehman, stress testing "measures the impact of the value of existing portfolios of specific changes in market factors for certain products, is performed with regularity." Lehman specifically said that stress testing was used on Lehman's "real estate portfolios." All of this was untrue. Lehman in fact excluded its commercial real estate investments from stress testing.

175.   The Examiner Report stated:

> Lehman's management excluded certain risky principal investments from its stress tests. Although Lehman conducted stress tests on monthly basis and reported the results of these stress tests periodically to regulators and to its Board of Directors, the stress tests excluded Lehman's commercial real estate investments, its private equity investments, and, for a time, its leveraged loan commitments. Thus, Lehman's management did not have a regular and systematic means of analyzing the amount of catastrophic loss that the firm could suffer from these increasingly large and illiquid investments.

ER at 50.

176.   Lehman's failure to perform stress testing on its complete real estate portfolio was particularly meaningful during 2006, 2007 and 2008 because of its decision to dramatically increase its risk in just that market. According to the Examiner, "Because Lehman's stress testing did not include its real estate investments, its private equity investments or, during a crucial time period, its leveraged loan commitments, Lehman's management pursued its

transition from the moving business to the storage business without the benefit of regular stress testing on the primary business lines that were the subject of this strategic change." ER at 69.

        c.     HEDGING MISREPRESENTATIONS

177. Despite its lack of even basic risk controls, Lehman nevertheless continued to reassure investors that its risk to the non-prime market was actively hedged throughout the market meltdown and that it was in a position to surpass market conditions. However, in reality there was no direct hedge for the Alt-A mortgages which comprised the majority of Lehman's mortgage portfolio.

178. In the second quarter of 2007, Defendant O'Meara stated that Lehman "do[es] have hedging strategies that are in place and have proven to be quite effective." However, Defendant O'Meara never disclosed what those strategies were and wholly failed to disclose Lehman's inability to directly hedge Alt-A loans.

179. On November 14, 2007, Defendant Lowitt, while at the Merrill Lynch Banking and Financial Services Conference, repeated Lehman's hedging mantra and stated in a presentation that "[w]e've had success in our hedging and so we don't believe that there will be any requirement for substantial markdowns and certainly no requirement for us to announce anything. We're very comfortable with where we are with regard to that."

180. On February 6, 2008, Defendant Callan continued to reassure investors, in a Credit Suisse Financial Services Forum, of Lehman's superior risk management including the active hedging of its residential mortgage book.

181. In a March 18, 2008, conference call regarding Lehman's first quarter 2008 financial reports, Defendant Callan stated that Lehman's "continued diligence around risk management discipline allowed [it] to avoid any single outsize loss" during the quarter.

Defendant Callan also discussed the mark-to-market adjustments Lehman recorded during the

quarter, stating:

> The gross revenue reduction, gross numbers for the quarter, from mark to
> market, pre-hedges, was approximately $4.7 billion.
>
> After hedges, we had a net impact of 1.8 billion, which I think is a pretty
> good testament to our **hedging and risk mitigation capabilities** that are
> core to our franchise.
>
> So let me speak a moment about the composition of the net 1.8 write-
> down. Residential mortgage related positions accounted for 800 million,
> net. The 800 million net relates to 3 billion gross. So I think it's fair to
> say **we continue to do a very, very good job managing the risk on**
> **residential mortgages**, an area that I think we're credited with a lot of
> expertise, a great franchise.

(emphasis added).

182.    In speaking about Lehman's exposure to failing market conditions, Defendant

Callan commented on both Lehman's increasing exposure to the Alt-A assets and Lehman's

hedging activities:

> Prime and Alt-A make up 14.6 billion versus 12.7 at year end. Again
> reflecting a fair amount of assets and bought opportunistically, and also
> includes a meaningful component of servicing which we added during the
> quarter, which really does reflect a very natural hedge for the mortgage
> asset class.

183.    During that conference call, UBS analyst Glenn Schorr asked Defendant Callan to

provide more detail regarding certain temporary, as opposed to permanent, asset mark downs.

Defendant Callan responded, in part saying:

> We are very well hedged. I mean, it's always a little challenging how you
> look at it, we would consider ourselves at this point net short in the
> residential asset class.

184.    However, despite Lehman's repeated assurances that its mortgage related assets

were well hedged, this was not the truth. Defendant Lowitt finally confessed on a September 10,

2008 conference call, what Lehman must have known all along, that there is no direct hedge for Alt-A mortgages, which made up a majority of Lehman's mortgage related assets.

### d.   LEHMAN ROUTINELY EXCEEDED VaR LIMITS

185.   Lehman also exceeded its VaR Limits.  VaR Limits measure what a potential loss will be in the fair value of a portfolio as a result of adverse movement in underlying risk factors. While Lehman touted its risk management controls by saying in its SEC filings that it "monitor(s) daily trading net revenues compared to reported historical simulation VaR," (First, Second and Third Quarter 2007 10-Q, 2007 10-K and First and Second Quarter 2008 10-Q) the truth was that it repeatedly exceeded its VaR limits.  Statements in Lehman's 2007 10-K and First Quarter 10-Q that there were only "four days...when [Lehman's] net trading loss exceeded [its] historical simulation VaR as of the end of the prior business day" and that in the "quarter ended February 29,2008, there were no days when daily net trading losses exceeded historical simulation VaR as measured at the close of the previous business day" were categorically false: Lehman breached its firm-wide VaR limit on 44 occasions during that time: Lehman's Global Real Estate Group was in breach of VaR limits every day from early October 2007 through September 15, 2008; its Hig Yield business breached its VaR limits routinely and every day from Mid-August 2007 through mid-May 2008; and its Fixed Income Division also breached its VaR limits repeatedly and every day from mid-October 2007 through Mid-May 2008.

### e.   A CULTURE OF FLAGRANT DISREGARD FOR RISK PROCEDURES

186.   Heading up Lehman's Global Real Estate Group was Mark Walsh.  Lehman gave free reign to Walsh in the issuance of residential and commercial mortgages.  Walsh was exempted from Lehman's risk management controls and "[t]here were reportedly capital committees and processes underway that everyone else had to go through and Walsh didn't have

to go through them."[12]   Unlike other investment firms where responsibilities were divided among several individuals, Mr. Walsh was in charge of all aspects of Lehman's real estate operations.

187.   At Lehman, you were either with the risk takers or against them -- and those who questioned or criticized the extreme risk accumulation, found themselves without a job.  As the housing market declined, some Lehman risk managers began to recognize and criticize Lehman's risk management, and mortgage-related holdings.  However, according to *Bloomberg Markets*, two such employees, Michael Gelband, head of Lehman's Fixed Income Division, and Madelyn Antoncic, Lehman's Chief Risk Officer, were "pushed aside" after they "urged caution" regarding Lehman's mortgage positions.  Ms. Antoncic was moved to a government relations job in September of 2007 and Mr. Gelband reportedly left Lehman's Fixed Income Division in May 2007, after he "balked at taking more risk."[13]

188.   The Officer Defendants did not voice concerns about the increased risk and departure from the Lehman risk standards and, in fact, downplayed or completely misrepresented the Lehman's risk exposure.

189.   By not disclosing to the Plaintiffs the true nature of Lehman's risk management and risk liquidity it misrepresented Lehman's alleged robust risk management in its Registration Statements and the SEC filings from the 2005 10-K, all 2006 10-Q, 2006 10 K, all 2007 10-Q's, 2007 10-K, and all 2008 10-Q and investor calls on March 14, 2007, June 12, 2007, September 18, 2007, December 13, 2007, March 18, 2008

---

[12] *New York Observer*, September 30, 2008.
[13] *Lehman Faul- Finding Points to Last  Man Fuld as Shares Languish*, Bloomberg Markets, July 22, 2008

5.     LEHMAN'S IMPROPER VALUATION OF ASSETS

190.    In addition to acquiring risky assets and failing to properly manage their associated risks, Lehman failed to properly value those assets. GAAP requires reporting by means of fair value accounting.  Fair value accounting is financial reporting which requires a company to measure certain assets and liabilities "at estimates of the prices they would receive if they were to sell the assets or would pay if they were to be relieved of the liabilities."

191.    In September 2006, FASB issued a new standard regarding fair value accounting, FAS 157.  FAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."[14]  FAS 157 emphasizes that fair value is market-based rather than entity-specific.

192.    FAS 157 provides for several methods of calculating fair value and establishes a hierarchy based on quality and reliability of information.  Quoted prices are the most reliable valuation inputs while model values based on unobservable data are the least reliable.

193.    According to FAS 157:

> The notion of unobservable inputs is intended to allow for situations in which there **is little, if any, market activity for the asset or liability at the measurement** date.  In developing unobservable inputs, the reporting entity need not undertake all possible efforts to obtain information about market participant assumptions.  However, the reporting **entity shall not ignore information about market participant assumptions that is reasonably available** without undue cost and effort.  Therefore, the reporting entity's own data used to develop unobservable inputs shall be adjusted if information is reasonably available without undue cost and effort that indicates that market participants would use different assumptions.

*Id.* (emphasis added).

194.    The SEC's Staff Accounting Bulletin No. 59 ("SAB 59"), Accounting for Noncurrent Marketable Equity Securities, specifies that "[a]cting upon the premise that a write-

---

[14] Statement of Financial Accounting Standards No. 157, Fair Value Measurements

down may be required, management should consider all available evidence to evaluate the realizable value of its investment."

195.    FASB classifies assets into Level 1, Level 2, and Level 3.  Level 1 assets can be valued with accuracy because they have clear market prices.  Level 2 assets are valued based on quoted values in inactive markets or on models.  The inputs used in Level 2 models are observable.  Level 3 assets are valued based on unobservable data and are based on management's own assumptions and expectations.

196.    By not disclosing to the Plaintiffs, as detailed above, the true value of Lehman's assets, Lehman misrepresented the values that it put on its assets in its Registration Statements, Prospectuses and the SEC filings including but not limited to the 2005 10-K, all 2006 10-Qs, 2006 10 K, all 2007 10-Q's, 2007 10-K, and all 2008 10-Q and investor calls on March 14, 2007, June 12, 2007, September 18, 2007, December 13, 2007, March 18, 2008

a.    INCREASED LEVEL 3 ASSETS

197.    Observable inputs for mortgage-related assets include the ABX and CMBX indices.  The ABX Index is a series of credit-default swaps based on 20 bonds that consist of subprime mortgages. The ABX index was created in January 2006 and serves as a benchmark of the market for securities backed by home loans issued to borrowers backed by weak credit.  The ABX emerged as a substitute for real market prices on subprime bonds since these assets rarely trade thus making them difficult to value.

198.    According to The White Paper, *Measurements of Fair Value In Illiquid (Or Less Liquid) Markets*, "[T]he pricing indicated by the ABX credit derivative index for subprime

mortgage bonds may be a Level 2 input when used as input to the valuation of a security backed by subprime mortgage loans."[15]

199.   CMBX derivatives are a group of indices made up of 25 tranches of commercial mortgage-backed securities ("CMBS"), each with different credit ratings. The CMBX indices, like the ABX index, provides insight and transparency into CMBS.

200.   Even though the ABX and CMBX are observable inputs and are meant to create visibility and transparency into the subprime market, Lehman nevertheless continued to value its mortgage-related assets as Level 3 instead of properly valuing them at Level 2.

201.   Improperly categorizing assets as Level 3 is a means of falsifying valuation.

202.   Labeling mortgage backed securities as Level 3 assets permitted Lehman discretion in valuing those assets.

203.   A February 8, 2007 *Bloomberg* article reported that the ABX declined 10% since its introduction.[16]   Another *Bloomberg* article reported that the ABX index tracking derivatives linked to subprime mortgage securities with the *highest* investment-grade ratings had fallen more than six percent in June of 2007 and the index tracking subprime mortgages with the *lowest* investment-grade ratings had declined thirty percent.[17]

204.   As Lehman increased its Level 3 assets each quarter, the ABX showed a substantial decline in the value of subprime residential mortgage-backed securities throughout 2007 and the CMBX indicated increasing risk in commercial mortgage-backed securities.

205.   Despite improperly valuing assets as Level 3, Lehman represented in its third quarter 10-Q for 2007 that "it measure[s] financial instruments and other inventory positions owned...at fair value." The third quarter 2007 report also stated:

---

[15] AICPA White Paper, *Measurements Of Fair Value In Illiquid (Or Less Liquid) Markets*
[16] *Subprime Mortgage Bond Risks Surge, Index Suggests,* Bloomberg, May 3, 2007.
[17] *Bear Stearns Halts Redemptions on Third Hedge Fund*, Bloomberg, July 31, 2007.

> During the 2007 three months, Level III assets increased to 12% of total Financial instruments and other inventory positions owned and measured at fair value, compared to 8% in the trailing quarter. **The increase in Level III assets resulted largely from the reclassification of approximately $9.8 billion of assets previously categorized as Level II assets into the Level III category** in the third quarter of 2007. Reduced liquidity in the capital markets resulted in a decrease in the observability of market prices for certain financial instruments, particularly for mortgage products.

(emphasis added).

206.    Even while Lehman was reporting these assets as Level 3, its own personnel were admitting that there was visibility in the market. On a December 13, 2007 conference call, Defendant O'Meara expressly stated:

> As you move down the capital structure, there aren't transactions being executed, maybe there are some, but it's not as visible and not as much information on it and so the way to model them out is you have to default to the information that is visible which is the index trading around ABX in the different parts of the capital structure for ABX and so those inputs or that information around the ABX is used to price out the cash products in the bottom parts of the capital structure. But there are some trades being done. **We've got good visibility into them**.

(emphasis added).

207.    On the March 18, 2008, conference call, Defendant Callan reiterated Lehman's assertion that its valuations were transparent and stated "[W]e began to see a lot more transparency in the Alt-A sector late in the quarter, allowing us to mark positions based on observable prices." [18]

208.    However, Defendant Callan also represented in this same conference call:

> [A]t the end of the year we were about 38.8 [billion] in total Level 3 assets. In terms of what happened in Level 3 asset changes this quarter, we had net sort of payments, purchases, or sales of 1.8 billion. We had net transfers in of 1.1 billion. **So stuff that was really moved in or recharacterized from Level 2.** And then there was about 875 million of write-downs. So that gives you a balance of 38,682 as of February 29.

(emphasis added).

---

[18] Callan was referring to the fourth quarter of 2007.

209.    On a June 16, 2008, conference call, Defendant Fuld touted Lehman's visibility by stating that it "had the benefit of much greater price visibility, due to the number of assets that were sold, especially in the commercial and residential mortgage area."

210.    On that same call, Defendant Lowitt confirmed Lehman's ability to observe the market:

> Although certain sectors of the markets are currently distressed, there has been recent sales activity in many asset classes, allowing us to benchmark prices. The strong flows we've seen over the past quarter **have given us very good transparency** in the marks we have against our remaining positions.

(emphasis added).

211.    Although Lehman repeatedly claimed that there was good visibility and transparency into the mortgage market, Lehman continuously moved its assets from Level 2 to Level 3. Lehman reported 7.55% of its assets as Level 3 for the first quarter of 2007, 8.48% in the second quarter of 2007, 12.74% in the third quarter of 2007, 14.98% in the final quarter of 2007, 15.1% in the first quarter of 2008, and finally Level 3 assets reached 17.01% by the second quarter of 2008.

212.    Lehman also continuously increased its percentage of mortgage and asset-backed securities which it categorized as Level 3. In the second quarter of 2007, 12.5% of Lehman's assets were categorized as Level 3 increasing to 25.9% in the third quarter of 2007, 28.3% in the fourth quarter of 2007, 28.1% in the first quarter of 2008, and 28.4% in the second quarter of 2008. Over the course of one year, Lehman's Level 3 mortgage and asset-backed securities increased nearly 14% while Lehman reported increased visibility.

213.    By not disclosing to the Plaintiffs the facts listed above about Level 3 assets Lehman and the Defendants materially misrepresented Lehman's Real Estate holdings in its Registration Statements and the SEC filings from the 2005 10-K, all 2006 10-Q, 2006 10 K, all

2007 10-Q's, 2007 10-K, and all 2008 10-Q and investor calls on March 14, 2007, June 12, 2007, September 18, 2007, December 13, 2007, March 18, 2008, June 16, 2008

### b.   LEHMAN'S OVER-VALUATION OF ITS ASSETS

214.   Although Lehman claimed that its real estate portfolio was valued properly, on June 10 2008, analyst, Douglas Sipkin, released a report titled "Too Many Inconsistencies" and stated:

> We underestimated how poorly marked [Lehman's] assets were.  In addition, the larger capital raise at meaningfully lower prices indicates that the Company did not have, and potentially still does not have, a complete grasp of its exposures.

215.   Additionally, Wall Street executives who reviewed Lehman's real estate portfolio said it was overvalued by more than $10 billion (or roughly 35%).[19] Defendant Lowitt, however, asserted (on a September 10, 2008 conference call)  that the real-estate assets had been "in and around our marks."

216.   Moreover, according to *The Wall Street Journal*, Lehman documents revealed that Lehman "marked" some European securities backed by real estate loans at 97.9% of par value, or nearly 98 cents on the dollar. However, when faced with substantially similar market conditions in the United States, Lehman valued the United States assets at only 56 cents on the dollar, rendering the European securities valuations misleading.

217.   During an October 23, 2008 interview with *The New York Times*, Federal Reserve Chairman Ben Bernanke confirmed that the government would not lend money to Lehman because the value of Lehman's assets created "a huge hole" on the company's balance sheet.

### i.   LEHMAN OVERVALUED ARCHSTONE

218.   In May of 2007, Lehman and Tishman Speyer set out to acquire Archstone, a publicly traded Real Estate Investment Trust ("REIT").  The transaction closed on October 5,

---

[19] *The Two Faces of Lehman's Fall*, Wall Street Journal, October 6, 2008.

2007, and constituted Lehman's largest commercial real estate investment at $5.4 billion. When Lehman committed to purchase Archstone, it expected to sell $8.9 billion in properties contemporaneously with closing, receive a $1.9 billion equity offering, receive enhanced returns in equity interest on its promote feature and syndicate one-half of its Archstone debt and limited partner interest within two weeks of closing. However, Lehman's plans proved unsuccessful.

219. Lehman failed to carry out its original plans for the Archstone assets and opinions in the market indicated that the Archstone investment had declined in value. However, in the first quarter of 2008, Lehman did not take any valuation-related write-downs. When Lehman valued Archstone at the end of the First Quarter of 2008, Archstone's bridge and permanent equity investment was overvalued by $200 million to $450 million.

220. Lehman primarily used a discounted cash flow ("DCF") method to value its Archstone position. The DCF method determines value by reducing future expected cash flows to their present value by applying a discount rate. The results are driven by three assumptions: rent growth, exit capitalization rates, and exit platform value.

221. By overvaluing Archstone, Lehman overstated its First Quarter 2008 income and understated its Second Quarter 2008 losses. As such, the statements in Lehman's March 18, 20078 8-K and First Quarter 2008 10-Q concerning Lehman's reported income were materially false and misleading when made.

ii.     LEHMAN'S OVERVALUATION OF RENT GROWTH

222. In conducting its DCF analysis, Lehman overestimated its rent growth. Lehman failed to use current market values to determine its estimated growth rate. In the first quarter of 2008, Lehman used a compound annual growth rate ("CAGR") of 5.72%. A CAGR of 5.72% means the rent was projected to increase an average of 5.72% per year on the portfolio expected

to be held through 2014.   In December of 2007, Bridge Equity personnel reevaluated growth rates and the data collected evidenced that Lehman's estimated growth rate was 1.9%-3.5% higher than third party rent growth projections of comparable apartments.   Lehman used inflated values for its rent growth which created an overvalued Archstone portfolio.   As a result, Lehman misrepresented to the public the true value of its commercial real estate holdings.

223.   By overvaluing Lehman rent growth Lehman overstated its 1st Quarter 2008 income and understated its 2nd Quarter 2008 loss.   As such, the statements in Lehman's 3/18/08 8-K, and 1stQuarter 2008 10-Q concerning Lehman's reported income were materially false and misleading when made.

### iii.   LEHMAN'S OVERVALUATION OF GOING-IN CAPITALIZATION RATE

224.   In addition to its inaccurate estimation of rent growth, Lehman overvalued its going-in capitalization rate.   In January or February of 2008, Tishman Speyer conducted a sensitivity analysis to evaluate the estimated value of Archstone.   The Lehman Bankruptcy Examiner used Tishman Speyer's results and applied the reductions to Lehman's Archstone holdings. The Examiner produced the following results:

Going-In Capitalization Rate Sensitivity Analysis (Q1 2008)

| Core Portfolio Cap Rate | 4.11% | 4.25% | 4.50% | 4.75% | 5.00% | 5.25% | 5.50% | 5.75% | 6.00% |
|---|---|---|---|---|---|---|---|---|---|
| Reduction in Total Equity Value | 0 | 596 | 1,551 | 2,406 | 3,175 | 3,871 | 4,504 | 5,081 | 5,611 |
| Reduction in Lehman's Equity (46.8%) | 0 | 279 | 726 | 1,127 | 1,487 | 1,813 | 2,109 | 2,379 | 2,627 |
| Write-Downs Taken by Lehman as of Q1 2008 | 262 | 262 | 262 | 262 | 262 | 262 | 262 | 262 | 262 |
| Incremental Write-Downs | (262) | 17 | 464 | 865 | 1,225 | 1,551 | 1,847 | 2,117 | 2,365 |

A negative value represents that Lehman's valuation may have been too low; a positive number represents that Lehman's valuation may have been too high.

72

225.    Lehman originally estimated the going-in capitalization rate (the ratio of the projected net operating income (NOI) in the first year of a holding period over the property) of its Archstone portfolio at 4%.   A Barron's article in 2008 observed that the going-in capitalization rate of Archstone's peers by January of 2008 was over 7%.   Applying this increase in the going-in capitalization rate between the commitment date (May 2007) and January 2008 indicated a large decrease in Archstone's value, thus a large decrease in the value of Lehman's equity investment in Archstone.

226.    Furthermore, Lehman recognized Avalon Bay as its best comparable in the market at the time for measuring going-in capitalization rates.   Avalon Bay's going-in capitalization rate between Lehman's commitment to purchase Archstone in May 2007 and January of 2008 had increased by over 30 basis points.   Applying an equivalent increase to Lehman's Archstone position results in an increase of the Archstone capitalization rate to 4.5% and therefore a write-down of nearly $464 million.   In addition, the capitalization rate for Avalon Bay in January of 2008 was between 4.65% and 5.0% which would mean a write-down between $865 million and $1.225 billion.

227.    In the first quarter of 2008, Lehman valued its Archstone bridge and permanent equity investment at $2.165 billion − this overvalued the investment by $200 million to $450 million according to available information in the market.

228.    By overvaluing Lehman's going in capitalization, Lehman overstated its First Quarter 2008 income and understated its Second Quarter 2008 losses.   As such, the statements in Lehman's March 18, 2008 8-K and First Quarter 2008 10-Q concerning Lehman's reported income were materially false and misleading when made.

6.    LEHMAN'S FAILURE TO TAKE APPROPRIATE WRITE-DOWNS

229.    As the market for subprime mortgages began its steep decline, Lehman did not take substantial write-downs like its competitors even though Lehman had more exposure to the subprime and Alt-A market.  As discussed above, the ABX showed an increase in the risk of subprime assets.  However, Lehman failed to take write-downs consistent with its competitors and the ABX index.

230.    As the real estate market continued its decline in 2007, Lehman's competitors made substantial write-downs in order to reflect market prices.  Lehman had nearly triple the mortgage related assets of Merrill Lynch and more than five times as many mortgage backed securities as Citigroup, yet in the first quarter of 2007, Lehman took only a fraction of the write-downs those two companies posted.

231.    In the first quarter of 2007, Citigroup and Merrill Lynch both announced significant losses.  Merrill Lynch reported a $1.97 billion loss while Lehman posted a profit of $489 million.  In the third quarter of 2007, Lehman reported $88 billion in mortgage-related assets.  On September 18, 2007, Lehman announced $700 million in write-downs.  During that same quarter, Merrill Lynch reported $7.9 billion in write-downs leaving $20.9 billion in mortgage-related assets. Citigroup disclosed $5.9 billion in losses on $15.3 billion in mortgage-backed securities.  UBS wrote down approximately $3.7 billion on its mortgage-backed securities.

232.    Furthermore, the $700 million in write-downs reported by Lehman were calculated net of hedges.  However, given that Lehman later admitted that there was no direct hedge for Alt-A products, the importance of the gross amount of write-downs taken by Lehman

was significant.   Nevertheless, Lehman continued its steadfast refusal to provide meaningful insight into its MBS exposure.

233.   In the fourth quarter of 2007, Lehman wrote down its mortgage-related portfolio by $1.5 billion, net of hedging gains, on a $70 billion portfolio.  However, Citigroup wrote down $17.4 billion. Merrill Lynch took write-downs of $9.9 billion of approximately $14.7 billion in asset-backed CDOs and $1.6 billion in write-downs related specifically to subprime residential mortgages.  UBS announced it would take write-downs of $10 billion as a result of its subprime exposure.

234.   Moreover, although in the first quarter of 2008, Lehman recognized only a $1.1 billion gross write-down of its commercial real estate portfolios, or 3%, the index of "AAA" CMBSs fell approximately 10% while lower rated securities fell an even greater percentage.

235.   By not disclosing to the Plaintiffs the facts listed above about write-downs the Defendants materially misrepresented Lehman's Real Estate holdings in its Registration Statements and the SEC filings from the 2005 10-K, all 2006 10-Q, 2006 10-K, all 2007 10-Q's, 2007 10-K, and all 2008 10-Q and investor calls on March 14, 2007, June 12, 2007, September 18, 2007, December 13, 2007, March 18, 2008, June 16, 2008.

7.   LEHMAN FAILED TO DISCLOSE CONCENTRATIONS OF CREDIT

236.   GAAP requires disclosure of material risk concentrations. Specifically, AICPA Statement of Position ("SOP") No. 94-6, *Disclosure of Certain Significant Risks and Uncertainties* ("SOP 94-6"), requires disclosures relating to risks and uncertainties that could significantly affect the results reported in the financial statements in the near term (i.e., one year), particularly from "[c]urrent vulnerability due to certain concentrations" of assets or liabilities in certain aspects of the entity's operations. SOP 94-6, ¶ 8. Also, FAS No. 107,

*Disclosures About Fair Value of Financial Instruments* ("FAS 107"), as amended by FAS No.

133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"), requires

disclosure of significant concentrations of credit risk for financial instruments such as loans,

including information about the "economic characteristic that identifies the concentration." FAS

107, ¶ 15 A. Also, FASB Staff Position ("FSP") SOP 94-6-1, *Terms of Loan Products That May*

*Give Rise to a Concentration of Credit Risk* ("FSP SOP 94-6-1"), addresses disclosure

requirements for entities that originate, hold, guarantee, service, or invest in loan products whose

terms may give rise to a concentration of credit risk.

237.    Certain disclosures regarding credit risk were omitted until the filing of Lehman's

second quarter 2008 Form 10-Q on July 10, 2008 – after Plaintiff purchased its Lehman

securities – when Lehman belatedly began to provide certain partial disclosures concerning its

commercial mortgage and real estate-related portfolios (which themselves omitted material

facts). Specifically throughout 2006 until July 10, 2008, Lehman's public filings failed to

disclose adequately or meaningfully the Company's risk concentrations in highly risky Alt-A

loans.

238.    Lehman was a leading originator of Alt-A loans. Lehman's public filings did not

even include the term Alt-A until it filed its first quarter 2008 Form 10-Q, and even that filing

was materially misleading. When Lehman finally began to identify Alt-A holdings in that Form

10-Q, Lehman consolidated its Alt-A holdings with prime holdings into a single category labeled

"Alt-A/Prime," even though less than 7% actually consisted of "prime mortgage-related assets,

the public filings did not adequately disclose Lehman's true exposure to the riskier Alt-A loans

that dwarfed the prime loans and were experiencing rising delinquencies and defaults throughout

2007 and 2008.

239.   Moreover, Lehman did not disclose that it had loosened its lending standards for Alt-A loans such that they were actually more akin to subprime than to prime.

240.   By not disclosing to the Plaintiffs the facts listed above about concentrations of risk the Defendants materially misrepresented Lehman's financial position in its Registration Statements, Prospectuses and the SEC filings from the 2005 10-K, all 2006 10-Q, 2006 10-K, all 2007 10-Q's, 2007 10-K, and all 2008 10-Q and 2008 8-K and investor calls on March 14, 2007, June 12, 2007, September 18, 2007, December 13, 2007, March 18, 2008, June 16, 2008.

C.   ERNST & YOUNG: LEHMAN'S AUDITOR

241.   Lehman was required by the SEC to engage an independent auditor to review its interim financial information before filing its quarterly financial statements.   Ernst & Young served as Lehman's auditor for several years and at all times relevant to Plaintiffs' claims. During the relevant time period, E&Y reviewed Lehman's quarterly financial statements and issued unqualified audit reports on Lehman's annual financial statements.

242.   Throughout 2005, 2006, 2007, and 2008, E&Y audited Lehman's financial statements and internal controls, issued written reports as to whether the financial statements were properly reported and performed reviews of Lehman's quarterly financial results.   E&Y reviewed drafts of Lehman's filings with the SEC prior to filing.

243.   However, E&Y turned a blind eye to information in Lehman's financial statements that were improperly reported, including its Repo 105 activity.   As a result, E&Y violated basic professional and contractual duties, as well as GAAP and Generally Accepted Auditing Standards ("GAAS").

244.   As Lehman's "independent" auditor, E&Y was aware that its audit reports would be used and relied upon by analysts and prospective and existing Lehman investors in evaluating

Lehman's financial condition. However, E&Y failed to suggest modifications to Lehman's misleading statements involving Repo 105 and subprime mortgage holdings.

### 1.   E&Y's KNOWLEDGE OF LEHMAN's BUSINESS PRACTICES

245.   By virtue of its long history with Lehman, E&Y was intimately familiar with Lehman's business model, its employees and its products.

246.   E&Y had unique access to the underlying information used to prepare Lehman's financial statements, which was not available to the public, and was well aware that Lehman was improperly cooking its books.

247.   Through its annual audit and quarterly reviews, E&Y knew about or recklessly disregarded Lehman's Repo 105 activity.

248.   E&Y breached its professional duties to Lehman's investors and, contrary to its statements, failed to design or perform its audit in a manner by which it could then provide unqualified opinions regarding Lehman's financial statements.

### 2.   E&Y's KNOWLEDGE OF REPO 105

249.   E&Y was fully aware of Lehman's use of Repo 105 in the years prior to Lehman's collapse. E&Y approved Lehman's Repo 105 accounting policy and structure when Lehman introduced the program in 2001. In fact, Bart McDade testified to the Examiner that Lehman "vetted" its Repo 105 accounting policy with E&Y. ER at 914.

250.   E&Y Partner Kevin Reilly understood that Lehman used Repo 105 transactions to "manage balance sheet metrics."[20] In fact, Lehman employee Kristine Smith sent a memo to Reilly, William Schlich (E&Y's lead partner on the Lehman audits) and E&Y Partner Matthew

---

[20] After Lehman's Bankruptcy Examiner issued his report, the New York Attorney General filed a civil complaint against E&Y. While the New York Attorney General relied, in part on the Examiner's findings, that office also obtained facts and testimony through its own investigation. References to the New York Attorney General's Complaint are cited here as" NYAG ¶ ___."

Kurseil dated August 19, 2001 entitled "Rules of Road—Repo Recharacterizations (Repo 105)." That memo noted that Repo 105 transactions allowed Lehman "an increased ability to net down [its] balance sheet." NYAG ¶17.

251.    In October 2002, when Lehman was considering expanding Repo 105 transactions into a "Repo 107" structure, Kristine Smith again spoke with Reilly, Schlich and Kurzweil.  Lehman provided E&Y with another memo indicating that Repo 105 transactions were being done to "reduc[e] the balance sheet as firm inventory."[21]  NYAG ¶18.

252.    On October 3, 2002, Smith sent an email to E&Y again attaching "Rules of the Road—Repo Recharacterizations (Repo 105) memo.  That memo referred to the fact that the "true sale" opinion, which was required for a Repo 105 "sale" under SFAS 140, received by Lehman was from Linklaters, an English firm, concerning English law and dealing with trades executed in London with customers residing in jurisdictions covered under English law. NYAG ¶21.

253.    The Linklaters "true sale" letter was replete with conditions under which Lehman could use SFAS 140 to account for Repo 105 transactions as "sales."  In fact, Smith, who reviewed the Linklaters letter understood that it applied only to transactions between LBIE and a counterparty in the United Kingdom using assets sited in the United Kingdom.  However, Smith testified that despite this requirement, American based securities were being used in Repo 105 transactions—and she told Schlich of that fact. NYAG ¶23.  Financial data showing the use of American based securities in Repo 105 transactions was available to E&Y, but E&Y ignored the origins of the transferred securities despite internal E&Y guidelines that required auditors to consider whether a separate legal opinion would be required for transactions governed by SFAS 140.  E&Y's legal isolation guideline stated, after noting that legal opinions may differ in

---

[21] Remember that Lehman did eventually expand into the use of Repo 108s for equity securities.

different countries, that "engagement teams should consider the need to receive a legal opinion in each country in which assets may have originated when auditing global transfers of financial assets." NYAG ¶¶42.  E&Y failed to consider whether a United States true sale opinion would be needed for assets originally sited in the United States.

254.    Further, on September 7, 2006, Bharat Jain, one of E&Y's auditors, sent an email to his senior manager questioning Lehman's use of Repo 105.  Specifically, Jain asked about E&Ys "thought process behind how much of these Lehman should do from reputational risk, etc. perspective.   Are we comparing to other competitors, are we referring to any industry publications, any regulatory guidance, etc.?"  When Jain's superior, Jennifer Jackson received the email, she thought Jain had raised serious concerns.  She testified that she could not think of any other example where E&Y was concerned with Lehman's reputational risk based on a transaction.  Jackson decided to bring the issue to Schlich for his input, but could not recall if she actually followed through with that decision.  NYAG ¶¶43, 45.

255.    In August 2007, Lehman provided E&Y with its "Accounting Policy Review Balance Sheet Netting and Other Adjustments" known as the "Netting Grid" which identified Lehman's use of Repo 105 transactions.  The Netting Grid disclosed $29 billion in Repo 105 transactions as of the end of Lehman's first quarter 2007. However, when Lehman conducted its year end 2007 audit, the Netting Grid provided to E&Y only included the volume of Repo 105 transactions from November 30, 2006, through February 28, 2007. Despite all of the information listed above, including E&Y's own auditors concerns with Lehman's use of Repo 105 transactions and the fact that E&Y knew that it did not have all of the information regarding Repo 105 for its 2007 year-end audit, E&Y issued an unqualified opinion in Lehman's 2006 and 2007 10-Ks.  NYAG ¶46

256.    In late 2007 or early 2008, E&Y received even more warnings concerning Lehman's use of Repo 105 transactions.   Martin Kelly, former Lehman Global Financial Controller, testified that he specifically spoke with Schlich seeking advice regarding Lehman's accounting treatment of Repo 105 in an effort to understand how E&Y analyzed the Repo 105 program.   Kelly told Schlich that he was concerned with (1) Lehman's inability to obtain a "true sale" opinion under United States law coupled with Lehman's reliance on the Linklater's "true sale" opinion, (2) the fact that American-based securities were being used in Repo 105 transactions, (3) the spike in Repo 105 transactions at the end of each quarter, (4) the fact that the accounting for Repo 105 transactions were "form-driven" and "legalistic", and (5) the fact that no other investment banks were using Repo 105 transactions. NYAG ¶¶29, 47.

257.    Additionally Lehman gave a "Balance Sheet Analysis Package" dated February 2008 to E&Y.  That package included a detailed analysis of Lehman's Repo 105 program— including volume and timing.  The package included a chart demonstrating the quarter end spikes in Repo 105 usage. NYAG ¶46.

258.    Moreover, in May of 2008, Matthew Lee, Senior Vice President in the Finance Division sent a letter to Lehman senior management identifying potential ethics violations of balance sheet issues.  As a result, Lehman requested that E&Y conduct an investigation of Lee's concerns.  Two E&Y partners, Schlich and Hillary Hansen, interviewed Lee on June 12, 2008. Hansen's notes from the interview reflects Lee's concerns with Repo 105 and Lehman's awareness of the Repo 105 issue.  Specifically, Lee told Schlich and Hansen that Lehman had moved $50 billion of inventory off of its balance sheet through the use of Repo 105.

259.    The day following the interview with Lee, Schlich and/or Hansen spoke with Lehman's Audit Committee but did not disclose the information Lee divulged regarding the

large volume of Repo 105 usage.   On July 8, 2008, Schlich and/or Hansen met with the Audit Committee again and failed to reveal the information regarding Repo 105 even though the Chairman of the Audit Committee told E&Y that he wanted every aspect of Lee's concerns investigated.   Moreover, E&Y never followed up regarding Lehman's Repo 105 activity. Thereafter, E&Y signed a Report of Independent Registered Public Accounting Firm for Lehman's 2008 second quarter filing, on July 10, 2008.  The report specifically stated that E&Y was not aware of any material modifications that should be made to the consolidated financial statements for them to be inconformity with United States GAAP.

3.      E&Y's MISSTATEMENTS

260.    Each of Lehman's 10-Qs for the first, second and third quarters of 2006, the first, second and third quarters of 2007 and the first quarter of 2008 contained a "Report of Independent Registered Public Accounting Firm" signed by E&Y.  Each of those reports stated E&Y reviewed Lehman's consolidated financials in accordance with the standards of the PCAOB and that E&Y was "not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles."   These statements were materially misleading, as discussed below, because E&Y did not review Lehman's financials in accordance with the standards of the PCAOB.  The statements were additionally misleading because E&Y was aware of Lehman's use of Repo 105 transactions and the fact that Lehman failed to disclose its use of Repo 105 transactions.   E&Y was aware of the impact that Repo 105 transactions had on Lehman's net leverage and balance sheet and the fact that Lehman misrepresented that it treated all agreements to repurchase as collateralized agreements of financing transactions when it, in fact, treated Repo 105 transactions as sales.   The statements were additionally misleading

82

because Lehman's failure to disclose its Repo 105 transactions, as discussed above, violated GAAP.

261.    Lehman's 2005, 2006 and 2007 10-Ks contained a "Report of Independent Registered Public Accounting Firm" signed by E&Y.  Each of those reports certified that Lehman's financial results for each respective year were prepared in accordance with GAAP and that they fairly represented, in all material aspects, the financial condition and operation of Lehman.  E&Y also represented that it conducted its audit of Lehman's financials in accordance with GAAS.  However, these statements were misleading because E&Y's audit of Lehman did not comply with GAAS standards and Lehman's financial results were not prepared in accordance with GAAP because they failed to disclose Lehman's use of Repo 105 transactions to artificially shrink its balances sheet and lower its net leverage ratios. The statements were additionally misleading because E&Y was aware of Lehman's use of Repo 105 transactions and the fact that Lehman failed to disclose its use of Repo 105 transactions.  E&Y was aware of the impact that Repo 105 transactions had on Lehman's net leverage and balance sheet and the fact that Lehman misrepresented that it treated all agreements to repurchase as collateralized agreements of financing transactions when it, in fact, treated Repo 105 transactions as sales. The statements were additionally misleading because Lehman's failure to disclose its Repo 105 transactions, as discussed above, violated GAAP.

4.      E&Y's ACCOUNTING REQUIREMENTS

262.    The purpose of an audit is to protect a company's investors, who do not have access to inside information.  Although E&Y's duty was to inform investors of Lehman's true financial condition, E&Y ignored its duties and professional responsibilities.

### a.   GENERALLY ACCEPTED AUDITING STANDARDS

263.   The American Institute of Certified Public Accountants ("AICPA") developed rules and standards, GAAS, to provide guidance to auditors.  These standards, which were adopted by the PCOAB, consist of general standards of field work and standards of reporting, along with interpretations to assist auditors and provide guidance.

264.   In performing its audit work for Lehman, E&Y had a duty to perform such work in conformity with accounting principles, as well as GAAS' Ten (10) Professional Standards of Care which include the following relevant General Standards, Standards of Field Work and Standards of Reporting:

**General Standards**

Due professional care is to be exercised in the planning and performance of the audit and the preparations of the report.

**Standards of Field Work**

The work is to be adequately planned and assistants, if any, are to be properly supervised.

**Standards of Reporting**

The report shall state whether the financial statements are presented in accordance with Generally Accepted Accounting Principles.

265.   E&Y violated these standards in its auditing practices.

266.   E&Y violated the above GAAS Reporting Standard requiring the audit report to accurately represent whether the financial statements are presented in accordance with GAAP. E&Y's audit opinion falsely represented that Lehman's financial statements complied with GAAP.  As more fully explained above Lehman's 10Qs and 10Ks were not compliant with GAAP.  For example, Lehman's 2006 and 2007 10-Ks and its 10-Qs from the first quarter of 2007 until the first quarter of 2008, were not GAAP complaint (as discussed *supra*) because it failed to account for tens of billions of dollars in Repo 105 transactions.  E&Y knew that

Lehman's use of Repo 105 to "manage balance sheet metrics" and to report materially misleading net leverage rations did not conform to GAAP. Therefore, the statements made by E&Y that it Lehman's financials were reported in accordance with GAAP were materially misleading.

267.   Additionally, because E&Y knew that Lehman's reported financials from year end 2006 through the first quarter of 2008 were not GAAP complaint, E&Y's statement that it conformed to PCOAB standards when reviewing and/or auditing Lehman's financials was false and misleading.

268.   E&Y also failed to take proper action when it discovered that information regarding the timing and volume of Lehman's Repo 105 usage may be materially misleading as well as certain MD&A disclosures. Lehman's financial statements indicated that Lehman treated its Repo 105s as collateralized agreements and financings rather than sales. Although E&Y knew this information to be false (since it approved the Repo 105 Accounting Policy and the Policy was "vetted" with E&Y), E&Y failed to correct these statements or make any suggestions to Lehman to modify these statements before the financial statements were filed.

269.   Moreover, E&Y violated the above GAAS Field Standard by failing to adequately plan its audit and properly supervise the work of assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements.

270.   E&Y was aware of problems with Repo 105 since, at least 2002, (when it learned that Lehman was using American based securities for the transactions and that the purpose of the transactions was to "reduc[e] the balance sheet as firm inventory")—and was explicitly concerned with Repo 105 since, at least, September 2006. However, E&Y failed to properly

supervise assistants to search for and detect the existence of errors and irregularities (Repo 105 transactions) that would have a material impact on Lehman's financial statements and instead simply ignored the tens of billions of dollars in Repo 105 transactions which occurred each quarter immediately prior to the filing of the financial statements.

      **b.**     STATEMENTS ON AUDITING STANDARDS ("SAS")

    271.   The AICPA also issues Statements on Auditing Standards ("SAS") which provide further guidance to external auditors on GAAS in regards to auditing an entity and issuing a report.[22]

    272.   SAS provides that the purpose of an audit is to obtain an opinion that the financial statements fairly present, in all material respects, the financial position of the company in conformity with GAAP.[23] Furthermore, the auditor has the affirmative duty to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud.[24]

    273.   To obtain such reasonable assurance, the independent auditor has to perform specific GAAS procedures and then determine if anything came to his attention that would lead him to believe that the financial statements were not fairly presented in accordance with GAAP.[25] The audit process requires professional skepticism in order to properly test management's representations so that the auditor actually has a reasonable basis on which to form an opinion regarding the financial statements.[26]

    274.   The misstatements of Lehman's quarterly and annual financial statements were material and in violation of GAAP. E&Y breached its professional responsibilities and acted in

---

[22] These standards are referred to with an "AU" number.
[23] AU 110.01.
[24] AU 110.02.
[25] AU 772.09.
[26] AU 333.02.

violation of GAAP and GAAS in its review of the quarterly financials and audits of the annual financial statements of Lehman.

275.    E&Y violated AU Section 722.41-43 requiring that an auditor issue a modified review report that describes any inadequacies and non-GAAP compliant matters on the financial statements, including ensuring that the financial statements and related notes are informative of matters that may affect their use, understanding and interpretation.  Based on E&Y's knowledge of Lehman's Repo 105 program, as outlined above, E&Y also violated AU Section 722.07 stating that the review of financial statements is to determine whether the accountant is aware of any material modifications that should be made to the financial information to ensure GAAP compliance.  Further, AU Section 722.10 demands that an auditor gain knowledge about the business sufficient to identify material misstatements which E&Y failed to do.  E&Y also violated AU Section 722.18 which requires that an auditor should inquire about significant transactions occurring or recognized in the last several days of the interim period.

276.    FAS 140 requires that in order to shift assets off of the balance sheet, there must be a true sale of the asset.  Although Lehman treated the Repo 105 transactions as a sale to remove assets from its balance sheet, Lehman misrepresented in its 2006 and 2007 10-Ks, and in its 10-Qs for the first, second and third quarter of 2007 and first quarter of 208,  that it treated repurchase and resale agreements as collateralized agreements and/or financings.  E&Y was familiar with Lehman's Repo 105 practice and aware that these transactions were classified as sales; however, E&Y colluded with Lehman in deceiving investors by concealing these Repo 105 transactions and violated GAAP and auditing standards.

277.    Moreover, E&Y violated auditing requirements when it failed to report that the net leverage ratio contained in Lehman's financial reports was misleading.  E&Y was aware that

the Repo 105 transactions had a substantial impact on net assets resulting in the temporary and artificial reduction of the net leverage ratio but did not report a suggestion for modification.

278.    AU 316.79 requires that an auditor bring to the attention of the appropriate level of management any evidence discovered that a fraud may exist.  E&Y violated this standard when it failed to disclose the cumulative information revealed in 1) the Rules of the Road—Repo Recharacterizations (Repo 105) regarding the requirement of using assets cited in the United Kingdom when E&Y was told that Lehman was using American based securities, 2) the questions raised by E&Y's own auditors concerning the use of Repo 105, 3) the specific concerns raised by Kelly to E&Y regarding the Repo 105 program, 4) the information contained on the Netting Grid and the information garnered from E&Y's meeting with Lee regarding Repo 105 activity.  In addition, an auditor is required under AU 317 to make additional inquiries, perform tests and inform the management and audit committee if an issue arises as to the possible violations of laws or regulations.  However, E&Y ignored the numerous red flags associated with Lehman's Repo 105 program and failed to report any concerns or conduct additional investigation as required by the auditing standards.

279.    E&Y also specifically violated AU 316 which requires the auditor to plan and perform its examination of the financial statements with professional skepticism.  AU 316 begins by stating, "the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."[27]  In Lehman's case, as discussed above, there were numerous red flags and risk factors that alerted E&Y to the potential of misstatements, yet E&Y signed reviews and unqualified audit reports stating that Lehman's financials were prepared in compliance with GAAP.

---

[27] AU 316.01.

280.   E&Y failed to expand its audit procedures and perform effective audit testing to obtain more reliable, persuasive audit evidence because of the above-described significant risk factors and red flags.  As AU 316 states, "[t]he nature of audit procedures may need to be changed to obtain evidence that is more reliable or to obtain additional corroborative information.  For example, more evidential matter may be needed from independent sources outside the entity."

281.   As discussed above, E&Y failed, in violation of AU 316, to obtain adequate confirmations and/or otherwise communicate directly with affiliates of Lehman regarding the true value and exposure from Lehman's assets.

282.   AU 316.27, which discusses the need to exercise professional skepticism in response to the risk of material misstatement, directs: (a) increased sensitivity in the selection of the nature and extent of documentation to be examined in support of material transactions, and (b) increased recognition of the need to corroborate management explanations or representations concerning materials matters.

283.   Additionally, E&Y violated AU 722.18, which states: "If, in performing a review of interim financial information, the accountant becomes aware of information that leads him or her to question whether the interim financial information to be reported conforms with generally accepted accounting principles, the accountant should make additional inquiries or employ other procedures he or she considers appropriate to provide the limited assurance for a review engagement."  Since, at least, September 2006, E&Y auditors were concerned with Lehman's use of Repo 105 and considered that the usage might subject Lehman to reputational risk.  However, from that time until well after the Lee interview, E&Y failed to make any additional

inquiries or employ any other procedures to find out the extensive nature of Leman's use of Repo 105.

284.    E&Y did not follow basic accounting principles.  As a result, its audit reports and reviews misrepresented the true financial condition of Lehman and misrepresented that it had conducted its audits and reviews with professional standards of care.  In view of all the previously described risk factors and red flags at Lehman, E&Y should have made additional inquiries, including further communications with customers and other related parties.

D.    LEHMAN'S VARIOUS UNDERWRITERS

285.    Each of the Preferred J Underwriter Defendants, the ANTEX Underwriter Defendants and the Moody Foundation Underwriter Defendants underwrote, within the meaning of federal and state securities laws, the various securities purchased by Plaintiffs and outlined above.  In their capacity as underwriters they occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offerings in which they participated. Underwriters must exercise diligence of a type commensurate with the confidence, both as to integrity and competence, that is placed in them and must conduct a reasonable investigation into the offering in which they participate. By associating itself with a proposed offering, an underwriter impliedly represents that it has made such an investigation in accordance with professional standards. Investors properly rely on this added protection which has a direct bearing on their appraisal of the reliability of the representations in a prospectus.  An underwriter who does not make a reasonable investigation is derelict in its responsibilities to deal fairly with the investigating public. By its participation in a sale of securities, an underwriter makes a recommendation that implies that the underwriter has a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents used

90

in the offerings.  In light of this duty to review and confirm the accuracy of the material in the documentation that it distributes, an underwriter impliedly makes a statement of its own to potential investors that it has a reasonable basis to believe that the information contained in the prospectus it uses to offer or sell securities is truthful and complete.

E.    ADDITIONAL SPECIFIC MISREPRESENTATIONS IN SEC FILINGS

286.    In addition to the specific misrepresentations concerning Repo 105 and other matters discussed *supra*, Lehman made additional misrepresentations in its SEC filings, including but not limited to, the representations discussed below.

1.    LEHMAN'S 2006 10-K /2007 FIRST QUARTER 10-Q

287.    The filings failed to disclose Lehman's exposure to the non-prime mortgage market and that its Alt-A mortgages could not be directly hedged.  These statements in Lehman's 2006 SEC filings and 2007 First Quarter 10-Q contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*.

2.    LEHMAN'S 2007 SECOND QUARTER 10-Q

288.    On July 10, 2007, Defendant Christopher O'Meara signed the 10-Q filed by Lehman with the SEC for the second quarter of 2007.

289.    The second quarter 10-Q reported "record net revenues, net income and diluted earnings per share."  Lehman reported net revenue of $5.51 billion, net income of $1.27 billion, and revenue from Principal Transactions of $2.88 billion.

290.    The 10-Q reported total assets of $605.86 billion including $285.68 billion in financial instruments and inventory positions owned.  Of the $285.68 billion, Lehman reported that $79.63 billion related to mortgages and mortgage-backed positions and $15.89 billion related to real estate held for sale.

291.    The second quarter 2007 filing reported gross revenue of $13.61 billion, net revenue of $3.59 billion, revenue from Principal Transactions of $2.64 billion, Fixed Income revenue of $1.89 billion, income before taxes of $1.35 billion and segment assets of $595.5 billion for the Capital Market segment.

292.    Lehman reported that net revenues decreased compared to the 2006 periods, but stated that they "continue to actively risk manage mortgage-related positions through dynamic risk management strategies."

293.    The second quarter 2007 report indicated:

We utilize a number of risk measurement methods and tools as part of our risk management process.  One risk measure that we utilize is a comprehensive risk measurement framework that aggregates market event risk and counterparty risks.  Market event risk measures the potential losses beyond those measured in market risk such as losses associated with a downgrade for high quality bonds, defaults of high yield bonds and loans, dividend risk for equity derivatives, deal break risk for merger arbitrage positions, defaults for mortgage loans and property value losses on real estate investments.  Utilizing this broad risk measure, our average risk for the three months ended May 31, 2007 resulted in a comparative increase from the three months ended February 28, 2007 and November 30, 2006.  The comparative increases in this broad risk measure are largely attributable to growth in the Company's business activities across all business segments and general credit spread movements in the market during the period.

294.    The report also addressed reporting assets at fair value stating:

Financial instruments and other inventory positions owned and other inventory positions sold but not yet purchased, are presented at fair value.

\*        \*        \*

Fair value is defined as the price at which an asset or liability could be exchanged in a current transaction between knowledgeable, willing parties.  Where available, fair value is based on observable market prices or parameters or derived from such prices or parameters.  Where observable prices or inputs are not available, valuation models are applied.  These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity.  The valuation process to determine fair value also includes making appropriate adjustments to the valuation model outputs to consider risk factors.

Beginning December 1, 2006, assets and liabilities recorded at fair value in the consolidated Statement of Financial Condition are categorized based upon the level of judgment associated with the inputs used to measure their fair value.

295. Lehman reported in the second quarter of 2007 that it carried $79.63 billion in mortgages and mortgage-backed positions on its books. Of this total, the report indicated that $24 million were classified as Level 1 assets, $69.67 billion as Level 2 assets, and $9.93 billion as Level 3 assets. Lehman reported that $96 million of its Level 3 mortgages and mortgage-related assets related to net transfers into Level 3 during the quarter, while $241 million related to realized gains and $459 million related to unrealized losses incurred. Lehman further reported net transfers into Level 3 of $234 million, realized gains of $429 million and unrealized losses of $585 million.

296. Moreover, the second quarter 10-Q reported a $9.1 billion investment grade interest in residential mortgage securitizations, a $1.7 billion non-investment grade interest in residential mortgage securitizations and a $600 million interest in other securitizations at quarter end. Lehman reported that $5.2 billion of its investment grade interests related to "agency collateralized mortgage obligations."

297. The 10-Q contained statements signed by Defendants Fuld and O'Meara that based on their knowledge:

> [The] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; and

> [T]he financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

298.    The report also contained a statement by Defendants Fuld and O'Meara in accordance with Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1350 ("SOX"), that stated:

> The information contained in the Report fairly presents, in all material respects the financial condition and results of operations of the Company.

299.    These statements in Lehman's 2007 second quarter 10-Q contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*.  The filing also failed to disclose Lehman's use of Repo 105, its exposure to the non-prime mortgage market and that it failed to adequately write down its mortgage-related assets in accordance with their fair value.   Furthermore, the filing failed to disclose that Lehman's Alt-A mortgages could not be directly hedged or that Lehman did not properly manage risk.

### 3.    LEHMAN'S 2007 THIRD QUARTER 10-Q

300.    On October 10, 2007, Defendant Christopher O'Meara signed the 10-Q filed by Lehman with the SEC for the third quarter of 2007. The report for the third quarter of 2007 contained certifications regarding Lehman's financial reporting as well certifications regarding SOX compliance.  These statements were substantially similar to those set forth above at ¶¶297-98 and were signed by Defendants Fuld and O'Meara.  The third quarter report also contained statements concerning Lehman's risk management, substantially similar to those set forth above at ¶293.

301.    In the third quarter report for 2007, Lehman reported net revenue of $4.3 billion, net income of $0.8 billion.   The report also included reported revenue from Principal Transactions of $1.61 billion.

302.    With respect to Capital Markets, Lehman reported gross revenue of $12.8 billion, net revenue of $2.4 billion, revenue from Principal Transactions of $1.3 billion, Fixed Income revenues of $1.0 billion, and Capital Markets segment assets of $648.2 billion.

303.    Furthermore, the third quarter filing reported that Lehman's Principal Transactions revenues decreased 28%, "with the decrease quarter over quarter generally attributable to negative valuation adjustments taken in our Capital Markets segment." Regarding this decrease, Lehman commented:

> Net revenues for our Fixed Income component of our Capital Markets business segment decreased 47% and 19% for the 2007 three and nine months, respectively. Our Capital Markets – Fixed Income businesses were the most affected by the market dislocations, risk re-pricing and de-levering that swept through the global capital markets during our third quarter. The adverse changes in the credit markets and continued correction in certain asset-backed security market segments impacted our valuations for certain inventory assets and lending commitments. We recorded very substantial valuation reductions, most significantly on leveraged loan commitments and residential mortgage-related positions. **These losses were partly offset by large valuation gains relating to economic hedges and liabilities. The impact of these valuation adjustments was a net reduction to revenues in Capital Markets – Fixed Income of approximately $700 million.**

(Emphasis added.)

304.    In the filing, Lehman also asserted that it "measure[s] financial instruments and other inventory positions owned . . . at fair value."

305.    The third quarter reported included the following statement:

> Generally, assets and liabilities carried at fair value and included in [Level 3] are certain mortgage and asset backed securities, certain corporate debt, certain private equity investments and certain derivatives.

> Financial assets and liabilities presented at fair value and categorized as Level III are generally those that are marked to model using relevant empirical data to extrapolate an estimated fair value. The models' inputs reflect assumptions that market participants would use in pricing the instrument in a current period transaction and outcomes from the models represent an exit price and expected future cash flows. Our valuation models are calibrated to the market on a

frequent basis.  The parameters and inputs are adjusted for assumptions about risk and current market conditions.  Accordingly, results from valuation models in one period may not be indicative of future period measurements.  Valuations are independently reviewed by employees outside the business unit and where applicable, valuations are back tested comparing instruments sold to where they were marked.

During the 2007 three months, Level III assets increased to 12% of total Financial instruments and other inventory positions owned and measured at fair value, compared to 8% in the trailing quarter.  The increase in Level III assets resulted largely from the reclassification of approximately$9.8 billion of assets previously categorized as Level II assets into the Level III category in the third quarter of 2007   Reduced liquidity in the capital markets resulted in a decrease in the observability of market prices for certain financial instruments, particularly for mortgage products.

306.    The third quarter report for 2007 reported total assets of $659.21 billion, including $302.29 billion in financial instruments and inventory positions owned.  Of that $302.29 billion, Lehman reported that $88 billion related to mortgages and mortgage-backed positions and $20.04 billion related to real estate held for sale.

307.    The third quarter 10-Q further reported that, of the $88 billion in mortgages and mortgage-backed positions recorded as of August 31, 2007, $222 million were classified as Level 1 assets, $65.03 billion as Level 2 assets, and $22.74 billion as Level 3 assets.  Lehman also categorized as Level 2 assets $246 million in mortgages and mortgage-backed positions sold but not yet purchased.

308.    Of the Level 3 assets reported, Lehman reported $1.85 billion in periodic payments, purchases and sales, $9.58 billion in net transfers into Level 3, $213 million in realized gains and $829 million in unrealized losses.  For the nine months ended August 31, 2007, Lehman reported $5.39 billion in Level 3 periodic payments, purchase and sales, $9.57 billion net transfers into Level 3, $687 million in realized gains, and $1.11 billion in unrealized losses.

309.    In addition, Lehman reported that it carried $9.2 billion in retained investment grade interests in residential mortgage securitizations, $1.7 billion in non-investment grade interests in residential mortgage securitizations, and a $3.4 billion retained interest in other securitizations.  Lehman also explained that the $3.4 billion exposure "included approximately $3.2 billion of investment grade commercial mortgages and approximately $0.1 billion of non-investment grade commercial mortgages."

310.    The statements in Lehman's 2007 third quarter 10-Q contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*.  The filing also failed to disclose Lehman's use of Repo 105, its exposure to the non-prime mortgage market and that it failed to adequately write down its mortgage-related assets in accordance with their fair value.  Furthermore, the filing failed to disclose that Lehman's Alt-A mortgages could not be directly hedged or that Lehman did not properly manage risk

4.    LEHMAN'S 2007 10-K

311.    On January 29, 2008, Lehman filed its Annual Report with the SEC for 2007.  The 2007 10-K was signed by Defendants Fuld, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber.  The 2007 10-K also contained certifications regarding Lehman's reporting, as well as those certifications required for SOX compliance.  These statements were substantially similar to those set forth above at ¶¶297-98, and were signed by Defendants Fuld and Callan.  The 2007 10-K also contained statements concerning the Company's risk management, which were substantially similar to those set forth above at ¶293.

312.    In the 2007 10-K, Lehman reported net revenue of $19.257 billion, including revenues from Principal Transactions of $9.197 billion, net income of $4.192 billion.

313.   With respect to Lehman's Capital Markets segment in 2007, the report indicated gross revenues of $51.897 billion, net revenues of $12.257 billion, revenues from Principal Transactions of $8.4 billion, Fixed Income revenues of $5.977 billion.

314.   Regarding Lehman's Capital Markets Fixed Income segment, Lehman reported the following values which "generally contributed to the decline of Capital Markets – Fixed Income revenues in 2007 from 2006":

| Gain/(Loss) in Billions | Gross | Net |
|---|---|---|
| Residential Mortgage-Related Positions | $(4.7) | $(1.3) |
| Commercial Mortgage Related Positions | (1.2) | (0.9) |
| Collateralized Debt and Lending Obligation Positions | (0.6) | (0.2) |
| High-Yield Contingent Acquisition Loans and Facilities | (1.0) | --- |
| Valuation of Debt Liabilities | (0.9) | (0.9) |
| TOTAL | $(6.8) | $(1.9) |

315.   As in its prior filings with the SEC, Lehman again represented in the 2007 10-K that: "[W]e measure financial instruments and other inventory positions owned . . . at fair value."

316.   The 2007 10-K reported total assets of $691.063 billion, financial instruments and inventory positions owned of $313.129 billion, of which the Company stated that $89.106 billion related to mortgages and asset-backed positions.

317.   The 2007 10-K also discussed Lehman's Level 3 assets, making representations substantially similar to those set forth previously. In addition, the 2007 10-K stated:

> During the 2007 fiscal year, our Level III assets increased, ending the year at 13% of Financial instruments and other inventory positions owned, measured at fair value and with our derivatives on a net basis. The increase in Level III assets resulted largely from the reclassification of approximately $11.4 billion of mortgage and asset-backed securities, including approximately $5.3 billion in U.S. subprime residential mortgage-related assets, previously categorized as Level II assets into the Level III category. This reclassification generally occurred in the second half of 2007, reflecting the reduction of liquidity in the capital markets that resulted in a decrease in the observability of market prices.

Approximately half of the residential mortgage-related assets that were classified as Level III at the end of the 2007 fiscal year were whole loan mortgages. In particular, the decline in global trading activity impacted our ability to directly correlate assumptions in valuation models used in pricing mortgage-related assets, including those for cumulative loss rates and changes in underlying collateral values to current market activity. Additionally and during the fiscal year, the increase of assets characterized as Level III was also attributable to the acquisition of private equity and other principal investment assets, funded lending commitments that had not been fully syndicated at the end of the fiscal year as well as certain commercial mortgage-backed security positions.

318.    Lehman broke down a portion of its $89 billion position in mortgage and asset-backed securities in the 2007 10-K, as set forth in the chart below:

| In Billions | Nov. 30, 2007 | Nov. 30, 2006 |
|---|---|---|
| **Residential and Asset-Backed:** | | |
| Whole Loans | $19.578 | $18.749 |
| Securities | 16.488 | 7.923 |
| Servicing | 1.183 | .829 |
| Other | 0.086 | 0.016 |
| Total Res. And Asset-Backed | $37.344 | $27.517 |
| **Commercial** | | |
| Whole Loans | $26.200 | $22.426 |
| Securities | 12.180 | 1.948 |
| Other | .588 | .351 |
| Total Commercial | $38.938 | $24.725 |
| **TOTAL** | $76.282 | $52.242 |

319.    Lehman also reported a $5.276 billion exposure to subprime residential mortgages, and stated that $3.226 billion of this exposure related to whole loans, while $1.995 billion related to retained interests in securitizations and $55 million to other subprime exposure.

320.    The 2007 10-K also reported $240 million in Level 1, $63.672 billion in Level 2, and $25.194 billion in Level 3 assets of the $89.1 billion mortgage exposure. Addressing the losses attributable to Lehman's Level 3 assets, the 2007 10-K stated:

Net revenues (both realized and unrealized) for Level III financial instruments are a component of Principal transactions in the Consolidated Statement of Income. Net realized gains associated with Level III financial instruments were approximately $1.3 billion for the fiscal year ended November 30, 2007. The net

unrealized loss on Level III non-derivative financial instruments was approximately$2.5 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized losses from mortgage and asset-backed positions. The net unrealized gain on Level III derivative financial instruments was approximately $1.6 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized gains from equity and interest rate-related derivative positions.. Level III financial instruments may be economically hedged with financial instruments not classified as Level III; therefore, gains or losses associated with Level III financial instruments are offset by gains or losses associated with financial instruments classified in other levels of the fair value hierarchy.

321.    With respect to its Level 3 asset value during fiscal year 2007, Lehman reported $6.914 billion in net payments, purchases and sales, $11.373 billion in net transfers into Level 3, $995 million in realized gains and $2.663 billion in unrealized losses.

322.    Lehman also reported $11.3 billion in retained interests in securitizations. Of this total, Lehman retained $7.1 billion in investment grade interests in residential mortgage securitizations, $1.6 billion in non-investment grade interests in residential mortgage securitizations, $2.4 billion in investment grade interests in commercial mortgage securitizations, and $26 million in non-investment grade interests in commercial mortgage securitizations.

323.    The 2007 10-K also contained representations concerning Lehman's risk management:

> Our goal is to realize returns from our business commensurate with the risks assumed. Our business activities have inherent risks that we monitor, evaluate and manage through a comprehensive risk management structure. These risks include market, credit, liquidity, operational and reputational exposures, among others.
>
> The bases of our risk control processes are:
>
> •    We establish policies to document our risk principles, our risk capacity and tolerance levels.
>
> •    We monitor and enforce adherence to our risk policies.
>
> •    We measure quantifiable risks using methodologies and models based on tested assumptions.

100

- We identify emerging risks through monitoring our portfolios, new business development, unusual or complex transactions and external events and market influences.

- We report risks to stakeholders.

324.   The 2007 10-K included E&Y's clean audit opinion:

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2007 and 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2007, in conformity with U.S. generally accepted accounting principles.  Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control over financial reporting as of November 30, 2007, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated January 28, 2008 expressed an unqualified opinion thereon.

325.   The statements in Lehman's 2007 10-K contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*. The filing also failed to disclose Lehman's use of Repo 105, its exposure to the non-prime mortgage market and its failure to adequately write down its mortgage-related assets in accordance with their fair value.  Furthermore, the filing failed to disclose that its Alt-A mortgages could not be directly hedged and that Lehman failed to properly managed its risk.

5.   LEHMAN'S 2008 FIRST QUARTER 10-Q

326.   On April 8, 2008, Defendant Erin Callan signed the 10-Q filed by Lehman with the SEC for the first quarter of 2008.

327.   The report included certifications regarding Lehman's interim financial statements and internal controls over financial reporting, as well as those certifications required

for SOX compliance, which were substantially similar to those set forth above at ¶¶297-98, and were signed by Defendants Fuld and Callan. The first quarter 2008 report also contained statements concerning the Company's risk management and the effectiveness of the Lehman's internal disclosure controls, substantially similar to those set forth above at ¶293.

328. In the first quarter 2008 report, Lehman reported net revenues of $3.507 billion, net income of $489 million. In addition, Lehman reported revenues from Principal Transactions of $773 million.

329. Furthermore, in the first quarter 2008 10-Q, Lehman disclosed total assets of $786.03 billion, financial instruments and inventory positions owned of $326.658 billion. Of that $326.65 billion, Lehman disclosed that $84.60 billion related to mortgages and asset-backed positions.

330. With respect to the Capital Markets segment, Lehman reported gross revenues of $10.512 billion, net revenues of $1.67 billion, revenue from Principal Transactions of $420 million, Fixed Income revenues of $262 million and Capital Markets segment assets of $774.6 billion.

331. In the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the report, Lehman attributed the reduction in Capital Markets Principal Transactions revenues to approximately $1.8 billion in "negative valuation adjustments made on certain components of Capital Markets inventory."

332. Moreover, the first quarter 2008 report indicated a $4.10 billion exposure to the subprime mortgage market: $1.29 billion in residential subprime whole loans, $2.69 billion in retained interests in subprime-backed securitizations, and $30 million in other subprime exposure as of February 29, 2008.

333.    The first quarter 2008 10-Q also reported that Lehman classified $270 million of its $84.6 billion in mortgage and asset-backed securities as Level 1 assets, $60.52 billion as Level 2 assets, and $23.81 billion as Level 3 assets.  Lehman further reported that the quarterly change in its Level 3 assets resulted from $46 million in net payments, purchases and sales, $519 million in net transfers out of Level 3, $83 million in realized gains and $750 million in unrealized losses.  The report further reported net gains (unrealized/realized) of $228 million on Level 3 assets.

334.    In addition, Lehman reported the following valuation adjustments to its real estate and mortgage-related positions for the three months ended February 29, 2008:

| Gain/(Loss) in Billions | Gross | Net |
|---|---|---|
| Residential Mortgage-Related Positions | $(3.0) | $(0.8) |
| Commercial Mortgage-Related Positions | (1.1) | (0.7) |
| Collateralized Debt and Lending Obligation Positions | (0.2) | (0.1) |
| Acquisition Finance Facilities (Funded and Unfunded) | (0.7) | (0.5) |
| Real Estate-Related Investments | (0.3) | (0.3) |
| Valuation of Debt Liabilities | 0.6 | 0.6 |
| TOTAL | $(4.7) | $(1.8) |

335.    The statements in Lehman's 2008 first quarter 10-Q contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*.  The filing also failed to disclose Lehman's use of Repo 105, its exposure to the non-prime mortgage market and its failure to adequately write down its mortgage-related assets in accordance with their fair value.  Furthermore, the filing failed to disclose that its Alt-A mortgages could not be directly hedged and that Lehman failed to properly manage risk.

F.    SCIENTER

336.    In addition to all other scienter allegations pled in this Second Amended Complaint, Plaintiffs further plead that Defendants Fuld, O'Meara, Gregory, Callan and Lowitt

(the "Officer Defendants") and E&Y acted with scienter in intentionally misrepresenting facts to the public and omitting material information from their SEC filings and conference calls.

337.    These Officer Defendants were the highest ranking officers at Lehman. Defendant Fuld was CEO from 1993 until Lehman filed bankruptcy in September 2008. Defendant O'Meara was CFO, Controller and an Executive Vice President from 2004 until December 1, 2007, and was in charge of Lehman's Worldwide Risk Management division. Defendant Gregory acted as COO until he was forced to resign in June 2008. Defendant Callan was CFO and an Executive Vice President from December 1, 2007 until June 2008. Defendant Lowitt became the CFO in June 2008, served as Co-Chief Administrative Officer and was on Lehman's Executive Committee.

338.    The Officer Defendants' positions within Lehman made them aware of the circumstances surrounding Lehman's business practices and financial position.   Each of the Officer Defendants made representations or failed to disclose information regarding Lehman's true financial condition through financial statements and public press conferences.

339.    Emails and documents distributed to Lehman's top executives, including the Officer Defendants, evidence each Officer Defendant's knowledge of Lehman's extensive use of Repo 105 transactions solely to gain balance sheet relief, in addition to Lehman's exposure to the failing market and its lack of sufficient capital.[28]  For example, a report detailing the daily benefit of Repo 105 to Lehman's balance sheet – "Balance Sheet and Disclosure Scorecard" was distributed to Defendants O'Meara, Callan and Lowitt, from April 2008 through September of 2008. ER at 915-16. However, each of the Officer Defendants continually reassured the public affirmatively stating that Lehman had sufficient capital and was in a position to overcome the

---

[28] Emails and documents provided to the House of Representatives Committee on Oversight and Government Reform for a hearing on October 6, 2008, regarding the Lehman bankruptcy.

rough economic market.  The Officer Defendants knew or recklessly disregarded the untrue or misleading nature of statements made regarding Lehamns' balance sheet, leverage, repo financing and financial results, based on their knowledge of Repo 105 transactions.  The sheer size of the Repo 105 program was such that the Officer Defendants could not have been unaware of its existence.  In fact, given that Repo 105 transactions had such a material impact on Lehman's balance sheet and financial reportings, including its reported leverage positions, the Officer Defendants had to have been aware of the practice.  As such, the Officer Defendants knew, or recklessly disregarded 1) the fact that Repo 105 transactions had no legitimate business purpose and 2) that the sole purpose in the use of Repo 105 transactions was to manage Lehman's balance sheet during a time when rating agencies and analysts (and, therefore Lehman, itself) were focused on leverage ratios.  The failure of the Officer Defendants to disclose the use of Repo 105 transactions, given their significant and material impact on Lehman's reported financials, evidences an intent to deceive.

340.   In addition to the Officer Defendants scienter with respect to Repo 105 transactions, the Officer Defendants also knew or recklessly disregarded the untrue or misleading nature of other statements or actions by Lehman, as discussed below.

341.   Although Lehman's competitors, many with less exposure to the non-prime mortgage market than Lehman, continuously took large write-downs, Lehman's executives took only minimal write-downs and made statements to the public and Lehman's investors that the company had superior risk management practices.

342.   Defendants Fuld, O'Meara, Callan and Lowitt signed 10-Qs and/or 10-Ks verifying SOX compliance and attesting to their responsibility for and knowledge of disclosure

controls and procedures, as defined in Exchange Act rules 13a-15(e) and 15d-15(E), as well as Lehman's internal controls over financial reporting.

343. Upon information and belief, based on Lehman's close relationship with its Alt-A subsidiary, Aurora, Lehman was in constant communication with Aurora and received performance reports on the loans Aurora serviced for Lehman. From these reports, Lehman was made aware that delinquencies and foreclosures began increasing dramatically in 2006.

344. Upon information and belief, based on Lehman's close relationship with BNC, Lehman's subprime subsidiary, BNC distributed monthly reports to Lehman about the problems BNC faced selling its loans in the secondary market, evidencing Lehman's knowledge that the mortgage market was declining.

345. Defendant Fuld even admitted on June 16, 2008, that Lehman did not react to the eroding markets and that Lehman's $2.8 billion loss that it was his responsibility.

346. In September 2008, in the midst of announcing an additional $3.9 billion loss, Defendant Lowitt finally admitted that there was "no direct hedge for Alt-A assets" despite Lehman's previous assurances to the contrary.

347. In a 2008 internal document, Lehman questioned how it had allowed itself to be so exposed while admitting that it saw the warning signs and knew the conditions were not sustainable but did not move early or fast enough to prevent staggering losses. Such an admission speaks volumes to the Officer Directors' state of mind.

348. However, despite seeing the warning signs and knowing about the unfavorable market conditions, the Officer Defendants steadfastly refused to curtail the use of Repo 105 transactions or to provide transparency into Lehman's assets and liabilities resulting in personal rewards for each Officer Defendant. For example, Defendant Fuld was paid $40 million,

Defendant Gregory was paid $34 million and Defendants O'Meara and Lowitt were each paid over $9 million, during the 2007 fiscal year.

### 1.   DEFENDANT FULD

349.   As early as November of 2004, Defendant Fuld predicted that low interest rates and cheap credit would create a real estate bubble that would one day pop.   Nevertheless, Defendant Fuld repeatedly misled investors by painting an improperly rosy picture of Lehman's financial condition in the company's 10-Ks and 10-Qs.   He knew that the filings contained material misrepresentations regarding Lehman's use of Repo 105 transactions for balance sheet relief, Lehman's lack of risk controls, Lehman's overvaluation of its assets, risk exposure to the non-prime mortgage market and its capital and liquidity all of which impacted Lehman's reported earnings.

350.   Defendant Fuld, who was admittedly focused on balance sheet and net leverage reduction in 2008, was aware of Lehman's extensive usage of Repo 105. ER at 806.   On March 27, 2008, Defendant Fuld received materials for a March 28, 2008, meeting, including a Balance Sheet and Key Disclosure document.   Those materials specifically referred to "Repo 105" as a topic on the agenda along with a presentation that noted Lehman's quarter-end Repo 105 usage for the first quarter of 2008 as $49.1 billion. ER at 918.   Bart McDade told the Examiner that he walked Defendant Fuld through the Balance Sheet and Key Disclosure document and "discussed with Fuld Lehman's quarter-end Repo 105 usage--$38 billion at year-end 2007, $49.1 billion at first quarter 2008 and $50.3 billion at second quarter 2008." ER at 919.

351.   Additionally, McDade had several discussions with Defendant Fuld about Lehman's Repo 105 usage in June of 2008, specifically regarding reducing the usage of Repo

105 transactions. ER at 919.  Based on his conversations with Defendant Fuld in June of 2008, McDade understood that Defendant Fuld:

     a.         "knew, at a basic level, that Repo 105 was used in the firm's bond business"

     b.         "was familiar with the term Repo 105"

     c.         understood reduction of Repo 105 usage "would put pressure on traders"

     d.         "knew about the accounting of Repo 105."

ER at 920-21.

352.    Based on this information, the Examiner concluded that Defendant Fuld was aware of Lehman's Repo 105 usage prior to signing Lehman's first quarter 10-Q 2008. ER at 999-1000.

353.    Further, mere months before Lehman's collapse, when Defendant Fuld was well aware of Lehman's lack of capital, Defendant Fuld agreed with a top Lehman executive that Lehman should spend $2 billion (of a $5 billion capital infusion) to buy back Lehman stock to punish an outspoken short-seller instead of using the money to shore up Lehman's capital position.[29]

354.    Further, despite the fact that less than a month earlier Lehman was looking to raise capital, on a June 16, 2008, conference call, Defendant Fuld continued to reassure analysts that Lehman's "capital and liquidity positions have never been stronger" even though Lehman's internal documents predicted that "[with] a small number of investors accounting for a large portion of demand, liquidity can disappear quite fast." Additionally, although Fuld stated that Lehman "had the benefit of much greater price visibility" into the non-prime market, he was well aware that "very few of the top financial issuers have been able to escape damage from the subprime fallout."

---

[29] May 26, 2008 email from David Goldfarb to Defendant Fuld.

355.    On September 10, 2008, only three months after Defendant Fuld wholeheartedly reassured investors and analysts of Lehman's superior financial condition, Lehman released its third quarter 2008 results and reported a staggering $3.9 billion loss, as well as another $7.8 billion in gross write-downs on its residential and commercial real estate holdings.  Despite this news, however, Defendant Fuld told investors that Lehman was on the right track to put the last two quarters behind it.

### 2.    DEFENDANT O'MEARA

356.    Defendant O'Meara repeatedly misled investors by painting an improperly rosy picture of Lehman's financial condition in the company's 10-Ks and 10-Qs and in public statements.    He knew that his comments and Lehman's filings contained material misrepresentations regarding Lehman's use of Repo 105 transactions to obtain balance sheet relief, risk controls, asset valuation, risk exposure to the non-prime mortgage market, and its capital and liquidity all of which impacted Lehman's reported earnings.

357.    Defendant O'Meara's knowledge of Lehman's Repo 105 program was extensive. By July 2006, Defendant O'Meara participated in setting a cap at $17 billion on Lehman's Repo 105 transactions and a $5 billion cap for Repo 108. ER at 921.

358.    Edward Grieb, Global Financial Controller, spoke with Defendant O'Meara repeatedly about Repo 105 transaction targets and limits over a period of several years *ending* December 1, 2007. ER at 924.

359.    Grieb, Defendant O'Meara and Gerard Reilly were responsible in setting limits on Repo 105 for several years—as late as November 2007. ER at 924.  In fact, a change in the Repo 105 limit could not be implemented without the consensus of Grieb, Defendant O'Meara and Reilly. ER at 924.

360.   Moreover, Defendant O'Meara continued to be involved in Lehman's Repo 105 program after his tenure as Lehman's CFO in taking on the role of Chief Risk Officer. ER at 926. An April 11, 2008 email from Defendant O'Meara to Reilly indicates a planned discussion regarding Lehman's Repo 105 program on April 14, 2008. ER at 927. In addition, Defendant O'Meara received a report issued continuously between April and September of 2008, the "Daily Balance Sheet Disclosure Scorecard," which noted Repo 105 and its impact on the balance sheet. ER at 928.

361.   Based on his extensive knowledge of the program, Defendant O'Meara had a duty to report the impact Lehman's Repo 105 program on Lehman's balance sheet –and the purpose for engaging in the transactions to his superiors—including Defendants Fuld, Gregory, Lowitt and Callan. ER at 1013.

362.   In addition to his knowledge of Lehman's Repo 105 usage, Defendant O'Meara had knowledge of other events occurring at Lehman. In a March 2007 conference call, Defendant O'Meara, despite knowing of the problems in the non-prime mortgage market told analysts that the company perceived the subprime business as having a minor impact on the economy and as being "reasonably contained." He even went on to state that Lehman expected to "see various opportunities as a result of the market dislocations."

363.   Defendant O'Meara assured analysts, despite increasing demands on Lehman's capital due to the problems with the mortgage market, that Lehman was "well positioned to benefit from this evolving situation given [its] experience in this sector as well as [its] ample liquidity and risk management practices.

364.   Additionally, although he knew that Lehman's two subsidiaries, Aurora and BNC, were funneling large amounts of *subprime* mortgages to Lehman for securitization, Defendant

O'Meara falsely reported that Lehman was "far more active in the prime and Alt-A" mortgages markets and represented that the majority of Lehman's non-investment grade retained interest and securitizations were prime mortgage related.

365.    Defendant O'Meara repeatedly assured investors that Lehman actively hedged its inventory positions and that Lehman's hedging strategies were "quite effective." However, Defendant O'Meara never disclosed what hedging strategies Lehman employed and wholly failed to disclose Lehman's inability to directly hedge Alt-A loans.

366.    Finally, even while Defendant O'Meara admitted that Lehman had good visibility into the mortgage market, he knew that Lehman increasingly valued its securitizations at Level 3.

### 3.    DEFENDANT GREGORY

367.    As Chief Operating Officer, Defendant Gregory was in charge of the day-to-day workings of Lehman and was aware of the misrepresentations made by various Lehman officers and directors but did nothing to correct those misrepresentations or filings.

368.    In March of 2008, Defendant Gregory began assisting McDade with "determining balance sheet targets firm-wide." ER at 810. On March 28, 2008, McDade called a meeting of Lehman's Executive Committee, including Defendant Gregory, to discuss the direction Lehman should pursue from a balance sheet perspective. The night before the meeting, McDade caused to be circulated various materials for the next day's meeting, including an agenda which specifically referenced, among other things, "Repo 105/108," "Delever v Derisk" and "Limit Accountability." ER at 813. At that meeting, McDade specifically discussed Lehman's use of Repo 105 transactions and its quarter end usage ($49.1 billion) for the first quarter of 2008. McDade testified to the Examiner that one of the reasons he sought the March 28 meeting was "to request Gregory's blessing in freezing Lehman's Repo 105 usage." ER at 999.

369.    Defendant Gregory as a member of the Risk Committee at Lehman and received the "Firm –Wide Risk Drivers" report, which contained detailed information regarding the firm's risks, and explanations regarding week-over-week changes in the data.

370.    Disregarding risk limits was a deliberate decision that Defendant Gregory made over the objection of other Lehman management, including Alex Kirk, then head of Lehman's Credit Business, and Madelyn Antoncic, then Lehman's Chief Risk Officer.

371.    Also, Defendant Gregory sought to remove insiders who opposed Lehman's growing risk management practices and who voiced concerns about the growing liquidity crisis. In 2007, Defendant Gregory removed Michael Gelband, head of Lehman's Fixed Income Division, and Madelyn Antoncic because of their opposition to management's growing accumulation of risky and illquid assets.

372.    Defendant Gregory was a member of Lehman's Executive Committee which was responsible for assessing Lehman's "risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed," and "allocated the usage of capital to each of our businesses and establishes trading and credit limits for counterparties."  The Executive Committee met twice a week for two hours at a time and "devoted significant amount of that time to risk."  According to Defendant Callan the Executive Committee was "intimately familiar with the risk that we take in all the different areas of our business."

### 4.    DEFENDANT CALLAN

373.    Defendant Callan had specific knowledge of Lehman's Repo 105 usage.  Martin Kelly spoke with Defendant Callan regarding his concern for the use of Repo 105 transactions including: (1) "reputational risk" if the public learned that Lehman used Repo 105 transactions solely to reduce its balance sheet; (2) the size of Lehman's Repo 105 usage; (3)  the "technical

basis" for Repo 105 usage, from an accounting prospective (4) Kelly's belief that none of Lehman's peers used Repo 105; and (5) the fact that Lehman's Repo 105 usage spiked at quarter-end. ER at 930.

374. Defendant Callan acknowledged that there was risk and that Kelly was concerned; however, Defendant Callan authorized Lehman's continued use of Repo 105 transactions. ER at 933.

375. In fact, documents discovered by the Examiner indicate that the use of Repo 105 was "a conversation at the CFO level" as of December 21, 2007, and that Defendant Callan received communications from various Lehman executives concerning the existence, volume, timing and materiality of Repo 105 transactions as early as January 2008. ER at 934-36. Defendant Callan "acknowled[ed] she was aware, as CFO, that Lehman's Repo 105 practice impacted net balance sheet [and] that the transactions had to routed through Europe." ER at 914.

376. Furthermore, Defendant Callan received materials for a March 28, 2008 meeting referencing Repo 105/108 in the agenda and indicating Lehman's $49.1 billion in Repo 105 transactions for the first quarter of 2008. ER at 934. Moreover, Defendant Callan attended the March 28, 2008 meeting where McDade discussed Lehman's use of Repo 105 and the need for a cap on Repo 105 transactions.

377. Defendant Callan was aware of the existence, timing, volume, materiality and purpose of Repo 105 transactions prior to placing her signature on Lehman's first quarter 10Q.

378. Defendant Callan represented to investors that Lehman's model with respect to the residential mortgage market was to originate and distribute MBSs rather than hold them. Based on this model, she stated that Lehman was not betting one way or the other about the performance of the underlying loans. However, she failed to disclose that even if Lehman did

distribute the MBSs in accordance with its model, the company still had exposure to nonperforming loans because of the buy-back provisions contained in the securities.

379.    Defendant Callan repeatedly assured investors that Lehman actively hedged its residential mortgage book. However, Defendant Callan also told investors that that residential mortgage book was constituted of primarily prime loans when, in reality, Lehman's book held largely Alt-A and subprime loans. Defendant Callan failed to tell investors that there was no direct hedge for Alt-A loans.

380.    Defendant Callan also commented that Lehman's superior risk management allowed Lehman to avoid large losses in the mortgage market. However, Defendant Callan, as CFO, was aware that Lehman's hedging strategies were ineffective and that Lehman did not internally manage risk.

381.    Despite the fact that Defendant Callan admitted that Lehman had transparency in the Alt-A sector, Lehman continued to move assets from Level 2 to Level 3.

5.    DEFENDANT LOWITT

382.    Defendant Lowitt was familiar with Lehman's use of Repo 105 to lower its balance sheet and was aware that Lehman began its Repo 105 program in the early 2000's. ER at 937. Defendant Lowitt was aware of Lehman's use of Repo 105 transactions for "many years" and was aware that Lehman used Repo 105 to "meet balance sheet targets." ER at 914-15. Defendant Lowitt stated to the Examiner that "Repo 105 transactions used only liquid inventory" and that Defendant O'Meara was involved in setting limits on Lehman's Repo 105 usage. ER at 915.

383.    Defendant Lowitt received month-end balance sheet targets for each business unit.  Further, Defendant Lowitt was aware that one means available for reaching balance sheet targets was by "sell[ing] down assets" through Lehman's Repo 105 program.

384.    Defendant Lowitt received from communications from other Lehman employees concerning   Lehman's use of Repo 105 as early as August of 2007, when he received an email concerning an attempt to place real estate securities into "the Repo 105 program." ER at 942-44.

385.    Moreover, Martin Kelly raised the same issue with Defendant Lowitt he raised with Defendant Callan.  Defendant Lowitt also ignored Kelly's concerns and did not change Lehman's habit of Repo 105 transactions.  Defendant Lowitt also received the same materials as Defendants Fuld, O'Meara and Callan for the March 28, 2008 Executive Committee meeting, Defendant Lowitt attended that meeting as an *ex officio* member.

386.    Defendant Lowitt was aware of Lehman's use of Repo 105 transactions for "many years" and was aware that Lehman used Repo 105 to "meet balance sheet targets." ER at 915-15.  Defendant Lowitt stated to the Examiner that "Repo 105 transactions used only liquid inventory" and that Defendant O'Meara was involved in setting limits on Lehman's Repo 105 usage. ER at 915.

387.    Defendant Lowitt, knowing of Lehman's true exposure to its non-prime securitizations, always falsely reassured investors that Lehman was in a superior position to weather the mortgage market crises.  For example, on November 14, 2007, Defendant Lowitt boasted that Lehman "had success in [its] hedging and so [it didn't] believe that there will be any requirement for substantial markdowns and certainly no requirement for [it] to announce anything."

388.    Less than a year later and after repeated assurances that Lehman's mortgage related assets were well hedged, Defendant Lowitt finally admitted on September 10, 2008 that there is no direct hedge for Alt-A mortgages, which made up a majority of Lehman's mortgage related assets.

389.    Even in the face of impending disaster, Defendant Lowitt continued to misrepresent Lehman's financial strength.  On September 10, 2008, Defendant Lowitt reported that Lehman's liquidity position remained strong and that Lehman would have ample cash to sustain its business opportunities.  Five days later, Lehman filed for bankruptcy.

6.    **DEFENDANT E&Y**

390.    As discussed *supra*, E&Y was fully aware of Lehman's use of Repo 105 solely to obtain balance sheet relief through its long experience with Lehman, its review, approval and vetting of the Repo 105 program from the beginnings of the practice, its auditors concern with the "reputational risk" associated with the Repo 105 program—prior to its receipt of the Netting Grids and the testimony of Matthew Lee.  Nevertheless, E&Y disregarded its auditing duties and did not report the use of Repo 105 to the investing public.  Instead of disclosing Lehman's accounting gimmick to the public, E&Y instead certified it conducted its reviews and audits pursuant to PCAOB's standards and that Lehman's financial reportings were compliant with GAAP.

## V. LOSS CAUSATION

391.    Between April 25, 2006 and September 15, 2008, the price of Lehman securities was artificially inflated as a result of the material misrepresentations and omissions set forth above. The artificial inflation was removed through a series of partial disclosures and the materialization of previously concealed risks.

116

392.   On June 9, 2008, Lehman issued a press release announcing its financial results for its second quarter of 2008, ended May 31, 2008. Despite having previously announced success with its delevering plan, its strong liquidity position, that it had risk management policies in place and that its assets were fairly valued, the press release disclosed that Lehman took $4 billion in mark-to-market write-downs, including $2.4 billion in residential mortgage related holdings, $700 million in commercial positions, and $300 million in real estate held for sale. In addition, the Company announced that it would raise $6 billion through a combined offering of preferred and common shares. On this news, Lehman's shares declined 8.7% and continued to fall an additional 19.44% over the next two days. In addition, rating agencies Fitch and Moody's downgraded Lehman's credit rating. However, the June 9, 2008 announcement only partially revealed the truth, and Lehman continued to misrepresent its financial condition.

393.   On September 8, 2008, Lehman announced that it would release its third quarter 2008 results and key strategic initiatives for the Company on September 18, 2008. Analysts at Bernstein Research and Oppenheimer predicted further write-downs in the third quarter of between $4 and $5 billion. In addition, there were market reports of Lehman's potential sale of assets to raise capital, which market commentators said smacked of desperation and indicated problems with Lehman's liquidity position. As a result of this news, Lehman's shares finished the trading day down 12.7%.

394.   On September 9, 2008, there were market reports that Lehman's attempts to obtain a capital infusion from the Korea Development Bank had failed, leading to concerns that "no one will inject capital" into Lehman. In addition, S&P and Fitch both placed their ratings on Lehman on review for downgrade. S&P specifically cited concerns about Lehman's ability to

raise capital. On this news, Lehman's shares declined 45% from the prior day's price to close at $7.79 per share.

395.   On September 10, 2008, Lehman reported a $3.9 billion loss for the third quarter of 2008, as well as $7 billion in gross write-downs on its residential and commercial real estate holdings, despite having previously announced success with its delevering plan, its strong liquidity position, that it had risk management policies in place and that its assets had been fairly valued. In announcing the results during the conference call, Defendant Lowitt, having replaced Defendant Callan as CFO, also disclosed that "[t]he majority of our write-downs were in Alt-A, driven by increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges." Contrary to defendants' earlier statements, Lowitt admitted that "unfortunately there is no direct hedge for Alt-A assets." In addition, Fitch and Dunn & Bradstreet downgraded Lehman's credit rating. On this news Lehman's shares declined 7% from the prior day's close to $7.25 per share.

396.   On September 15, 2008, Lehman filed for bankruptcy protection because it had "significant liquidity problems." As a result, Lehman's shares declined over 94% on that date.

397.   The disclosures regarding Lehman's massive write-downs and liquidity problems revealed the truth about Lehman's financial condition and represented the materialization of several interrelated, concealed risks from Lehman's disregard for its risk limits and its massive Repo 105 transactions which masked the Company's net leverage and true liquidity issues. As set forth above, as a direct result of Lehman's failure to abide by its risk limits and risk management policies, Lehman acquired tens of billions of dollars of highly risky, illiquid assets that ultimately required enormous write-downs and triggered the liquidity crisis that ended Lehman's existence. During the Relevant Period, in order to conceal the problems with its

balance sheet, and in particular the amount of troubled assets it held, Lehman engaged in tens of billions of dollars worth of Repo 105 transactions in order to temporarily remove assets from its balance sheet solely for reporting purposes. Through these sham transactions, Lehman artificially reduced its net leverage ratio, misrepresented its balance sheet, hid off-balance transactions, fraudulently preserved its credit ratings, and created the appearance that Lehman was more capitalized and liquid than it really was.

398.    The declines in the price of Lehman securities and resulting losses are directly attributable to the disclosure of information and materialization of risks that were previously misrepresented or concealed by the Officer Defendants. Had Plaintiffs known of the material adverse information not disclosed by Lehman and the Officer Defendants or been aware of the truth behind their material misstatements, Plaintiffs would not have purchased Lehman securities at artificially inflated prices.

399.    Additionally, any verbal "Safe harbor" warnings accompanying its oral forward-looking statements ("FLS") were ineffective to shield those statements from liability.

400.    The Officer, Director, EY& and all Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Lehman who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

119

## VI. CAUSES OF ACTION

401. Except as otherwise specifically provided, Plaintiffs hereby incorporate by reference all the proceeding paragraphs into each of the causes of action and requests for relief listed below and herein.

### A. EXCHANGE ACT VIOLATIONS

#### 1. VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT

402. All Plaintiffs bring this cause of action against the Officer Defendants and E&Y for violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

403. As explained above, the Officer Defendants and E&Y are liable for making false and misleading statements, or failing to disclose material adverse facts and acting directly as a participant in a scheme and/or course of business which: (i) deceived the investing public, including Plaintiffs, regarding Lehman, its business, products, and prospects; (ii) artificially inflated the market price of Lehman securities during 2006, 2007, and 2008; and (iii) caused Plaintiffs to purchase Lehman securities at inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Officer Defendants and E&Y took the actions set forth previously in this complaint.

404. Each Officer Defendant's and E&Y's direct participation includes the presentation and/or review of Lehman's false and/or misleading SEC filings, registration statements, prospectuses and/or press releases, and giving false information to securities analysts, money and portfolio managers, and institutional investors in conference calls.

405. Each Officer Defendant and E&Y had a duty to disseminate accurate and truthful information promptly with regard to Lehman's operations, financial condition, and performance so that the market prices of Lehman's securities would be based on truthful, complete and

accurate information. Additionally, the Officer Defendants and E&Y each had a duty to correct any previously issued statements that had become untrue and to disclose any adverse trends known to them that would materially affect Lehman's operating results. The Officer Defendants' and E&Y's duties are required, in part, by the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X 17 and S-K[30] and other SEC regulations.

406. Each Officer Defendant and E&Y, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as pled with specificity in this complaint in the way that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading; or (c) engaged in acts, practices and a course of business which operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Lehman securities.

407. Despite their knowledge of Lehman's false and misleading statements, each Officer Defendant and E&Y failed, throughout 2006, 2007, and 2008 to disclose material adverse facts about the financial condition and business prospects of Lehman, which caused the SEC filings, registration statements, prospectuses, press releases and other public statements issued in 2006, 2007, and 2008 to be materially false and misleading for the reasons particularized previously. Each Officer Defendant and E&Y, directly and indirectly, knowingly engaged and participated in a fraudulent scheme and course of conduct to conceal adverse material information about the business, finances, financial condition, and future business prospects of Lehman.

408. Each of the Officer Defendant's primary liability arises from the fact that: (i) each Officer Defendant was a high-level executive and/or director of Lehman during the years

---

[30] 17 C.F.R. § 210.01 *et. seq.* and 17 C.F.R. 229-10 *et. seq.*, respectively.

2006-2008; (ii) each Officer Defendant, by virtue of his or her responsibilities and activities as a senior executive officer and/or director of Lehman, was privy to, and participated in, the creation, development and reporting of Lehman's internal budgets, plans, projections and/or reports; (iii) each Officer Defendant had familiarity with each other and were advised of and had access to other members of Lehman's management teams, internal reports, and other data and information about Lehman's financial condition and performance at all relevant times; and (iv) each Officer Defendant was aware of Lehman's dissemination of information to the investing public that he/she knew was materially false and misleading or for which he/she recklessly disregarded the truth.

409.   E&Y's primary liability arises from the fact that it had a long standing relationship with Lehman as Lehman's auditor and its access to Lehman's information concerning its financial condition.

410.   Plaintiffs, at the time of the misrepresentations and omissions, were ignorant of the falsity of the statements and believed them to be true.   In reliance upon these misrepresentations, and upon the integrity of the market, the securities offering process, the fidelity, integrity and superior knowledge of the Officer Defendants and E&Y, Plaintiffs, in ignorance of the true condition of Lehman, were induced to and did purchase Lehman securities. Had Plaintiffs known the truth, they would not have bought their securities or would have bought them at a lower price.

## 2.   VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

411.   The Officer Defendants violated Section 20(a) of the Exchange Act and are liable to all Plaintiffs.  Lehman violated Section 10(b) of the Exchange Act by failing to disclose the

122

true nature of Lehman's financial condition as described above.[31]  Each Officer Defendant was, and acted as, a controlling person of Lehman within the meaning of Section 20(a) of the Exchange Act.  Each Officer Defendant had direct involvement in the day-to-day operations of Lehman and with respect to the transactions in question and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Lehman, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Each Officer Defendant was provided with or had unlimited access to copies of Lehman's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

412.    By reason of such wrongful conduct, each Officer Defendant is liable to Plaintiffs pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Lehman securities.

**B.    SECURITIES ACT VIOLATIONS**

1.    **VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT**

413.    For purposes of this cause of action, Plaintiffs expressly disavow reliance on and do not incorporate any allegations that may be interpreted to sound in fraud or any allegations relating to scienter or motive.  This cause of action is based solely on strict liability and negligence.

a.    **CIS'S CLAIMS**

414.    CIS brings this claim against Defendants Fuld, Callan and O'Meara, the Director Defendants, Preferred J Underwriter Defendants and E&Y.

---

[31] Lehman is expressly not named as a defendant in this Complaint.

415.    CIS purchased Lehman Preferred Series J stock pursuant to the 2006 Propsectus and the Prospectus Supplement dated February 5, 2008 all filed with the SEC. Defendant Fuld and the Director Defendants are signatories of the Shelf Registration Statement and were each directors of Lehman at all relevant times. Defendants O'Meara and Callan each signed a Lehman Form 10-K and/or Form 10-Q that was incorporated by reference into the May 30, 2006 Registration Statement and Prospectus. The Preferred J Underwriter Defendants were underwriters, pursuant to Section 11(a)(5) of the Securities Act, of the Preferred J Stock purchased by CIS. E&Y served as Lehman's auditor at all relevant times and issued statements within the Preferred J registration statement and/prospectuses.

416.    Defendants Fuld, Callan and O'Meara, the Director Defendants, Preferred J Underwriter Defendants and E&Y owed CIS the duty to make a reasonable and diligent investigation of the statements contained in the relevant Shelf Registration Statement, including the Prospectus and Supplemental Prospectus, at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

417.    Defendants Fuld, Callan and O'Meara, Director Defendants, Preferred J Underwriter Defendants and E&Y issued and disseminated, caused to be issued and disseminated, participated in the issuance and dissemination of, material misstatements to the investing public contained in the Shelf Registration Statement, Prospectus or Supplemental Prospectus which misrepresented or failed to disclose, the facts set forth previously in this complaint.

418.    The Preferred J Underwriter Defendants acted negligently and are liable to CIS for the securities it bought pursuant to or traceable to the relevant Registration Statement,

Prospectus and/or supplemental prospectuses.   By reason of the conduct alleged herein, Defendants Fuld, Callan and O'Meara, each Director Defendant, Preferred J Underwriter Defendants, and E&Y violated Section 11 of the Securities Act.

419.   Defendants Fuld, Callan and O'Meara, the Director Defendants, Preferred J Underwriter Defendants and E&Y failed to make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the May 30, 2006 Shelf Registration statements (including the financial reports incorporated into that registration statement) were true, were without omissions of material facts and were not misleading.

420.   At the time CIS obtained its shares of Lehman Preferred J stock, CIS had no knowledge of the facts concerning the misstatements or omissions alleged herein.

421.   CIS sustained damages as the value of the securities sold pursuant to or traceable to the relevant Shelf Registration Statement, Prospectus(es), and financial reportings of Lehman has declined substantially due to Defendants Fuld, Callan and O'Meara, the Director Defendants, Preferred J Underwriter Defendants and E&Y's violations of Section 11 of the Securities Act.

422.   By virtue of the foregoing, CIS is entitled to damages under Section 11 from Defendants Fuld, Callan and O'Meara, each of the Director Defendants, the Preferred J Underwriter Defendants and E&Y, jointly and severally.

### b.   ANTEX'S CLAIMS

423.   ANTEX brings this claim against Defendants Fuld and O'Meara, Director Defendants, the ANTEX Underwriter Defendants, and E&Y.

424.   ANTEX purchased Lehman securities pursuant to the 2005 Prospectus and the Series H pricing supplement, as set forth more fully above.  Defendant Fuld and the Director Defendants are signatories of the 2005 Prospectus and were each directors of Lehman at all

relevant times. Defendants O'Meara and Fuld each signed a Lehman Form 10-Q that was incorporated by reference into the 2005 Prospectus. See First quarter 10-Q for 2006, filed April 10, 2006. The ANTEX Underwriter Defendants were underwriters, pursuant to Section 11(a)(5) of the Securities Act, of the securities purchased by ANTEX. E&Y served as Lehman's auditor at all relevant times and issued statements within the the relevant registration statements and/prospectuses.

425.    Defendant Fuld and the Director Defendants were each directors of Lehman at all relevant times. The ANTEX Underwriter Defendants were underwriters, pursuant to Section 11(a)(5) of the Securities Act, of the ANTEX Bond. E&Y served as Lehman's auditor at all relevant times and issued statements within the ANTEX Bond registration statement and/prospectus.

426.    Defendant Fuld, Defendant O'Meara the Director Defendants, ANTEX Underwriter Defendants and E&Y owed to ANTEX the duty to make a reasonable and diligent investigation of the statements contained in the ANTEX Bond Registration Statement, including the Prospectus, at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

427.    Defendant Fuld, Defendant O'Meara, the Director Defendants, ANTEX Underwriter Defendants and E&Y issued and disseminated, caused to be issued and disseminated, participated in the issuance and dissemination of, material misstatements to the investing public contained in the ANTEX Bond Registration Statement and Prospectus, which misrepresented or failed to disclose, the facts set forth above. By reason of the conduct alleged

herein, Defendant Fuld, Defendant O'Meara, each Director Defendant, ANTEX Underwriter Defendants, and E&Y violated Section 11 of the Securities Act.

428.     At the time ANTEX obtained the ANTEX Bond, it had no knowledge of the facts concerning the misstatements or omissions alleged herein.

429.     By virtue of the foregoing, ANTEX is entitled to damages under Section 11 of the Securities Act from Defendant Fuld, Defendant O'Meara, each of the Director Defendants, ANTEX Underwriter Defendants, and E&Y, jointly and severally.

### c.     MOODY FOUNDATION'S CLAIMS

430.     Moody Foundation brings this claim against Defendants Fuld, Callan and O'Meara, the Director Defendants, Moody Foundation Underwriter Defendants and E&Y.

431.     Moody Foundation purchased Lehman securities pursuant to the 2006 Prospectus, and various Prospectus supplements and/or pricing supplements as set forth more fully above. Defendant Fuld and the Director Defendants are signatories of the 2006 Prospecuts and were each directors of Lehman at all relevant times. Defendants O'Meara and Callan each signed a Lehman Forms 10-K and/or Forms 10-Q that was incorporated by reference into the 2006 Prospectus.     See **Table 4**, *supra*. The Moody Foundation Underwriter Defendants were underwriters, pursuant to Section 11(a)(5) of the Securities Act, of the securities purchased by Moody Foundation.     E&Y served as Lehman's auditor at all relevant times and issued statements within the relevant registration statements and/prospectuses.

432.     Defendants Fuld, Callan and O'Meara, the Director Defendants, Moody Foundation Underwriter Defendants and E&Y owed to Moody Foundation the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, including the Prospectus(es) and pricing supplements for the securities purchased by Moody

Foundation, at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

433.   Defendants Fuld, Callan and O'Meara, the Director Defendants, Moody Foundation Underwriter Defendants and E&Y issued and disseminated, caused to be issued and disseminated, participated in the issuance and dissemination of, material misstatements to the investing public contained in the Registration Statement and Prospectus(es) for the securities purchased by Moody Foundation, which misrepresented or failed to disclose, the facts set forth above.

434.   The Moody Foundation Underwriter Defendants acted negligently and are liable to Moody Foundation for the securities it bought pursuant to or traceable to the relevant Registration Statements, Prospectuses and/or pricing supplements.  By reason of the conduct alleged herein, Defendants Fuld, Callan and O'Meara, each Director Defendant, Moody Foundation Underwriter Defendants, and E&Y violated Section 11 of the Securities Act.

435.   Defendants Fuld, Callan and O'Meara, the Director Defendants, Moody Foundation Underwriter Defendants and E&Y failed to make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the May 30, 2006 Shelf Registration statements (including the financial reports incorporated into that registration statement) were true, were without omissions of material facts and were not misleading.

436.   At the time Moody Foundation obtained the Lehman securities, it had no knowledge of the facts concerning the misstatements or omissions alleged herein.

437.   Moody Foundation sustained damages as the value of the securities sold pursuant to or traceable to the relevant Shelf Registration Statement, Prospectus(es), pricing supplements

and financial reportings of Lehman has declined substantially due to Defendants Fuld, Callan and O'Meara, the Director Defendants, Moody Foundation Underwriter Defendants and E&Y's violations of Section 11 of the Securities Act.

438.   By virtue of the foregoing, Moody Foundation is entitled to damages under Section 11 from Defendants Fuld, Callan and O'Meara, each of the Director Defendants, Moody Foundation Underwriter Defendants and E&Y, jointly and severally.

### 2.   VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT

439.   For purposes of this cause of action, Plaintiffs expressly disavow reliance on and do not incorporate any allegations that may be interpreted to sound in fraud or any allegations relating to scienter or motive. This cause of action is based solely on strict liability and negligence.

### a.   CIS'S CLAIMS

440.   This Count is asserted by CIS against Defendant Wachovia pursuant to Section 12(a)(2) of the Securities Act.

441.   Defendant Wachovia offered or sold Lehman Preferred J securities pursuant to the 2006 Prospectus and the February 2008 prospectus supplement (the "CIS Prospectuses"). The CIS Prospectuses contained untrue statements of material fact and omitted other material facts necessary to make the statements not misleading and failed to disclose material facts. Defendant Wachovia sold CIS the Preferred J securities.

442.   Defendant Wachovia was a seller or solicitor within the meaning of the Securities Act because it: (a) transferred title to CIS who purchased the Preferred J securities; and (b) solicited Preferred J securities to CIS motivated, at least in part, by a desire to serve its own financial interests and the financial interests of Lehman, including but not limited to the

commissions on its sales of those securities. Defendant Wachovia used means and instrumentalities of interstate commerce and the United States mail.

443. Defendant Wachovia owed CIS the duty to make a reasonable and diligent investigation of the statements contained in the CIS Prospectuses, to ensure that such statements were true and that there were no omissions of material fact necessary to prevent the statements contained in those offering materials from being misleading. Defendant Wachovia did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in and incorporated by reference into the CIS Prospectuses at the time of the offering in which it participated were true and without omissions of any material facts and were not misleading. Therefore, Defendant Wachovia is liable to CIS.

444. CIS purchased Lehman Preferred J securities in the offering pursuant to the materially untrue and misleading CIS Prospectuses and did not know or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

445. CIS hereby offers to tender those Lehman Preferred J securities it purchased on the offerings and continue to own in return for the full consideration paid, plus interest, for those securities.

446. Based on the conduct alleged in this Complaint, Defendant Wachovia violated Section 12(a)(2) of the Securities Act. CIS, therefore, has the right to rescind and tender its securities to Defendant Wachovia.

b. **ANTEX'S CLAIMS**

447. This Count is asserted by ANTEX against Defendant RBC Capital Markets pursuant to Section 12(a)(2) of the Securities Act.

448.    Defendant RBC Capital Markets offered or sold Lehman Medium Term, Series H notes pursuant to the 2005 Prospectus and the April 2006 pricing supplement (the "ANTEX Prospectuses").   The ANTEX Prospectuses contained untrue statements of material fact and omitted other material facts necessary to make the statements not misleading and failed to disclose material facts. Defendant RBC Capital Markets sold ANTEX the Medium Term, Series J notes.

449.    Defendant RBC Capital Markets was a seller or solicitor within the meaning of the Securities Act because it: (a) transferred title to ANTEX who purchased the Medium Term, Series H notes; and (b) solicited Medium Term, Series H notes to ANTEX motivated, at least in part, by a desire to serve its own financial interests and the financial interests of Lehman, including but not limited to the commissions on its sales of those securities.  Defendant RBC Capital Markets used means and instrumentalities of interstate commerce and the United States mail.

450.    Defendant RBC Capital Markets owed ANTEX the duty to make a reasonable and diligent investigation of the statements contained in the ANTEX Prospectuses, to ensure that such statements were true and that there were no omissions of material fact necessary to prevent the statements contained in those offering materials from being misleading.  Defendant RBC Capital Markets did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in and incorporated by reference into the ANTEX Prospectuses at the time of the offering in which it participated were true and without omissions of any material facts and were not misleading.  Therefore, Defendant RBC Capital Markets is liable to ANTEX.

451.    ANTEX purchased Lehman Medium Term, Series H notes in the offering pursuant to the materially untrue and misleading ANTEX Prospectuses and did not know or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

452.    ANTEX hereby offers to tender those Lehman Medium Term, Series H notes it purchased on the offerings and continue to own in return for the full consideration paid, plus interest, for those securities.

453.    Based on the conduct alleged in this Complaint, Defendant RBC Capital Markets violated Section 12(a)(2) of the Securities Act.  ANTEX, therefore, has the right to rescind and tender its securities to Defendant RBC Capital Markets.

        c.     **MOODY FOUNDATION'S CLAIMS**

454.    This Count is asserted by Moody Foundation against Defendant UBS Investment pursuant to Section 12(a)(2) of the Securities Act.

455.    Defendant UBS Investment offered or sold Lehman Series D Notes (CUSIP 52519FFE6) pursuant to the 2006 Prospectus and the January 31, 2008 pricing supplement (the "Moody Foundation Prospectuses").  The Moody Foundation Prospectuses contained untrue statements of material fact and omitted other material facts necessary to make the statements not misleading and failed to disclose material facts. Defendant UBS Investment sold Moody Foundation the Lehman Series D Notes (CUSIP 52519FFE6).

456.    Defendant UBS Investment was a seller or solicitor within the meaning of the Securities Act because it: (a) transferred title to Moody Foundation who purchased the Lehman Series D Notes (CUSIP 52519FFE6); and (b) solicited Lehman Series D Notes (CUSIP 52519FFE6) to Moody Foundation motivated, at least in part, by a desire to serve its own

financial interests and the financial interests of Lehman, including but not limited to the commissions on its sales of those securities. Defendant UBS Investment used means and instrumentalities of interstate commerce and the United States mail.

457.     Defendant UBS Investment owed Moody Foundation the duty to make a reasonable and diligent investigation of the statements contained in the Moody Foundation Prospectuses, to ensure that such statements were true and that there were no omissions of material fact necessary to prevent the statements contained in those offering materials from being misleading. Defendant UBS Investment did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in and incorporated by reference into the Moody Foundation Prospectuses at the time of the offering in which it participated were true and without omissions of any material facts and were not misleading. Therefore, Defendant UBS Investment is liable to Moody Foundation.

458.     Moody Foundation purchased Lehman Series D Notes (CUSIP 52519FFE6) in the offering pursuant to the materially untrue and misleading Moody Foundation Prospectuses and did not know or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

459.     Moody Foundation hereby offers to tender those Lehman Series D Notes (CUSIP 52519FFE6) it purchased on the offerings and continue to own in return for the full consideration paid, plus interest, for those securities.

460.     Based on the conduct alleged in this Complaint, Defendant UBS Investment violated Section 12(a)(2) of the Securities Act. Moody Foundation, therefore, has the right to rescind and tender its securities to Defendant UBS Investment.

133

### 3.   VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

461.   This Count is asserted by all Plaintiffs against the Officer Defendants for violations of Section 15 of the Securities Act.  For purposes of this cause of action, Plaintiffs expressly disavow reliance on and do not incorporate any allegations that may be interpreted to sound in fraud or any allegations relating to scienter or motive. This cause of action is based solely on strict liability and negligence.

462.   The Officer Defendants acted as controlling persons of Lehman within the meaning of Section 15 of the Securities Act as alleged herein.  Lehman violated Sections 11 and 12(a)(2) of the Securities Act as discussed in this complaint.[32]  By virtue of their high-level positions, stock ownership, management, and/or participation in the operations of Lehman, the Officer Defendants had and exercised the power to influence and control the decision-making of Lehman including the content and dissemination of the Registration Statements, Prospectuses and SEC filings which contained the untrue statements and omissions of material fact described herein. The Officer Defendants, as officers and directors of a publicly owned company had a duty to disseminate accurate and truthful information concerning Lehman's financial condition.

463.   Each of the Officer Defendants was a culpable participant in the violation of Sections 11 and 12(a)(2) of the Securities Act by virtue of having influenced and controlled the decision making of Lehman, including the content and dissemination of the relevant Registration Statements and Prospectuses which contained untrue statements and omissions of material fact described herein.

464.   As a direct and proximate cause of the conduct of the Officer Defendants Plaintiffs suffered damages in connection with their purchase of Lehman Securities.

---

[32] Lehman is expressly not named as a defendant in this complaint.

134

C.     VIOLATIONS OF § 27.01 OF THE TEXAS BUSINESS AND COMMERCE CODE

465.    This count is brought by CIS against all Officer Defendants and E&Y for violations of Section 27.01 of the Texas Business & Commerce Code.

466.    The Officer Defendants and E&Y made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false concerning the Preferred J stock purchased by CIS.

467.    The misrepresentations were intended to and did deceive CIS about the true financial condition of Lehman; (ii) artificially inflated and maintained the price of the Preferred J stock; (iii) caused CIS to purchase the Preferred J securities at artificially inflated prices; and (iv) deprived CIS of the expected return on its investment.

468.    The CIS Prospectuses that described the Preferred J securities was materially false and misleading because they failed to disclose the information detailed in this complaint, above. The Officer Defendants and E&Y made the foregoing misrepresentations and/or omissions with the intent to induce purchasers of the Preferred J securities.

469.    CIS reasonably and justifiably relied on the misrepresentations in deciding to purchase Preferred J securities.

470.    As a direct and proximate result of the Officer Defendants' and E&Y's wrongful conduct, CIS incurred substantial monetary damages.

135

D.    VIOLATIONS OF THE TEXAS SECURITIES ACT

    1.    PRIMARY VIOLATIONS OF THE TEXAS SECURITIES ACT

        a.    CIS'S CLAIMS

471.    This Count is asserted by CIS against Defendant Wachovia for violations of Article 581, Section 33A. Defendant Wachovia offered and sold Preferred J stock to investors including CIS. In doing so, Defendant Wachovia made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading and false as described above. The CIS Prospectuses materially misrepresented the risks associated with investing in the Lehman. Had Defendant Wachovia conducted a proper and adequate due diligence investigation, however, it would have realized the material misrepresentations contained in the CIS Prospectuses.

472.    Defendant Wachovia's misrepresentations (i) artificially inflated and maintained the price of the securities; (ii) caused CIS to purchase the securities at artificially inflated prices; and (iii) deprived CIS of the expected return on its investment.

473.    As a direct and proximate result of Defendant Wachovia's conduct, CIS incurred substantial monetary damages.

        b.    ANTEX'S CLAIMS

474.    This Count is asserted by ANTEX against Defendant RBC Capital Markets for violations of Article 581, Section 33A. Defendant RBC Capital Markets offered and sold Medium Term, Series H notes to investors including ANTEX. In doing so, Defendant RBC Capital Markets made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not

misleading and false as described above. The ANTEX Prospectuses materially misrepresented the risks associated with investing in the Lehman. Had Defendant RBC Capital Markets conducted a proper and adequate due diligence investigation, however, it would have realized the material misrepresentations contained in the ANTEX Prospectuses.

475. Defendant RBC Capital Markets' misrepresentations (i) artificially inflated and maintained the price of the securities; (ii) caused ANTEX to purchase the securities at artificially inflated prices; and (iii) deprived ANTEX of the expected return on its investment.

476. As a direct and proximate result of Defendant RBC Capital Markets' conduct, ANTEX incurred substantial monetary damages.

        c.     **MOODY FOUNDATION'S CLAIMS**

477. This Count is asserted by Moody Foundation against Defendant UBS Investment for violations of Article 581, Section 33A. Defendant UBS Investment offered and sold Lehman Series D Notes (CUSIP 52519FFE6) to investors including Moody Foundation. In doing so, Defendant UBS Investment made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading and false as described above. The Moody Foundation Prospectuses materially misrepresented the risks associated with investing in the Lehman. Had Defendant UBS Investment conducted a proper and adequate due diligence investigation, however, it would have realized the material misrepresentations contained in the Moody Foundation Prospectuses.

478. Defendant UBS Investment's misrepresentations (i) artificially inflated and maintained the price of the securities; (ii) caused Moody Foundation to purchase the securities at artificially inflated prices; and (iii) deprived Moody Foundation of the expected return on its investment.

137

479.    As a direct and proximate result of Defendant UBS Investment's conduct, Moody Foundation incurred substantial monetary damages.

2.    AIDING & ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT

a.    CIS'S CLAIMS

480.    This Count is asserted by CIS against the Officer Defendants and E&Y. The Officer Defendants and E&Y violated the Texas Securities Act by aiding and abetting Defendant Wachovia in its sale of Preferred J stock by virtue of false and misleading statements of material fact.

481.    With general awareness of its role in the misrepresentations of the CIS Prospectuses, the Officer Defendants and E&Y directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth for the law, materially aided Defendant Wachovia in making untrue statements of material fact and omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

482.    The Officer Defendants and E&Y knew or acted with reckless disregard for the truth in not knowing, that Defendant Wachovia's representations contained in the CIS Prospectuses were false and untrue.

483.    The Officer Defendants approved and filed the CIS Prospectuses. E&Y acted as Lehman's auditor and included statements in the CIS Prospectuses. Thus the Officer Defendants and E&Y had knowledge regarding the status of Lehman's financial condition but failed to correct Defendant Wachovia's statement to investors prior to the purchase of the Preferred J by CIS from Defendant Wachovia.

484.     Defendant Wachovia, with material assistance from the Officer Defendants and E&Y made or omitted to make statements with reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of Preferred J stock.

485.     The CIS Prospectuses materially misrepresented the risks associated with investing in the Lehman.

486.     The Officer Defendants and E&Y's representations were false at the time they were made and the Officer Defendants and E&Y knew the representations were false or acted with reckless disregard for the truth in not knowing that its statements were false.

487.     CIS would not have purchased the Preferred J securities if the true financial health of Lehman had been accurately stated in the CIS Prospectuses.

488.     As a direct and proximate result of the Officer Defendants and E&Y aiding and abetting Wachovia's misrepresentations, CIS has suffered damages.

        **b.**     **ANTEX'S CLAIMS**

489.     This Count is asserted by ANTEX against the Officer Defendants and E&Y.  The Officer Defendants and E&Y violated the Texas Securities Act by aiding and abetting Defendant RBC Capital Markets in its sale of Lehman Medium Term, Series H notes by virtue of false and misleading statements of material fact.

490.     With general awareness of its role in the misrepresentations of the ANTEX Prospectuses, the Officer Defendants and E&Y directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth for the law, materially aided Defendant RBC Capital Markets in making untrue statements of material fact and omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

491.   The Officer Defendants and E&Y knew or acted with reckless disregard for the truth in not knowing, that Defendant RBC Capital Markets' representations contained in the ANTEX Prospectuses were false and untrue.

492.   The Officer Defendants approved and filed the ANTEX Prospectuses. E&Y acted as Lehman's auditor and included statements in the ANTEX Prospectuses. The Officer Defendants and E&Y had knowledge regarding the status of Lehman's financial condition but failed to correct Defendant RBC Capital Markets' statement to investors prior to the purchase of the Lehman Medium Term, Series H notes by ANTEX from Defendant RBC Capital Markets.

493.   Defendant RBC Capital Markets, with material assistance from the Officer Defendants and E&Y made or omitted to make statements with reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale Lehman Medium Term, Series H.

494.   The ANTEX Prospectuses materially misrepresented the risks associated with investing in the Lehman.

495.   The Officer Defendants and E&Y's representations were false at the time they were made and the Officer Defendants and E&Y knew the representations were false or acted with reckless disregard for the truth in not knowing that its statements were false.

496.   ANTEX would not have purchased the Lehman Medium Term, Series H notes if the true financial health of Lehman had been accurately stated in the ANTEX Prospectuses.

497.   As a direct and proximate result of the Officer Defendants and E&Y aiding and abetting Defendant RBC Capital Markets' misrepresentations, ANTEX has suffered damages.

c.    MOODY FOUNDATION'S CLAIMS

498.    This Count is asserted by Moody Foundation against the Officer Defendants and E&Y for violations of Article 581, Section 33F.

499.    Both Lehman and Defendant UBS Investment violated the Texas Securities Act by selling and/or issuing the securities purchased by Moody Foundation, including the 2006 Prospectus, all supplemental prospectuses and all pricing supplements, at issue in this complaint (the "Moody Foundation Securities") by virtue of false and misleading statements of material fact.[33]

500.    With general awareness of its role in the misrepresentations of the Moody Foundation Securities at issue in this matter, the Officer Defendants and E&Y directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth for the law, materially aided and substantially assisted Lehman and UBS Investment in making untrue statements of material fact and omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false concerning the Moody Foundation Securities.

501.    The Officer Defendants and E&Y knew or acted with reckless disregard for the truth in not knowing, that Lehman's and UBS Investment's representations regarding the risks of the Moody Foundation Securities were false.

502.    The Officer Defendants and E&Y approved and filed the Moody Foundation Securities.  The Officer Defendants and E&Y had knowledge regarding the status of Lehman's financial condition but failed to correct financial statements prior to Moody Foundation's purchase of Lehman securities.

---

[33] UBS Investment was a primary violator of the Texas Securities Act with respect to Lehman Series D Notes (CUSIP 52519FFE6) only.  Moody Foundation  brings this cause of action against UBS Investment in relation to that security.

503. Lehman and UBS Investment, with material assistance from the Officer Defendants and E&Y, made or omitted to make statements with reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the Moody Foundation Securities.

504. The Moody Foundation Securities materially misrepresented the risks associated with investing in the Lehman.

505. The Officer Defendants' and E&Y's representations were false at the time they were made and the Officer Defendants and E&Y knew the representations were false or acted with reckless disregard for the truth in not knowing that its statements were false.

506. Moody Foundation would not have purchased the Moody Foundation Securities if the true financial health of Lehman had been accurately stated.

507. As a direct and proximate result of the Officer Defendants and E&Y aiding and abetting Lehman's and UBS Investment's misrepresentations, Moody Foundation has suffered damages.

3.     CONTROL PERSON LIABILITY

508. This Count is asserted by the Moody Foundation against the Officer Defendants for violations of Article 581, Section 33F.

509. Lehman is an issuer of securities purchased by Moody Foundation. Lehman violated the Texas Securities Act by selling and/or issuing the securities purchased by Moody Foundation, including the 2006 Prospectus, all supplemental prospectuses and all pricing supplements, at issue in this complaint (the "Moody Foundation Securities") by virtue of false and misleading statements of material fact. The Officer Defendants exercised active control over the day-today affairs of Lehman and had the power to influence or control the transactions

142

described above that gave rise to violations of the Texas Securities Act alleged above. As such, the Officer Defendants are controlling persons of Lehman and are jointly and severally liable to the Moody Foundation.

510.    As a direct and proximate result of the Officer Defendants acts, Moody Foundation has suffered damages.

### E.    COMMON LAW FRAUD

511.    All Plaintiffs bring this cause of action against each Officer Defendant and E&Y.

512.    As fully described above, each Officer Defendant and E&Y made false and misleading statements and/or material omissions of fact to Plaintiffs in connection with their purchase of Lehman securities.

513.    Each Officer Defendant and E&Y knew the representations were false at the time they were made.

514.    Such statements of fact were material to Plaintiffs in their decision to purchase the Lehman Securities.

515.    Plaintiffs reasonably relied upon the Officer Defendants' and E&Y's materially false and misleading misrepresentations and/or material omissions of fact.

516.    Each Officer Defendant and E&Y intended that Plaintiffs would act on their misrepresentations and purchase Lehman securities.

517.    Plaintiffs were damaged as a result of each Officer Defendant's and E&Y's materially false and misleading statements and/or material omissions of fact.

### F.    CONSPIRACY

518.    All Plaintiffs bring this cause of action against each Officer Defendant and E&Y.

519.    Each Officer Defendant and E&Y was a member of a combination.

143

520.    The object of the combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means.

521.    Each Officer Defendant and E&Y had a meeting of the minds concerning the object of the combination.

522.    One of the Officer Defendants and/or E&Y committed an unlawful, overt act to further the object of the combination.

523.    Plaintiffs were damaged as a result of the actions of the combination and/or its members.

G.    NEGLIGENT MISREPRESENTATION

1.    CIS'S CLAIMS

524.    CIS brings this cause of action against the Officer Defendants, Director Defendants, E&Y and Defendant Wachovia.

525.    The Officer Defendants, Director Defendants, E&Y and Defendant Wachovia owed CIS the duty to ensure any such statements they made were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

526.    As detailed above, Officer Defendants, Director Defendants, E&Y and Defendant Wachovia breached their duty to CIS by making false and misleading statements and/or material omissions of fact to CIS in connection with its purchase of Lehman Securities.

527.    The Officer Defendants, Director Defendants, E&Y and Defendant Wachovia made such misrepresentations in the CIS Prospectuses pursuant to which CIS purchased its Lehman securities.

144

528.   The Officer Defendants, Director Defendants, E&Y and Defendant Wachovia had pecuniary interests in Lehman securities.

529.   Officer Defendants, Director Defendants, E&Y and Defendant Wachovia misrepresentations of fact were made to CIS with the intent that it would rely on them.

530.   CIS reasonably and justifiably relied upon the Officer Defendants, Director Defendants, E&Y and Defendant Wachovia's materially false and misleading misrepresentations and/or material omissions of fact.

531.   The Officer Defendants, Director Defendants, E&Y and Defendant Wachovia knew, or in the exercise of reasonable care should have known, that their representations were false.

532.   CIS was damaged as a result of the Officer Defendants, Director Defendants, E&Y and Defendant Wachovia's materially false and misleading statements and/or material omissions of fact.

533.   CIS was in the limited class of persons the Officer Defendants, Director Defendants, E&Y and Defendant Wachovia knew would rely on their representations.

2.   **ANTEX'S CLAIMS**

534.   ANTEX brings this cause of action against the Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets.

535.   The Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets owed ANTEX the duty to ensure any such statements they made were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

145

536. As detailed above, Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets breached their duty to ANTEX by making false and misleading statements and/or material omissions of fact to ANTEX in connection with its purchase of Lehman Securities.

537. The Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets made such misrepresentations in the ANTEX Prospectuses pursuant to which ANTEX purchased its Lehman securities.

538. The Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets had pecuniary interests in Lehman securities.

539. Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets' misrepresentations of fact were made to ANTEX with the intent that it would rely on them.

540. ANTEX reasonably and justifiably relied upon the Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets' materially false and misleading misrepresentations and/or material omissions of fact.

541. The Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets knew, or in the exercise of reasonable care should have known, that their representations were false.

542. ANTEX was damaged as a result of the Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets' materially false and misleading statements and/or material omissions of fact.

543. ANTEX was in the limited class of persons the Officer Defendants, Director Defendants, E&Y and Defendant RBC Capital Markets knew would rely on their representations.

### 3. MOODY FOUNDATION'S CLAIMS

544. Moody Foundation brings this cause of action against the Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment.

545. The Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment owed Moody Foundation the duty to ensure any such statements they made were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

546. As detailed above, Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment breached their duty to Moody Foundation by making false and misleading statements and/or material omissions of fact to Moody Foundation in connection with its purchase of Lehman Securities.

547. The Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment made such misrepresentations in the Prospectuses, supplemental prospectuses and pricing supplements, including all SEC filings incorporated therein, pursuant to which Moody Foundation purchased its Lehman securities.

548. The Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment had pecuniary interests in Lehman securities.

549. Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment's misrepresentations of fact were made to Moody Foundation with the intent that it would rely on them.

147

550.     Moody Foundation reasonably and justifiably relied upon the Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment's materially false and misleading misrepresentations and/or material omissions of fact.

551.     The Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment knew, or in the exercise of reasonable care should have known, that their representations were false.

552.     Moody Foundation was damaged as a result of the Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment's materially false and misleading statements and/or material omissions of fact.

553.     Moody Foundation was in the limited class of persons the Officer Defendants, Director Defendants, E&Y and Defendant UBS Investment knew would rely on their representations.

## VII.  PRAYER

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Defendants as follows:

a.     Actual damages, including all direct, consequential, and special damages;

b.     All equitable relief to which they may be entitled;

c.     Pre-judgment interest as provided by law;

d.     Punitive damages as provided by statutory and common law;

e.     Attorneys' fees and legal expenses (including expert fees);

f.     Post-judgment interest; and

g.     Costs of Court.

Plaintiffs further pray for general relief and such other and further monetary or equitable relief to which they may be entitled.  Plaintiffs respectfully demand a trial by jury.

Respectfully submitted,

By:/s/ Andrew J. Frisch                              .
**The Law Office of Andrew J. Frisch**
**Andrew J. Frisch**
950 Third Avenue, 15th Floor
New York, New York 10022
(212) 784-2413
(212) 888-0919 Facsimile
afrisch@andrewfrisch.com

**GREER, HERZ & ADAMS, L.L.P.**
**Andrew J. Mytelka**
**Attorney-in-Charge**
S.D. Texas Federal  I.D. No. 11084
State Bar No. 14767700
**Janet L. Rushing**
State Bar No. 17403100
S.D. Texas Federal I.D. No. 11570
**Roni S. Mihaly**
State Bar No. 24027899
S.D. Texas Federal I.D. No. 29994
**Eric J. Kirkpatrick**
State Bar No. 24031215
S.D. Texas Federal I.D. No. 500364
One Moody Plaza, 18th Floor
Galveston, Texas  77550
(409) 797-3200 (Telephone)
(409) 766-6424 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**

149

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS SECURITIES
ANDERISA LITIGATION

This Document Applies Only to:

American National Insurance Company
et al. v. Richard S. Fuld, Jr., et al.,
No. 1:09-cv-02363-LAK

Civil Action 09 MD 2017 (LAK)
ECF CASE

JURY TRIAL DEMANDED

### Certificate of Service of Second Amended Complaint

I hereby certify that on October 7, 2011, a copy of the foregoing Second Amended Complaint was served upon the counsel identified below via first class mail.  Additionally, all counsel who are registered with the Court's Electronic Filing System (ECF) in this matter may access this filing, and will be sent notice of the filing through the ECF system.

/s/ Eric J. Kirkpatrick                .

Eric Milo Albert
Paul C. Curin
Simpson Thacher & Bartlett, LLP (NY)
425 Lexington Avenue
New York, New York 10017

Andrew Rhys Davies
Todd Steven Fishman
Allen & Overy, LLP
1221 Avenue of the Americas
New York, New York 10010

Martin J. Auerbach
Dornbush, Mandelstam & Silverman
747 Third Avenue
New York, New York 10017

Robert J. Cleary
Proskauer Rose LLP (NY)
11 Times Square
New York, New York 10036

Alfred Ulmer Pavlis
Daly & Pavlis, LLC
107 John Street
Southport, Connecticut 06890

Mitchell A. Lowenthal
Cleary Gottlieb Steen & Hamilton, LLP (NYC)
One Liberty Plaza
New York, New York 10006

Michael Andrew Hanin
Mark Paul Ressler
Kasowitz, Benson, Torres & Friedman, LLP (NYC)
1501 Broadway, 12th Floor
New York, New York 10036

Michael Patrick Daly
Mayer Brown, LLP
1909 K Street, N.W.
8th Floor, Suite 804
Washington, D.C. 20006

Steven O. Kramer
Sheppard, Mullen, Richter & Hampton LLP
333 South Hope Street, 48th Floor
Los Angeles, California 90071

Kevin Michael McDonough
Lathan & Watkins LLP (NY)
885 Third Avenue
New York, New York 10022

Adam Jay Wasserman
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036